IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SONRAI SYSTEMS, LLC,

Plaintiff,

v.

ANTHONY M. ROMANO, GEOTAB, INC., THE HEIL CO. d/b/a ENVIRONMENTAL SOLUTIONS GROUP and ALLIANCE WIRELESS TECHNOLOGIES, INC.,

Defendants.

Civil Action No. 1:16-cv-3371

**JURY TRIAL DEMANDED**

Honorable Thomas M. Durkin

**DEFENDANT THE HEIL CO'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND DEMAND FOR JURY TRIAL**

## ANSWER

Heil answers Plaintiff Sonrai Systems, LLC's Second Amended Complaint as follows:

**Summary Of Claims[1]**

1. Plaintiff has asserted claims for: (1) tortious interference with contracts and prospective economic advantage against Geotab; (2) violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125, against Geotab; (3) violation of the Illinois Uniform Deceptive Practices Acts against Geotab; (4) breach of contract against Geotab; and (5) breach of fiduciary duty against Romano; (6) breach of contract against Heil; (7) tortious inducement of breach of fiduciary duty against Heil; and (8) unjust enrichment against Heil and AWTI.

**ANSWER:** Heil admits that the Second Amended Complaint purports to assert the listed claims but denies that plaintiff has properly asserted any claim against Heil, denies any liability, and further denies any remaining allegations in ¶ 1.

[1] Sonrai's unnumbered headers throughout the Second Amended Complaint constitute organizational breaks in the document to which no response is required; however, to the extent there are any allegations of factual or legal nature, Heil denies such allegations.

## The Parties

2. Sonrai is an Illinois limited liability company with its principal place of business located at 25W102 Ramm Drive, Naperville, IL 60564; its members are all Illinois residents. Sonrai is an information technology company with extensive experience in the equipment manufacturing, waste collection and management industries.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 2 of the Second Amended Complaint and therefore denies same.

3. Romano is a resident of the state of Pennsylvania with an address at 343 Strathmore Rd., Havertown, Pennsylvania, 19083-3733. Romano was Executive Vice President of Sonrai until he resigned on January 11, 2016.

**ANSWER:** Heil admits that Mr. Romano is a resident of Pennsylvania and admits his address. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 3 of the Second Amended Complaint and therefore denies same.

4. Geotab is a corporation organized under the laws of Ontario, Canada with its principal place of business at 1075 North Service Road West, Unit 21, Oakville, Ontario, L6M2G2, Canada. Geotab provides what it describes as an "open fleet management platform."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 4 of the Second Amended Complaint and therefore denies same.

5. Heil is a Delaware corporation headquartered in Chattanooga, Tennessee.

**ANSWER:** Heil admits that it is a Delaware corporation headquartered in Chattanooga, Tennessee.

6. Heil acquired AWTI, a Texas corporation headquartered in Houston, Texas, in September of 2016. AWTI now calls itself "3rd" Eye, a Dover Company." Sonrai hereafter references AWTI as "3rd Eye."

**ANSWER:** Heil admits it acquired AWTI, a Texas corporation headquartered in Houston, Texas, in September of 2016. AWTI is no longer a separate entity from Heil and the former AWTI is referred to as "3rd Eye, a Dover Company."

**Jurisdiction and Venue**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is an action regarding a dispute between parties of different states (in the case of Defendants Romano, Heil and AWTI) or countries (in the case of Defendant Geotab), and the amount in dispute exceeds $75,000.00. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. Venue is also proper under § 1391(b)(1) for Defendant, Geotab since it is not resident in the United States.

**ANSWER:** Heil admits the Court has subject matter jurisdiction. Heil denies that a substantial part of the events or omissions giving rise to Plaintiff's claims against Heil occurred in this district. Heil denies that venue is proper in this district. Heil denies any remaining allegations in ¶ 7.

8. This Court has personal jurisdiction over Romano. Romano was an employee of Plaintiff since 2006. During the course of his employment, Romano made frequent visits to the State of Illinois in this district to regularly conduct business activities. Romano has committed tortious acts in Illinois and this district. Romano's wrongful conduct arises out of and is related to the business he has transacted and the tortious acts he has committed within this state and district.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 8 of the Second Amended Complaint and therefore denies same.

9. This Court has personal jurisdiction over Geotab. Geotab advertises in Illinois, through among other activities, advertising its company on sanitation equipment. Geotab transacts business with Plaintiff in this district and has committed tortious acts in Illinois in this District. Geotab's wrongful conduct arises out of and is related to the business it has transacted and the tortious acts it has committed within this state and district.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 9 of the Second Amended Complaint and therefore denies same.

10. This Court has personal jurisdiction over Heil and 3rd Eye, both of which regularly advertise and sell products in Illinois and regularly conduct business in Illinois with their parent company, Dover Corp. In addition, specific jurisdiction exists over Heil and 3rd Eye inasmuch as their conduct described below was directed against an Illinois party, resulting in injury in Illinois.

**ANSWER:** Heil denies personal jurisdiction in this district. Heil denies that it has committed any wrongful or tortious acts, admits that its products are advertised and sold in Illinois, and denies any remaining allegations contained in ¶ 10 of the Second Amended Complaint.

**Background**

11. Sonrai's work in the area of Event Validation Systems has been lauded in the waste hauling industry. As reported in Forbes magazine, Sonrai's work made it one of the recipients of the Sustainability Partnership Game Changer Award for "a strategic plan of sustainable partnerships that would modernize waste and recyclables collection for the 21st century."

**ANSWER:** Heil denies that Sonrai's work in Event Validation Systems has been lauded in the waste hauling industry. To the extent that Sonrai has received recognition for its own or purported work, it has received it for RFID systems, which are not at issue in this case. Additionally, Sonrai's recognition in Forbes and its award of Sustainability Partnership Game Changer Award were due to its work with Heil, which was also a recipient of the award.

12. One of Sonrai's products is the "Vector" system. Vector is a comprehensive telematics and vehicle information system for the waste hauling industry. Among other things, Vector enables a waste hauling truck fleet operator to monitor all relevant data from the truck chassis and the waste collection body in near real-time. This gives the fleet operator benefits in, among other areas, transit visibility, work order management, dispatch operations, route optimization and tracking, and inventory asset optimization. Another Sonrai product is its "RFID" (radio frequency identification) unit, which included hardware for sensing data from a waste receptacle.

**ANSWER:** Heil admits that Sonrai has marketed something called "Vector," but denies that Sonrai developed the technology listed in ¶ 12. Vector's "comprehensive telematics and vehicle information system" was designed and developed by Heil engineers using Geotab hardware. Heil also designed and developed that functionality "to monitor all relevant data from the truck chassis and the waste collection body in near real-time." Each

of the purported advantages of the Vector system listed in ¶ 12 comes from the use of Heil developed technology with the Geotab system which was disclosed to Sonrai pursuant to a non-disclosure agreement it engaged with Heil. Heil admits that Sonrai developed a separate RFID product. Heil denies any remaining allegations in ¶ 12.

**Sonrai's Relationship with Geotab**

13. Starting in 2014, Sonrai used a website hosted by Geotab in its Vector and RFID products; Sonrai also used hardware sold by Geotab in that implementation. Sonrai augmented the standard Geotab ECM (Engine Control and Monitoring) device in order to monitor the activity in the waste hauling body of a truck (such as lifts); activity which Geotab's existing devices did not monitor.

**ANSWER:** Heil admits that Sonrai represented and passed off Geotab's website and hardware to Heil as its own products. Heil denies that Sonrai "augmented the standard Geotab ECM (Engine Control and Monitoring) device in order to monitor the activity in the waste hauling body of a truck (such as lifts)." Heil engineers designed and developed the system within a waste hauling truck that provided waste hauling body information to the SAE J1939 bus (J-bus) in a Heil truck. Heil engineers then instructed Sonrai (and eventually Geotab) how to modify the ECM to listen to and interpret Heil developed signal encodings in a Heil truck. Sonrai lacked the technical ability to even modify the ECM and were reliant on Geotab to implement Heil's instructions. Heil alone conceived of using the J bus to monitor body signals. Heil denies any remaining allegations in ¶ 12.

14. At Geotab's request, Sonrai coordinated its activities with Assured Telematics, Inc. ("ATI"), a Geotab partner which had released an application center designed specifically for fleets using the Geotab platform. Geotab described ATI to Sonrai as "our hardware reseller." Under Sonrai's arrangement with Geotab and ATI, for each truck connected to the Geotab platform, Sonrai paid ATI approximately $30 per month, nearly 90% of which ATI remitted to Geotab.

**ANSWER:** Heil admits that Sonrai misrepresented and passed off Geotab and ATI products as its own. Heil lacks information or knowledge sufficient to form a belief as to

the remaining allegations contained in ¶ 14 of the Second Amended Complaint and therefore denies same.

15. Sonrai's relationship with Geotab was different than that of a standard Geotab "reseller," inasmuch as Sonrai was developing applications which were unique to the waste hauling industry, which applications had the prospect of bringing a significant volume of new business to the Geotab platform. In that vein, in January of 2014, Geotab and Sonrai executed a Confidential Information Agreement to govern the evaluation [sic] "a possible business transaction." (Exhibit A). That Agreement protected not only trade secrets, but also "confidential information" of both parties.

**ANSWER:** Heil denies that Sonrai developed anything unique to the waste hauling industry. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 15 of the Second Amended Complaint and therefore denies same.

16. On June 24, 2014 Sonrai also contracted with Geotab for the purchase of a "Premium Server" branded with Sonrai's banner, within which Sonrai built a site specific to its product. The Premium Server also allowed customers to interact with Sonrai's website.

**ANSWER:** Heil admits that Sonrai re-branded Geotab's website as its own. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 16 of the Second Amended Complaint and therefore denies same.

17. In 2014 and 2015, Sonrai developed software for its site on the Geotab platform, which included a dashboard for critical waste hauling data events, login screens, drop down lists for rules and filtering, and the creation of service area maps. Sonrai also created a Sonrai Systems Geotab Application User Guide for customer navigation of the Sonrai portal on the Geotab platform. Sonrai's costs for integrating its software into the Geotab platform were approximately $130,000.

**ANSWER:** Heil denies that Sonrai "developed" the software for its site on the Geotab platform. The "dashboard for critical waste hauling data events, login screens, drop down lists for rules and filtering, and the creation of service area maps" were either already Geotab functionality, were requested by Heil, or were well known performance metrics or utilities for tracking waste hauling vehicles. Heil lacks information or knowledge sufficient

to form a belief as to the remaining allegations contained in ¶ 17 of the Second Amended Complaint and therefore denies same.

18. Sonrai officer Romano worked closely with Geotab and ATI, not only on the Sonrai site development, but also in the pursuit of mutual business opportunities. For example, on June 15, 2015, Romano sent a "Mack Confidential" email to Jon Shapiro, Geotab's Senior Manager of Partner Management, about the shared business opportunity of Mack Truck, stating, "As a partner, we are glad to share this data with you to help your pursuit of Mack as a Geotab platform." Romano went on to explain:

> Jon, I understand and agree with Geotab's normal model of integrating as much as you can with the manufacture and then turning all of your resellers loose on it. In the waste industry, things may be a little different. ***Sonrai had a brand and credibility as a data provider in the waste industry prior to our development with Geotab. The integrated body with the chassis has been a Holy Grail item in the waste business. I think some of Mack's attention to Sonrai is because we were able to get that completed. Sonrai's experience with chassis specifications and waste collections processes allows us to deploy and be much more relevant than any other data provider in the industry.***

(Emphasis added).

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 18 of the Second Amended Complaint and therefore denies same.

19. Sonrai's assistance enabled Geotab to land Mack Truck as a customer for the Geotab platform.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 19 of the Second Amended Complaint and therefore denies same.

20. ATI assured Sonrai that it was working on Sonrai's behalf and that its dealings with Sonrai would remain confidential. For example, in February of 2015, ATI's President, Frank Pellitta, forwarded Romano an email he had sent to Neil Cawse, Geotab's CEO stating, "Please consider these discussions under the ATI/Geotab NDA (we have our own with Sonrai/Heil)." Sonrai has been unable to locate an NDA with ATI; either ATI's President was mistaken, or Romano destroyed or deleted it when he resigned from Sonrai. In any event, ATI unquestionably understood, as further confirmed below, that Sonrai's information relating to its products would remain confidential.

**ANSWER:** Heil admits that Sonrai violated the terms of the Sonrai/Heil NDA by sharing Heil confidential information with Geotab and/or ATI and possibly other entities. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 20 of the Second Amended Complaint and therefore denies same.

21. In June of 2015, ATI President Pellitta wrote Geotab's Manager of Solutions Engineering, Jordan Guter, on Sonrai's behalf to address a concern that "Geotab has done nothing to protect the work that Tony [Romano] has done in regards to his competitors being able to use the data produced with Tony." In response, Geotab (Guter) assured ATI that Sonrai's information would remain confidential: ***"we've ensured not to share this [Sonrai] information with anyone."*** (emphasis added).

**ANSWER:** Heil admits that Sonrai violated the terms of the Sonrai/Heil NDA by sharing Heil confidential information with Geotab and/or ATI and possibly other entities. On information and belief, the "data produced with Tony" was created using Heil confidential information and shared by Sonrai in violation of the Sonrai/Heil NDA. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 21 of the Second Amended Complaint and therefore denies same.

22. By late 2015, ATI realized that Sonrai presented a unique opportunity for the Geotab platform, thus requiring a new arrangement with Geotab. On November 6, 2015, ATI President Pellitta wrote Romano: "Obviously ATI/Sonrai is the only [Geotab] reseller with the technical capabilities to create the custom apps and data feeds required by waste management, so we have to come up with a 'plan b' which I am not yet sure of."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 22 of the Second Amended Complaint and therefore denies same.

23. Geotab also recognized that Sonrai's technology specific to the waste hauling industry merited the negotiation of a direct contract between Geotab and Sonrai. In November of 2015, Geotab began discussions with Romano of how to divide responsibility for sales and support of the Sonrai application on the Geotab platform. On November 18, 2015, Colin Sutherland, Co-Founder of Geotab, wrote Romano about what he titled "Next Steps":

- To avoid issues with Tier ½ support of the Customer, regardless of which partner sold the hardware, Geotab would agree to take the Customer Support call for device support – not Sonrai support.

Draft thinking there is:

- ***Sonrai would become an Application that Sonrai would sell direct to Customer***
- ***Sonrai would support Customer for the Sonrai software***

We want to have a proper draft proposal that will be shared with all Customer stakeholders next week.

(Emphasis added). Due to Romano's ownership play, and subsequent resignation – more fully addressed below – these Geotab proposals never made it into an executed contract.

**ANSWER:** Heil admits that Sonrai violated the terms of the Sonrai/Heil NDA by sharing Heil confidential information with Geotab and/or ATI and possibly other entities. On information and belief, the "Sonrai technology" listed in ¶ 23 was developed by Heil and shared with Geotab without Heil consent. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 23 of the Second Amended Complaint and therefore denies same.

**Sonrai's Relationship with Progressive**

24. In late 2014, Sonrai began negotiations with Progressive Waste Solutions ("Progressive") to place Vector in all of Progressive's approximately 5,000 trucks. As part of that process, Progressive initially arranged with Sonrai to place and test 276 Vector units in five different Progressive sites, and 139 RFID units in four different Progressive sites. The purpose of these placements was to determine whether Progressive would deploy Sonrai's products in all of Progressive's trucks. Sonrai incurred significant installation and testing expenses surrounding these efforts, only a portion of which were reimbursed by Progressive.

**ANSWER:** Heil admits that Sonrai marketed the Vector product to Progressive. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 24 of the Second Amended Complaint and therefore denies same.

25. Progressive successfully promoted and demonstrated what it called the "web based Sonrai GPS system" to land a significant waste hauling contract for the Region of Peel, Ontario, in November of 2015.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 25 of the Second Amended Complaint and therefore denies same.

26. Progressive was quite pleased with the performance of Sonrai's Vector and RFID products. Progressive executive Chuck Palmer, Director of Information Technology- Operations Applications, repeatedly praised the performance of the Sonrai products and voiced his eagerness to place those products in all of Progressive's trucks. For example, in a meeting with Sonrai on October 20, 2015, Palmer declared that Sonrai's product "is a game changer; nobody can touch us." Also, on October 20, 2015, Palmer proposed the following financial terms for the rollout of Sonrai products on all of 4,860 Progressive's trucks for a minimum of three years: (1) the Vector device at a price of $246.70 per truck; (2) additional hardware including cables at $350 per truck; (3) an installation fee of $75 per truck; and (4) a data fee of $45.29 per month per truck. Palmer also proposed specific pricing for add-ons to be provided by Sonrai on an as-needed basis, such as inclinometers for the older trucks in Progressive's fleet, and RFID units. Sonrai agreed to those terms.

**ANSWER:** Heil admits that the "game changer" aspects of the Sonrai Vector were developed by Heil. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 26 of the Second Amended Complaint and therefore denies same.

27. In early January of 2016, Palmer informed Sonrai that Progressive's board of directors had approved the terms of the contract, and that Progressive would be drafting a formal contract for execution.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 27 of the Second Amended Complaint and therefore denies same.

28. Sonrai worked directly with Geotab in troubleshooting the deployment of the Sonrai products for the Region of Peel. For example, on December 16, 2015, Romano contacted Geotab about delays in the receipt of certain of the signals. Romano cautioned, "We will be needing this functionality operating properly when Progressive starts collections in the Region of Peel on Jan. 4."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 28 of the Second Amended Complaint and therefore denies same.

29. Geotab understood that the Peel project was the precursor to a fleet-wide deployment at Progressive. On January 5, 2016, ATI President Pellitta informed Geotab's

Sutherland: "The opportunity with Progressive Waste is very large beyond this one install at Peel, but this install is the benchmark for Progressive to move forward with Geotab."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 29 of the Second Amended Complaint and therefore denies same.

**Sonrai's Relationship with Waste Management**

30. In 2015, Waste Management began working with Sonrai on an integrated data project, one aspect of which was an application designed to compress chassis delivery times, which application would also be accessed through Sonrai's portal on the Geotab platform.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 30 of the Second Amended Complaint and therefore denies same.

31. In that regard on December 7, 2015, Waste Management's Corporate Fleet Director, Marty Tufte, instructed Jordan Guter, Geotab's Manager of Solutions Engineering:

> Please let this email serve as my request for Geotab to provide WM chassis data from all manufacturers and resellers to Sonrai Systems. WM will be working with Sonrai to identify and track procedures in the manufacturing and delivery process with the goal of condensing the delivery time. ***Please consider Sonrai Systems as the data agent for WM for this project.***

(Emphasis added).

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 31 of the Second Amended Complaint and therefore denies same.

32. Geotab Support Engineer Jobin Thayilchira represented on December 14, 2015:

> "***I will make sure Sonrai has access to all vehicle information after the merge.*** I have been working with Marty directly to make sure everything will be set the way he prefers." (Emphasis added).

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 32 of the Second Amended Complaint and therefore denies same.

**Romano Makes a Play for Ownership in Sonrai**

33. Progressive worked closely with Sonrai Vice President Romano in the deployment of the Sonrai products at the various Progressive sites. In late 2015, Romano attempted to leverage his relationships with Progressive and Geotab and Heil (as more fully described below) into an ownership interest in Sonrai. This effort culminated with a January 11, 2016, ultimatum to Sonrai that absent the demanded ownership interest, Romano would resign. When Sonrai did not accede, Romano resigned.

**ANSWER:** Heil admits that Romano resigned from Sonrai, and further admits that at some point, Romano and Sonrai discussed an ownership interest in Sonrai for Romano. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 33 of the Second Amended Complaint and therefore denies same.

**Geotab and Romano Destroy Sonrai's Relationship with Progressive and Perhaps Others**

34. Before and after his resignation, Romano discussed with Geotab and Progressive the possible implementation of a technology platform to mimic Sonrai's technology. After his resignation, Romano continued to access Sonrai's portal on Geotab with new credentials supplied by Geotab. After his resignation, Romano also arranged meetings between Progressive and Geotab to enlist Geotab's support in cutting Sonrai out of the project to deploy Sonrai's products across Progressive's entire fleet.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 34 of the Second Amended Complaint and therefore denies same.

35. During its discussions with Progressive, Geotab discussed Sonrai's existing deployment of products in Progressive trucks, as well as the planned deployment of those products across Progressive's entire fleet. In those discussions, Geotab not only disparaged Sonrai, it also made statements suggesting that Sonrai did not own its products, and that its distribution of such products was unlawful. Among other things, Geotab represented to Progressive that "Sonrai was not an authorized distributor of the software" used in Vector, and "did not have the right to license this software to [Progressive]." Sonrai first learned of these representations in March of 2017.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 35 of the Second Amended Complaint and therefore denies same.

36. During meetings with Progressive, Geotab also gave Progressive administrative access to Sonrai's site, allowing Progressive to view route and other information of Sonrai's

other customers. Geotab gave Progressive such access without Sonrai's authorization. This action was in violation of the Confidential Information Agreement; it also was contrary to the June 11, 2015 assurance of Geotab that "we've ensured not to share this [Sonrai] information with anyone."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 36 of the Second Amended Complaint and therefore denies same.

37. These efforts succeeded. On March 2, 2016, Palmer wrote Sonrai, "Effective March 1st Progressive will be supported by the recommended Geotab supplier and will be moving all of our units over to their support program." Palmer also stated that Progressive had been able to view route and other information of Sonrai's other customers after Geotab gave Progressive administrative access to Sonrai's site.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 37 of the Second Amended Complaint and therefore denies same.

38. Shortly thereafter, Sonrai's planned venture with Waste Management also flamed out, purportedly due to Geotab's inability to provide Sonrai access to requested chassis data. On information and belief, since then, Geotab devices have been deployed on every new truck in Waste Management's fleet.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 38 of the Second Amended Complaint and therefore denies same.

**Heil's Dealings with Sonrai and Romano**

39. Heil is a leading manufacturer of waste hauling vehicles in the United States. Once Heil learned of Sonrai's Vector product, it began efforts to obtain control over that product, either through the acquisition of Sonrai or other means.

**ANSWER:** Heil admits that it is a leading manufacturer of waste hauling collection bodies in the United States. Heil denies that "Vector" is "Sonrai's" to the extent that "Vector" improperly and misleadingly is used by Sonrai to refer to Heil proprietary technology running in cooperation with a Geotab box. Heil denies that it sought control of anything other than its own intellectual property, which Sonrai sought to (and has) used without Heil's permission. Heil denies the remaining allegations of ¶ 39.

40. As one Heil executive internally declared:

> Sonrai Systems provides a unique opportunity for extracting data from a refuse collection vehicle (RCV), and highly evolved analysis and reporting of that data, enabling customers to make better decisions and improve asset utilization. Although a small company, Sonrai is well known and well respected in the industry due to their background as haulers. . . . Sonrai's proprietary framework, imbedded in Vector standard hardware, is a cost-effective (< $500 list price) technology for extracting available data from an RCV, allowing Heil to include as part of its standard offering on every unit.

**ANSWER:** Heil is unable to verify this purported declaration as Sonrai has not provided a source document, and thus denies it. Additionally, to the extent such a statement may have been made, it would only represent an individual's statement based on his/her available information at the time, not a "position paper" by Heil. Heil also states that Sonrai misled Heil into believing that Geotab's technology was Sonrai technology. Accordingly, statements made praising Sonrai's technology are in reality praise for Geotab. Heil would eventually discover that Sonrai was passing off Geotab technology as its own. Heil denies the remaining allegations contained in ¶ 40 of the Second Amended Complaint.

41. As part of its effort to gain control over Vector, on June 24, 2014, Heil entered into a Confidentiality Agreement with Sonrai (Ex. B) for the ostensible purpose of evaluating Sonrai's confidential information "for a possible sale, licensing or other collaborative refuse collection vehicle data collection and reporting. . . ." The Confidentiality Agreement also expressly provided that all communications regarding the potential transaction would go through Sonrai officer Romano.

**ANSWER:** Heil admits that Heil and Sonrai entered into the June 24, 2014 agreement in Exhibit B. Heil also admits that this agreement refers to "a possible transaction involving possible sale, licensing, or other collaborative development agreement . . . with respect to refuse collection vehicle data collection." Heil further admits that the agreement states, "all communications regarding the Potential Transaction, requests for additional information, and discussions or questions regarding procedures, will be submitted or

directed only to . . . in the case of Sonrai, Tony Romano, VP Business Development." Heil denies the remaining allegations of ¶ 41 of the Second Amended Complaint.

42. The Confidentiality Agreement also provided:

> If either party decides that it does not wish to proceed with the Potential Transaction with the other party, the party that so decides will promptly inform the other party of that decision. In that case, each party will promptly deliver to the other party all documents and other physical embodiments of Evaluation Material (and all copies thereof) furnished to it or its Representatives pursuant hereto and provide written certification to the other party that all such documents have been returned. In the event of such a decision or request, all other Evaluation Material prepared by the Receiving Party or its Representatives shall promptly be destroyed, subject to the Receiving Party's right to retain one archive copy thereof for compliance purposes, and upon the request of the Disclosing Party, the Receiving Party will provide written certification thereof to the Disclosing Party. ***Notwithstanding the return or destruction of the Evaluation Material, each party will continue to be bound by its obligations of confidentiality and other obligations hereunder.***
>
> ***   *   ***
>
> all of the Evaluation Material prepared by a Disclosing Party and provided to a Receiving Party shall remain the sole and exclusive property of the Disclosing Party and provided to a Receiving Party shall remain the sole and exclusive property of the Disclosing Party. . . . Further, this letter agreement shall not be construed to limit the Receiving Party's right to independently develop or acquire business ideas, products or technologies similar to or the same as that which is provided by the Disclosing Party; ***provided that the Receiving Party does not use Evaluation Material of the Disclosing Party in the development or acquisition of such ideas, products or technologies.***

(Ex. B at 3, *emphasis added*).

**ANSWER:** Heil admits that the quoted text appears in Exhibit B.

43. The Confidentiality Agreement also prohibited Heil from directly or indirectly soliciting the employment of any Sonrai officer or employee.

> In consideration of the Evaluation Material being furnished to the Receiving Party, the Receiving Party hereby agree that, for a period of two (2) years from the date hereof, neither the Receiving Party nor any of its affiliates and Representatives will directly or indirectly solicit to employ any of the

> officers or employees of the Disclosing Party so long as they are employed by the Disclosing Party, or any other person who was employed by the Disclosing Party during the six (6) month period preceding any such solicitation by the Receiving Party, in each case without obtaining the prior written consent of the Disclosing Party; provided however, the foregoing will not prohibit the parties hereto from making a general solicitation for employment that is not specifically targeted at such employees or the hiring of any such employee as a result of such general solicitation.

(Ex. B at 3-4).

**ANSWER:** Heil admits that the quoted text appears in Exhibit B. Further, the mutual nature of the language in Exhibit B clearly prohibits Sonrai from using any Heil Confidential Information, including but not limited to Heil's J-Bus mappings and programming codes.

**Heil and Romano Demo Vector at WasteExpo 2015; Major Haulers Are Receptive**

44. Sonrai provided Heil with detailed information about its Vector product, including planned launches, upgrades and customer information. Sonrai also gave Heil passwords for access to Sonrai data behind Sonrai's portal on the Geotab platform. Again, under the Confidentiality Agreement, Heil could only use such information "for a possible sale, licensing or other [collaboration]," and not to develop a competing product.

**ANSWER:** Heil denies that "Vector" is "Sonrai's" to the extent that "Vector" improperly and misleadingly is used by Sonrai to refer Heil technology operating in connection with a Geotab box. Heil denies that Sonrai had permission under the Sonrai/Heil NDA to provide Heil confidential technology in the Vector product to anyone other than Heil. Heil denies the remaining allegations contained in ¶ 44 of the Second Amended Complaint.

45. As the result of those disclosures, Heil expressed that it was eager to collaborate with Sonrai on Vector. Among other things, Heil had Sonrai showcase Vector at the Heil booth at WasteExpo in June of 2015, where Vector was implemented in a Heil truck. There, Romano and Heil executive Todd Morrison demonstrated Vector to attendees.

**ANSWER:** Heil admits that it collaborated with Sonrai in developing Sonrai's Vector product and disclosed to Sonrai the Heil technology that enabled Vector to operate. Heil

admits that Heil demonstrated its technology as used with a Geotab box provided by Sonrai at the Waste Expo in 2015. Heil admits that Mr. Romano and Mr. Todd Morrison (who is a key account salesperson and not an officer of Heil or "executive" as posited by Sonrai) demonstrated the Vector system at the Waste Expo using a Heil truck that had been modified using Heil technology to enable the detection of waste collection body events. Without the Heil technology on Heil's trucks and the accompanying Geotab box mappings provided by Heil, the Geotab box provided by Sonrai would be unable to detect any waste collection body events and would not have been worth showcasing to anyone. Heil denies the remaining allegations contained in ¶ 45 of the Second Amended Complaint.

46. Vector was a huge hit at WasteExpo, and Heil reported that Waste Management, Waste Connections, Waste Corp. of America ("WCA"), Republic Services, Inc. ("Republic") and other major waste haulers expressed keen interest. About Waste Connections, Heil's Director of Sales, Frank Kennedy, reported that Waste Connections was:

> Taking Vector back to corporate offices. . . . WCNX has committed money to Drive Cam system but are open to shift if it makes sense. Told WCNX that Vector could be available out of Heil factory with three months free subscription (per Tony [Romano]). ***This is a real and large opportunity.*** Next steps are to leverage all involved to present to cross functional WCNX team (Ops., Fleet, IT) to pitch both Heil Vector integration and Sonrai back office capabilities.

**ANSWER:** Heil is unable to verify this purported statement as Sonrai has not provided a source document, and thus denies it. Heil admits that Heil technology as implemented on a Geotab box provided by Sonrai was well received at Waste Expo in 2015. Heil denies that remaining allegations contained in ¶ 46 of the Second Amended Complaint.

47. Later that month, Sonrai (through Romano) and Heil demonstrated and tested Vector on Waste Management trucks in Oakland, California.

**ANSWER:** Heil denies the allegations contained in ¶ 47 of the Second Amended Complaint.

**Sonrai Rejects Heil's Vague Licensing Proposal**

48. Romano informed Heil that Progressive intended to launch a company-wide implementation of Vector. Heil viewed that development as a huge potential benefit; as one Heil executive put it: "By being first to market, we have the opportunity to establish Sonrai as the standard in our industry for extracting, owning, and analyzing data, but we have to move fast, before competitors get entrenched with alternative solutions." This development lent urgency to Heil's effort to "control" Vector: "Sonrai Systems rapidly moving ahead with their system-***need to influence/control their direction.***" (*emphasis added*)

**ANSWER:** Heil is unable to verify this purported statement as Sonrai has not provided a source document, and thus denies it or the allegation it was made by an "executive" of Heil. Accordingly, Heil denies the allegations contained in ¶ 48 of the Second Amended Complaint.

49. On August 27, 2015, Heil (Patrick Carroll and Geoff Apthorp) met with Sonrai (Chris Flood and his advisor Mickey Flood) to discuss what Sonrai anticipated would be an acquisition offer. Instead of making an acquisition offer, however, Carroll proposed a possible transaction under which Heil would license Sonrai's technology and have a "right of first refusal" to acquire Sonrai before any sale to a third party. During this meeting, however, Heil declined to discuss specific numbers for either licensing or acquisition, stating that it was not prepared to discuss a price.

**ANSWER:** Heil admits that a meeting occurred on August 27, 2015 in which Patrick Carroll, Geoff Apthorp, Chris Flood, and Mickey Flood were in attendance. Heil admits that it provided an offer to Sonrai that included a right of first refusal to protect Heil IP from being sold to a competitor. Heil provided detailed information at that meeting from which Sonrai could easily have calculated a range of possible acquisition values. Heil denies the remaining allegations of ¶ 49 of the Second Amended Complaint.

50. Heil subsequently sent draft documents titled "Joint Marketing and Supply Agreement" and "Right of First Refusal and Option Agreement," neither of which contained economic terms, as Sonrai had specifically requested. Heil made clear that it wanted to pursue an arrangement that would keep Sonrai working exclusively with Heil, without having to actually buy Sonrai.

**ANSWER:** Heil admits that it sent draft documents titled "Joint Marketing and Supply Agreement" and "Right of First Refusal and Option Agreement" to Sonrai. The documents speak for themselves. Heil added as much detail in the proposed draft agreements as was possible in the absence of specific Sonrai responses on Heil's proposed terms (from the MOU draft, the presentation, and or the Orlando meeting discussion). Heil denies the remaining allegations contained in ¶ 50 of the Second Amended Complaint.

**Heil and Romano Implement "Plan B"**

51. By early November of 2015, Heil realized that Sonrai was not biting on the Heil "non-acquisition" strategy. Accordingly, Heil and Romano decided to embark on an alternative path which would give Heil control over Vector. Under this path, Romano – while still a Sonrai officer -- would assist Heil in developing its own product which would mimic Vector. In particular, Romano would work closely with key Heil executives to replicate Vector's data mapping and "Virtual Intelligence Layer" which included the ability to (1) view all truck activity in real time; (2) view a "bread crumb trail" of a truck; (3) detect body signals at individual houses; (4) import zones for geofence mapping; and (5) create reporting on all such activity. Romano and Heil kept this plan and these activities secret from Sonrai. In return, Heil promised Romano a position at Heil in the event that Sonrai rejected his bid for ownership.

**ANSWER:** Heil denies the allegations contained in ¶ 51 of the Second Amended Complaint. Specifically, Heil asserts that the "Virtual Intelligence Layer" abilities set forth in ¶ 51 were either developed by Heil or were standard aspects of the ATI/Geotab website, and denies that any of the "abilities" stated in ¶ 51 were even developed by Sonrai.

52. As part of that plan, Romano and Heil executives repeatedly accessed the Sonrai data residing behind Sonrai's portal on the Geotab platform. Romano also spent several days at Heil offices in early December of 2015 working on the project. Records show that Romano began backing up key information from the hard drive of his Sonrai computer in earnest in December 2015. Sonrai believes that, among other things, such information included actual code for Vector's service verification and its zone importer.

**ANSWER:** Heil admits that Heil executives have accessed information captured from Heil trucks that was stored on the Geotab site used by Sonrai. Heil lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in ¶ 52 of the Second Amended Complaint and therefore denies same.

53. Romano also authored documents for Heil as part of this effort while still an officer of Sonrai. For example, a document which Sonrai has recovered from Romano's company computer showed that "Anthony Romano [of] Sonrai Systems" was the author of the "Heil Dashboard" for a product identical to Vector. (Ex. C).

**ANSWER:** Heil denies that Mr. Romano "authored" any improper documents for Heil. On information and belief, the document "Heil Dashboard" noted in ¶ 53 was authored by Heil and provided to Sonrai under the Sonrai/Heil NDA. Heil denies the remaining allegations contained in ¶ 53 of the Second Amended Complaint.

54. Romano also actively aided Heil in usurping Sonrai business opportunities while he was still a Sonrai officer. For example, in late September of 2015, WCA informed Romano that it wanted to implement Sonrai's Vector in a 19-truck pilot program in Jefferson City Missouri. Romano never informed Sonrai of this development. Instead, Romano secretly arranged for the 19 Heil truck chassis to be outfitted with Vector in November of 2015 and monitored on a separate database which Heil and Romano created on the Geotab platform. Through these actions, Romano greatly increased the likelihood that Heil, and not Sonrai, would land a significant order from WCA for service validation products and services.

**ANSWER:** Heil denies the allegations contained in ¶ 54 of the Second Amended Complaint.

55. Romano's activities – most of which pre-dated his January 11, 2016, resignation from Sonrai – were all directed to enabling Heil to develop and launch its own "Vector" product, in violation of his fiduciary duties to Sonrai. Heil encouraged that conduct by the promise of compensation upon Romano's (likely) resignation.

**ANSWER:** Heil denies the allegations contained in ¶ 55 of the Second Amended Complaint.

56. Immediately following his resignation from Sonrai, Heil employed Romano to continue working on the same project on which he had secretly been working as a Sonrai officer: the replication of Vector functionality for a "new" Heil product. He did so, once again, using the Sonrai tools he had downloaded from the Sonrai computer, and the data and functionality derived from Vector.

**ANSWER:** Heil denies that Mr. Romano was hired as an employee "immediately following his resignation." Heil denies the allegations contained in ¶ 56 of the Second Amended Complaint.

57. As part of that development effort, Romano and Heil employees continued to access Sonrai data residing behind Sonrai's portal on the Geotab platform. Heil employees working with Romano on the project – Anthony Henson, Robert Michener, Eric Munson and Todd Morrison -- beginning in January of 2016 accessed that data a whopping ***2,467 times***. The attached access log (Ex. D) shows that Heil executive Todd Morrison continued to access the Sonrai site in 2017. When asked about this, Heil counsel had no logical explanation for these repeated visits, stating only that Morrison represented to him that "there must be some mistake." There was no "mistake," just intentional misconduct.

**ANSWER:** Heil admits that Heil employees have previously accessed information captured from Heil trucks that was stored on the Geotab site used by Sonrai. Heil denies that Mr. Morrison knowingly accessed the Geotab site used by Sonrai in 2017. Heil denies the remaining allegations contained in ¶ 57 of the Second Amended Complaint.

58. Romano and Heil also needed to prevent the planned launch of Vector across the Progressive fleet, as such a launch would give Sonrai what Heil called a "first to market advantage" over the Vector knock-off which Romano and Heil were feverishly building.

**ANSWER:** Heil denies the allegations contained in ¶ 58 of the Second Amended Complaint.

59. Accordingly, between January 11 and March 2, 2016, Romano directly communicated with Progressive's Chuck Palmer and Geotab to disparage Sonrai and encourage Progressive to back out of the planned contract with Sonrai.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 59 of the Second Amended Complaint and therefore denies same.

60. At Heil's direction, Romano also sought to usurp the Sonrai business opportunities with Waste Connections, Republic, WCA and others; opportunities which had been developed with Sonrai assets.

**ANSWER:** Heil denies the allegations contained in ¶ 60 of the Second Amended Complaint.

61. In September of 2016, Heil acquired AWTI, d/b/a 3rd Eye, a vehicle safety camera company. 3rd Eye was not in the business of monitoring service validation events and had no such capability. After that acquisition, Heil "migrated" its Vector knock-off project – and Romano himself – to 3rd Eye.

**ANSWER:** Heil admits that it acquired Alliance Wireless Technologies Inc. in September 2016. Heil denies that AWTI's was not in the business of monitoring service validation events and had no capability. As early as 2012, AWTI was developing technologies that could monitor events off the J-1939 bus. Heil denies that the existence of a "Vector knock-off project." 3rd-Eye products use technology developed entirely by AWTI in combination with technology developed entirely by Heil. Heil admits that when Mr. Romano was hired by Heil, he was assigned to the work with 3rd Eye. Heil denies the remaining allegations contained in ¶ 61 of the Second Amended Complaint.

62. Heil and Romano thereafter engaged in a "stealth" launch of Heil's Vector product through 3rd Eye without any press release or other fanfare. Indeed, one cannot find the product on 3rd Eye's website. Nor did 3rd Eye advertise that product at the June 2017 WasteExpo in New Orleans.

**ANSWER:** Heil denies the allegations contained in ¶ 62 of the Second Amended Complaint.

63. In July of 2017, Sonrai obtained information about 3rd Eye's service validation event product for the waste industry through a Freedom of Information Act request to the City of Lakeland, Florida. The response to that FOIA request outlined the capabilities of that product and confirmed that Romano's project to replicate Vector was successful. Heil and 3rd Eye are selling that product today to at least Waste Connections and Republic.

**ANSWER:** Heil denies that its 3rd Eye products contain any confidential information from Sonrai. 3rd-Eye products use technology developed entirely by AWTI in combination with technology developed entirely by Heil. Heil denies selling any product designed to replicate Vector. Heil denies the remaining allegations contained in ¶ 63 of the Second Amended Complaint.

**Romano Backs Up Vector Files And Destroys Evidence To Cover His Tracks**

64. When Romano resigned, he did not return Sonrai's laptop and cellphone. Accordingly, on February 6, 2016, Plaintiff wrote Romano demanding return of the laptop and

cellphone. On February 11, 2016, Romano returned the laptop, though it appeared to have been "wiped."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 64 of the Second Amended Complaint and therefore denies same.

65. After reacquiring the laptop and cellphone from Romano, Sonrai hired computer forensic experts to recover the information that had been "wiped." During that process, Sonrai learned that prior to deleting the laptop hard drive, Romano had engaged in a huge effort to back up the hard drive on his separate backup devices, principally in December of 2015 and early February of 2016. In this litigation, Romano has lied about these actions, claiming that he no longer has any documents whatsoever from his tenure at Sonrai.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 65 of the Second Amended Complaint and therefore denies same

66. Recovered information from Romano's laptop included text messages stating:

- "Should I scrub the phone."
- "I'm [f*******] killing myself to clean this machine and get it to the Philly Airport by 9 o'clock. How much does our position lessen if you have it by Friday."
- "I just feel myself in a panic and scrambling to get this done."
- "Landed a whale."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 66 of the Second Amended Complaint and therefore denies same.

67. Romano was anxious to scrub his devices because he did not want Sonrai to see his communications with Heil, Progressive, Geotab and others.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 67 of the Second Amended Complaint and therefore denies same.

## COUNT I
## Tortious Interference with Contractual Relationships and Business Expectancies Against Geotab

68. Plaintiff realleges and incorporates Paragraphs 1 through 67 of this Amended Complaint as though fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-67 of the Second Amended Complaint as though fully set forth herein.

69. Sonrai had contracts and a valid business expectancy with Progressive. The contracts were for the Sonrai products already placed in Progressive trucks, and the expectancy was the planned contract to deploy Sonrai products across Progressive's entire fleet of trucks.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 69 of the Second Amended Complaint and therefore denies same.

70. Geotab knew of those contracts and that business expectancy, yet purposefully and unjustifiably colluded to disrupt them, -- and perhaps the Waste Management expectancy -- by, among other things, falsely suggesting that Sonrai's sale of its products was unlawful, and falsely representing to Progressive that Sonrai was not authorized to distribute the software underlying its products. Geotab also improperly granted Progressive administrative access to Sonrai's site as part of Geotab's effort to disrupt Sonrai's relationship with Progressive.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 70 of the Second Amended Complaint and therefore denies same.

71. Geotab's interference was successful, inasmuch as Progressive backed out of its planned contract to deploy Sonrai's products in Progressive's entire fleet. On March 2, 2016, Progressive wrote Sonrai: "Effective March 1st Progressive will be supported by the recommended Geotab supplier and will be moving all of our units over to their support program." Sonrai has been damaged as a result.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 71 of the Second Amended Complaint and therefore denies same.

**COUNT II**
**Violation of the Lanham Act against Geotab**

72. Plaintiff realleges and incorporates Paragraphs 1 through 71 of this Amended Complaint as though fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-71 of the Second Amended Complaint as though fully set forth herein.

73. Geotab's false representations to Progressive about Sonrai's products caused Progressive to believe that Sonrai lacked ownership rights in its products and the lawful right to distribute those products.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 73 of the Second Amended Complaint and therefore denies same.

74. As a result of such representations, Progressive backed out of its planned contract to deploy Sonrai's products in Progressive's entire fleet.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 74 of the Second Amended Complaint and therefore denies same.

75. Such representations constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125, and Sonrai has been damaged thereby.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 75 of the Second Amended Complaint and therefore denies same.

**COUNT III**
**Violation of Deception Trade Practices Act against Geotab**

76. Plaintiff realleges and incorporates Paragraphs 1 through 75 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-75 of the Second Amended Complaint as if fully set forth herein.

77. Geotab's representations to Progressive about Sonrai and its products violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 77 of the Second Amended Complaint and therefore denies same.

78. Sonrai was injured as the result of that violation.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 78 of the Second Amended Complaint and therefore denies same.

**COUNT IV**
**Breach of Contract against Geotab**

79. Plaintiff realleges and incorporates Paragraphs 1 through 78 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-78 of the Second Amended Complaint as if fully set forth herein.

80. In early 2016, the Confidential Information Agreement between Sonrai and Geotab was still in full force and effect. While Sonrai was already doing business with Geotab, the parties' relationship was continuing to evolve, and the parties were in the process of negotiating a new "possible business transaction"; specifically, an agreement recognizing Sonrai's unique status as a reseller with technology specific to the waste hauling industry.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 80 of the Second Amended Complaint and therefore denies same.

81. Geotab understood that the "possible business transaction" for which it could use Sonrai's confidential information had to be one which would benefit both Sonrai and Geotab and not Geotab alone.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 81 of the Second Amended Complaint and therefore denies same.

82. On June 11, 2015, Geotab reaffirmed its confidentiality obligations with Sonrai, representing, "we've ensured not to share this [Sonrai] information with anyone."

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 82 of the Second Amended Complaint and therefore denies same.

83. Geotab breached its contract with Sonrai by giving Progressive administrative access to Sonrai's site, thus allowing Progressive to view route and other information specific to Sonrai's other customers, which information was Sonrai's confidential information.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 83 of the Second Amended Complaint and therefore denies same.

84. Geotab also breached that contract by using confidential information about Sonrai's relationship with Progressive, including the plan to deploy Sonrai products in Progressive's entire fleet, to otherwise interfere with Sonrai's relationship with Progressive.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 84 of the Second Amended Complaint and therefore denies same.

85. Sonrai was damaged by such breach.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 85 of the Second Amended Complaint and therefore denies same.

**COUNT V**
**Breach of Fiduciary Duty against Romano**

86. Plaintiff realleges and incorporates Paragraphs 1 through 85 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-85 of the Second Amended Complaint as though fully set forth herein.

87. At all relevant times, Romano owed Sonrai a fiduciary duty by virtue of his position as an officer of Sonrai.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 87 of the Second Amended Complaint and therefore denies same.

88. Romano had a duty to act with utmost good faith and loyalty in managing Sonrai and was prohibited from enhancing his own personal interests at the expense of corporate interests.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 88 of the Second Amended Complaint and therefore denies same.

89. Romano's duty of loyalty included the obligation to disavow any corporate opportunity where his private interests conflicted with those of Sonrai. Further, under the corporate opportunity doctrine, Romano could not usurp a business opportunity which was developed through the use of Sonrai assets.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 89 of the Second Amended Complaint and therefore denies same.

90. Romano breached his fiduciary duties by, among other actions: (1) usurping and disrupting Sonrai's business relationship and opportunities with Progressive, and (2) usurping and disrupting Sonrai's business relationship and opportunities with Geotab, and (3) usurping and disrupting Sonrai's business relationships and opportunities with Waste Connections, Waste Corp. of America, Republic and others, and directing such opportunities to Heil and 3rd Eye.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 90 of the Second Amended Complaint and therefore denies same.

91. Romano engaged in these breaches of fiduciary duty with malice.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 91 of the Second Amended Complaint and therefore denies same.

92. Sonrai has been damaged by Romano's breach of fiduciary duties.

**ANSWER:** Heil lacks information or knowledge sufficient to form a belief as to the allegations contained in ¶ 92 of the Second Amended Complaint and therefore denies same.

**COUNT VI**
**Breach of Contract Against Heil**

93. Plaintiff realleges and incorporates Paragraphs 1 through 92 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-92 of the Second Amended Complaint as though fully set forth herein.

94. Heil's above-described conduct, including the misuse of Sonrai's confidential information and the use of Romano on the project to knock-off Vector, constitutes breaches of the Confidentiality Agreement, and Sonrai has been damaged thereby.

**ANSWER:** Heil denies the allegations contained in ¶ 94 of the Second Amended Complaint.

**COUNT VII**
**Tortious Inducement Of A Breach Of Fiduciary Duty Against Heil**

95. Plaintiff realleges and incorporates Paragraphs 1 through 94 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-94 of the Second Amended Complaint as though fully set forth herein.

96. At all relevant times, Heil knew that Romano was a Sonrai officer principally entrusted with the business relationship between Sonrai and Heil. Heil also knew that Romano owed duties and loyalty and good faith to Sonrai, and that he was prohibited from usurping business opportunities which were developed through the use of Sonrai assets.

**ANSWER:** Heil denies the allegations contained in ¶ 96 of the Second Amended Complaint.

97. Heil unlawfully colluded with Romano and induced his breach of fiduciary duties by encouraging him to (1) assist Heil in developing a competing product to Vector; (2) disrupting Sonrai's planned launch of Vector with Progressive; and (3) seeking to divert corporate opportunities to Heil and 3rd Eye which had been developed with Sonrai assets.

**ANSWER:** Heil denies the allegations contained in ¶ 97 of the Second Amended Complaint.

98. Heil knowingly induced and participated in such breach, and it has knowingly accepted the benefits of such breach.

**ANSWER:** Heil denies the allegations contained in ¶ 98 of the Second Amended Complaint.

99. Sonrai has been damaged by such conduct.

**ANSWER:** Heil denies the allegations contained in ¶ 99 of the Second Amended Complaint.

**COUNT VIII**
**Unjust Enrichment Against Heil and 3rd Eye**

100. Plaintiff realleges and incorporates Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:** Heil repeats each and every response to ¶¶ 1-99 of the Second Amended Complaint as though fully set forth herein.

101. Heil and 3rd Eye procured the benefit of their service validation product at Sonrai's expense through the unlawful conduct detailed above.

**ANSWER:** Heil denies the allegations contained in ¶ 101 of the Second Amended Complaint.

102. On these facts, the derivation of Heil's and 3rd Eye's service validation product render it fundamentally unjust for Heil and 3rd Eye to retain the benefits from the sale of that product.

**ANSWER:** Heil denies the allegations contained in ¶ 102 of the Second Amended Complaint.

## RESPONSE TO PRAYER FOR RELIEF

The paragraph containing Sonrai's "Prayer for Relief" and subparagraphs "(1)" through "(8)" of the Second Amended Complaint constitute a prayer for relief to which no response is required; however, to the extent there are any allegations of factual or legal entitlement to the relief requested, Heil denies such allegations. Sonrai is not entitled to judgment or to any relief, requested or otherwise. Heil further states that Sonrai is not entitled to compensatory damages for Count III as a matter of law. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848, 857 (Ill. App. Ct. 2009) ("the [UDTPA] does not permit a party to recover monetary damages").

## DEFENSES

1. Sonrai fails to state a claim against Heil.
2. Sonrai's claims are barred, in whole or in part, by the doctrine of laches and/or waiver.
3. Sonrai's claims are barred, in whole or in part, by the applicable statute of limitations.
4. Sonrai failed to mitigate its alleged damages.
5. Sonrai has suffered no damage due to any action by Heil.
6. Sonrai's claims are barred, in whole or in part, by the doctrine of unclean hands.

7. Sonrai's claims are barred, in whole or in part, by the doctrine of unjust enrichment.
8. Sonrai's claims are barred, in whole or in part, by the doctrine of equitable estoppel.
9. Sonrai's breach of contract claim is barred to the extent Sonrai materially breached the Nondisclosure Agreement prior to any alleged material breach by Heil, thereby excusing any alleged subsequent material breach by Heil.
10. Sonrai's tortious inducement claim is barred because Heil acted in its own legitimate competitive interest.

## COUNTERCLAIMS

For its Counterclaims against Sonrai, The Heil Co. ("Heil") alleges as follows:

### The Parties

1. Heil is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chattanooga, Tennessee. Heil has never registered "Environmental Solutions Group" as a d/b/a. The Heil Co. should be referred to as The Heil Co.

2. On information and belief, Sonrai is an Illinois limited liability company with its principal place of business located at 25W102 Ramm Drive, Naperville, IL 60564. Sonrai alleges that its members are all Illinois residents.

### Jurisdiction And Venue

3. The Court has subject matter jurisdiction over Heil's counterclaims pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332, and 1338. The Court has supplemental jurisdiction over Heil's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as Heil's federal claims.

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391.

5. The Court has personal jurisdiction over Sonrai because Sonrai has a place of business in this district. In addition, Sonrai sued Heil before this Court in the present lawsuit. Sonrai thus consented to the personal jurisdiction of this Court.

**Heil's "Connected Truck"**

6. At least since the 1990s, it has been known in the waste hauling industry that data generated by sensors in refuse collection vehicles could be captured, transmitted and analyzed to improve the efficiency of waste hauling. (*See, e.g.,* U.S. Patent Nos. 4,926,331; 4,979,170; 5,014,206; 5,732,074; 5,835,376; 5,928,291; 6,088,650; 6,108,591; 6,167,333; 6,181,994; 6,292,724; 6,295,492; *see also* U.S. Patent Application Publication No. 2003/0162523.) At least by 2012, Heil understood that technological advancements made vehicular telemetry more feasible, and that such technology could provide a competitive advantage. In 2012, Heil introduced a new controller into its waste collection vehicles. This controller had the built-in ability to detect certain data from the chassis of a Heil Waste Collection vehicle and provide those signals to a SAE J-1939 compliant bus ("J-bus") within the vehicle.

7. While the detection of chassis events had been known for some time and numerous commercial systems existed that could be connected to the J-bus to detect them, Heil envisioned expanding the system to also capture and provide events related to the waste collection body. These waste collection events included actions such as the movement of various parts such as arms, forks, or the tailgate. Heil also envisioned using chassis events to identify certain collection events even in the absence of signals from the body itself. Data regarding these events could then be collected and transmitted to a server for display to a user. Once accessed through an appropriate application, the data can be used to improve the efficiency of both hauling waste and maintaining vehicles. Heil dubbed this technological concept "Connected Truck."

8. Connected Truck is a reality today due to Heil's acquisition of AWTI, now known as 3rd Eye. 3rd Eye sells numerous products for vehicles, including digital cameras. As early as 2012, 3rd Eye began developing telemetric systems that interface with the J-bus to allow monitoring of various vehicle operation parameters including vehicle speed, engine diagnostics, and fuel monitoring; this development further included geofencing, GPS tracking with "bread crumb" functionality, and capturing video of incidents such as accidents and driver infractions. 3rd Eye also developed an app for remotely displaying data pertaining to these parameters. By 2014, AWTI was already advertising systems with these features to customers (see below). Heil and 3rd Eye created Connected Truck by combining 3rd Eye's telemetric and web technology with Heil's technology, specifically, Heil's J-bus mapping and encryption as further described below.

9. AWTI used the advertisement below at least as early as 2014.



**Executive Overview:** 3rd Eye Cam vs. DriveCam



| 3RD EYE CAM | DRIVECAM |
|---|---|
| This system is a monitored behavior modification system which includes coaching tools and website reporting. | This system is dual camera event review with online reporting. |

**3RD EYE CAM**

- Up to 8 camera recording capability
- Up to 128 GB SD card for extending recording
- 30 FPS for full frame HD recording (704 x 480)
- G Force / Speeding event settings can be remotely set and or adjusted over the network
- Software updates sent remotely through network
- Remote SD card for retrieving video – never miss an accident through continuous recording
- Play back recording can be reviewed through individually customized websites
- iPad and iPhone connectivity
- 20 second event clips that are scored for infractions and sent to website for coaching
- Customizable management reports available via website for analysis (driver behavior, risky driver, itemized infraction etc.)
- Video analytics (stop sign, red light, speed sign, lane proximity and facial recognition) will automatically trigger an event
- J Bus interface for accurate speed and engine diagnostic data management reports
- Manual event trigger for clips that will be sent directly to a supervisor's e-mail address for immediate review. (blocked container, over filled container, 911 emergency situations)
- AVL Automatic vehicle tracking for trucks, breadcrumb and GEO fencing.
- Inputs to capture PTO activations
- Video search to find event of interest quickly
- Linux operating system (server grade stability and ongoing support from open source community)
- 3G for video downloading, software updates
- TI processor
- Ruggedized platform that can handle shock, vibration and extended temperature
- Managed service located in Dallas, TX

**DRIVECAM**

- 2 camera recording capability (In/Out of cab)
- 250 MB video storage
- 4 FPS viewing (640 x 368)
- No SD card or extended storage capabilities
- G Shock event recording
- Events categorized as GPS, G-Shock, speed, direction and video data collection
- 12 Second event clips (8 seconds before the incident, 4 seconds after)
- Online reports available for coaching and training
- 90 day storage of video clips via website (optional long term storage for additional costs)
- Clips are only downloaded once per day
- Manual events available for review on customer's website with added fees
- Optional add on for fleet tracking available at an additional cost (real time status, trip history, geofencing, reporting)
- Managed service located overseas
- 3rd party warranty repair service

There is no ECU integration for true engine diagnostics or capturing true speed.

10. Before finding the right partner in 3rd Eye, Heil first dealt with Sonrai regarding its Connected Truck project in 2012. At that time, Sonrai's technology for capturing data during refuse collection consisted of RFID tags on waste collection bins. Sonrai had not previously used the J-bus for event tracking – preferring to use its RFID technology. In particular, on November 18, 2012, various engineers at Heil held a conference call with Chris Flood and Tony Romano from Sonrai. Sonrai proposed using its RFID technology as the backbone of Heil's connected truck project, but Heil was not interested in RFID. Heil was interested in using the J-Bus. During

the call, Sonrai informed Heil their system did not integrate into the J1939 bus, as shown by the 11/27/12 email from John Smith to Chris Flood and others.

11. However, during the November 18, 2012 conference call, Sonrai represented to Heil that it could provide a device that could collect Heil's new proprietary body data and transmit it to a server for display or use. Heil would later learn that Sonrai planned to simply pass off over-the-counter J-bus reading technology from Geotab as their own.

12. Believing Sonrai's claims that it could develop a system to receive J-bus signals for collection events, Heil set to work developing the technology needed to make such a system feasible. As a first step, Heil would need to design and develop an entirely new system for collecting vehicle body signals and integrating them onto the J-bus, which did not include any provision for refuse body signals. This development effort – which is heart of what Sonrai ultimately tries to claim as its Vector system – was developed by Heil engineers over the course of years without help from Sonrai.

13. The SAE J1939 protocol assigns a Suspect Parameter Number ("SPN") to each desired data source, i.e., each finite event that is desirable to track, in a vehicle. Groups of SPNs are combined into packets of data assigned a Parameter Group Number ("PGN"). For example, engine coolant temperature, fuel temperature and engine oil temperature are assigned SPNs which are then grouped together in a data packet assigned a PGN for engine temperature. Heil developed its own unique and proprietary coding for various operations that refuse collection vehicles commonly perform.

14. Heil's engineers eventually succeeded in creating a PGN mapping sequence that was compatible with both its trucks and the J1939 bus standard. Heil considered this list of proprietary, custom PGN mappings was considered to be highly confidential.

15. Heil engineers were also able to develop new propriety techniques for using chassis events, such as braking events or stops, to glean useful information about collection events. For example, these proprietary techniques permitted Heil to distinguish between a traffic stop and waste pickup in interpreting chassis J-bus data.

16. Heil's technological developments in Event collection using the J-Bus were so significant that Heil has multiple pending patent applications covering the groundbreaking technology.

17. Sonrai has filed no patent applications covering the "Vector" product.

**Sonrai Misrepresents Itself to Convince Heil to Share Confidential Information**

18. Sonrai held itself out as an industry leader in waste hauling analytics, including as an innovator in technology related to vehicle telemetrics and back-end data applications. Heil engaged Sonrai as a potential partner for Connected Truck based on these representations. However, over time, it became apparent to Heil that Sonrai was little more than a middleman passing off the technology of a Canadian company, Geotab, as its own.

19. Geotab makes a telemetric device called the Go7, a cellular modem and GPS receiver that is compatible with the J1939 vehicle bus. Geotab's box, which runs on firmware developed by Geotab, can transmit the data read from the J-bus to a remote server where it is accessible through Geotab's website, MyGeotab.com. Lacking its own telemetric solution for Connected Truck, Sonrai co-opted and eventually re-branded Geotab's technology as its "Vector."

20. Sonrai informed Heil that it had reprogrammed and redesigned the Geotab box to be compatible with Heil's J1939 bus. Sonrai also informed Heil that it had designed its own custom website for display of Heil confidential data. Heil eventually discovered that both representations were false.

21. In the meantime, Heil shared valuable confidential information with Sonrai under the Sonrai/Heil NDA. For example, on August 19, 2014, in an email prefaced "Confidential & and protected under mutual NDA," Heil Engineer John Smith sent Sonrai a "complete list of Heil PGNs." The Heil PGN mappings provided to Sonrai were a direct result of hundreds of hours of Heil research and development. Heil chose to provide them to Sonrai under the belief that Sonrai would be able to integrate support of the PGN mappings into its firmware. Heil would eventually discover that Sonrai simply passed Heil's confidential information to Geotab and asked Geotab to update its firmware, in clear violation of the Sonrai/Heil NDA.

22. Indeed, over time, Heil repeatedly saw that Sonrai had misrepresented its technological capabilities, and that Sonrai contributed almost nothing to the "Vector technology." For example, Sonrai misrepresented itself as having the technical capacity to update the firmware on the Geotab device to recognize Heil's PGN codes. Heil ultimately discovered that Sonrai simply asked Geotab to update its firmware to understand Heil's confidential encoding.

23. Sonrai represented that it designed its web portal and software on its own. Sonrai represented to Heil that it had written APIs (Application Programming Interfaces) that were integrated into the Vector system. Yet, in early 2015, Heil Engineer Ricardo Castano discovered that Sonrai's software was virtually identical to the software provided by Geotab and Geotab reseller Assured Telematics (ATI). Heil also discovered that Sonrai had not created any APIs supporting its product.

24. Sonrai represented to Heil that it was entitled to and would be seeking IP protection for its Vector system. Heil eventually discovered that Sonrai had sought no protection for the Vector system. The false assertion by Sonrai that it was seeking IP protection perpetuated Sonrai's false narrative that the Geotab technology was in fact, its own.

25. Sonrai's initial misrepresentations convinced Heil that Sonrai would be an effective partner for Connected Truck. In October 2014, soon after Heil's advancements in Connected Truck made collaboration with Sonrai look promising, Heil began negotiating with Sonrai regarding a possible acquisition. However, by early 2015, Heil started to suspect that Sonrai was passing off Geotab's product as its own. Heil engineer Ricardo Castano emailed fellow Heil Engineer John Smith noting "Now that I have some names I have been doing some research and I found this. ***The software Sonrai is using is almost the same as the Assured Telematics software, just a change in logos and some customizations***. So it could be we could as well get this service from Assured Telematics directly…" Assured Telematics is a Geotab reseller.

26. Eventually, it became impossible for Sonrai to continue its shell game of passing off Geotab's technology as Vector. Soon after, Heil began dealing directly with Geotab personnel for any technical support regarding the Geotab box, as Sonrai did not have sufficient technical knowledge of the Geotab box to support it.

27. The revelation of misrepresentation by Sonrai was particularly egregious because the relationship with Sonrai was built on the understanding that Sonrai was providing Heil with a propriety and custom technology that Sonrai itself had developed. However, rather than developing its own technology to be used in conjunction with Heil's technology, Sonrai had simply been providing confidential Heil information to Geotab and potentially others to include in their technology to create the illusion that Sonrai had its own product.

28. Even though Sonrai had misled Heil about its Vector product, Heil still hoped to be able to salvage the relationship between the companies. Sonrai employee Tony Romano was a knowledgeable marketer in the waste collection space and Heil was willing to continue its some form of relationship with Sonrai to be able to leverage Mr. Romano's marketing talents. However,

as the Sonrai Vector product was based on Heil confidential information, Heil could not permit Sonrai to give Heil confidential information to a competitor. Accordingly, as a condition of continuing the relationship, Heil demanded that Sonrai give Heil a right of first refusal should Sonrai ever be sold. This protection would ensure that Heil's confidential information could not be sold out to a Heil competitor.

29. Sonrai refused this request, and the venture between Heil and Sonrai ended in December of 2015. Sonrai should have returned, deleted, or destroyed all of Heil's confidential information at that point, except for an archive copy which, by agreement, was not to be used for the development or acquisition of ideas, products or technologies.

30. On information and belief, Sonrai did not want to continue its venture with Heil because it wished to use Heil's confidential information to sell products to new customers without Heil's consent.

**Sonrai Seeks to License Heil's IP and is Rebuffed**

31. On information and belief, sometime in the fall of 2015, Mr. Chris Flood or others at Sonrai realized that their Vector product was effectively worthless without Heil's confidential information, including at least its PGN mappings and proprietary J-bus encryption algorithm.

32. Sonrai CEO Chris Flood emailed Heil Vice President Geoff Apthorp, and courtesy copied Heil CEO Patrick Carroll, to request a license for Sonrai to use Heil's confidential J-bus technology:

Tue 12/15/2015 11:02 PM

Chris Flood <chris@sonraisystems.com>

**Re: Sonrai ESG Alliance**

To Geoff Apthorp

Cc Pat Carroll; Keizer Dennis

You replied to this message on 12/16/2015 8:22 AM.

Geoff,

First, I want to apologize for the delayed response. I have been tied up taking care of my mother. She has been hospitalized with a broken back, due to a fall on Friday.

I want to communicate my appreciation to ESG for their understanding and willingness to continue to work with us.

My follow up and response to your open item is that, yes we are very much interested in discussing licensing of the portion ofEGS's j1939 refuse vehicle body communications system, controller software and encryption algorithm to supply agreed signals to our industry wide patented service verification IP platform.

I would like to request a follow up meeting ASAP at your site with Dennis Keizer and myself. I will have Dennis reach out and set the process in motion to create an agenda in advance of our meeting.

33. Heil never agreed to license Sonrai any of its confidential information or technology.

**Sonrai Violates the Sonrai/Heil NDA and Continues to Use Heil's IP**

34. Without Heil's confidential and propriety J-Bus technology, it is highly impractical or impossible to use a Geotab box to understand the meaning of waste collection truck body events without hardwiring to sensors on the truck body. On information and belief, in 2016 and presently, Sonrai lacks the technical expertise and experience required to hardwire sensors to a truck or to wire those sensors to a Geotab box.

35. Sonrai was required by the Sonrai/Heil NDA to return, delete, or destroy Heil's confidential PGN mappings and encryption algorithms. Sonrai did not return, delete, or destroy Heil's confidential PGN mappings and encryption algorithms.

36. Sonrai was required by the Sonrai/Heil NDA to delete or destroy any Geotab boxes that included code having Heil confidential information. On information and belief, Sonrai has not deleted or destroyed any Geotab boxes that included code having Heil confidential information.

37. Sonrai was required by the Sonrai/Heil NDA to delete or destroy confidential truck tracking data that was collected from Heil trucks. Sonrai did not return, delete, or destroy confidential truck tracking data that was collected from Heil trucks.

38. In July 2017, Sonrai provided Heil with a copy of a document that listed Heil's confidential PGN mappings. Per the terms of the Sonrai/Heil NDA, this document should have been returned, destroyed, or deleted at least by early 2016.

39. Sonrai continued to advertise and sell its Vector products at least into 2017 despite the fact that it had no right to sell a product including Heil's confidential information. For example, at Waste Expo 2017, Sonrai employee Dennis Keizer provided an interview in which he publicly stated that: "the newest solution is now with the technology available through your chassis J-bus and now an integrated body with regards to the body signals, you have options to create a menu that would provide accurate data for you from body signals and provide a dataset that you can act against…" Mr. Keizer then goes onto to describe that Sonrai offers "three legs of a stool," of which one is a "smart-truck option that is going to collect data."

40. Sonrai further offered 50 Vector systems for action at Waste Expo 2016. As shown below, Sonrai advertised its Vector system as using "Operational Data from the Collection Body."




41. The Sonrai advertising further showed Vector as being able to collect over a dozen body signals that correspond to PGN mappings provided to Sonrai by Heil. On information and belief, the system advertised for auction at Waste Expo 2016 improperly used confidential Heil

technology and information that should have been deleted or destroyed after the Heil/Sonrai venture ended.

42. Additionally, the Sonrai advertising used Heil waste collection vehicle graphical images without Heil's consent. Heil originated graphical vehicle images are recognizable to individuals in the waste hauling industry and Sonrai's decision to use Heil's images without consent improperly indicated to the industry that Heil was the source of Sonrai's products.

**Sonrai's Improper Use of Heil's Proprietary Data**

43. Heil understood the value of the J1939 mappings and accompanying encryption that it had developed. From the outset, Heil had been wary of disclosing this valuable intellectual property to Sonrai. Accordingly, Heil entered a non-disclosure agreement with Sonrai before disclosing its technology for Connected Truck. Specifically, Heil and Sonrai entered into a non-disclosure agreement on June 24, 2014 that states:

> If either party decides that it does not wish to proceed with the Potential Transaction with the other party, the party that so decides will promptly inform the other party of that decision. In that case, each party will promptly deliver to the other party all documents and other physical embodiments of Evaluation Material (and all copies thereof) furnished to it or its Representatives pursuant hereto and provide written certification to the other party that all such documents have been returned. In the event of such a decision or request, all other Evaluation Material prepared by the Receiving Party or its Representatives shall promptly be destroyed, subject to the Receiving Party's right to retain one archive copy thereof for compliance purposes, and upon the request of the Disclosing Party, the Receiving Party will provide written certification thereof to the Disclosing Party. ***Notwithstanding the return or destruction of the Evaluation Material, each party will continue to be bound by its obligations of confidentiality and other obligations hereunder.***
> ** * **
> all of the Evaluation Material prepared by a Disclosing Party and provided to a Receiving Party shall remain the sole and exclusive property of the Disclosing Party and provided to a Receiving Party shall remain the sole and exclusive property of the Disclosing Party. . . . Further, this letter agreement shall not be construed to limit the

> Receiving Party's right to independently develop or acquire business ideas, products or technologies similar to or the same as that which is provided by the Disclosing Party; ***provided that the Receiving Party does not use Evaluation Material of the Disclosing Party in the development or acquisition of such ideas, products or technologies.***

Exhibit A (emphasis added).

44. The J1939 mappings and encryption technology for Connected Truck fall within the scope of "Evaluation Material" under the non-disclosure agreement:

> The term "Evaluation Material" shall be deemed to include all notes, analyses, compilations, studies, interpretations or other documents, product schematics, specifications or drawings, descriptive materials, manufacturing procedures and specification, **software (source code or object code)**, sales and customer information, market data, business polices or practices, information prepared or owned by the Receiving Party or any of its Representatives which contain, reflect or are based upon, in whole or in part, the information furnished to the Receiving Party or any of its Representatives pursuant hereto.

Exhibit A (emphasis added).

45. Despite the terms of this agreement, upon information and belief, Sonrai continues to exploit the J1939 mappings and encryption technology that Heil developed for Connected Truck.

**COUNT I**
**Breach of Contract**

46. Heil restates the averments of the preceding paragraphs.

47. Sonrai agreed to return or destroy all of the material it received from Heil in relation to Connected Truck upon termination of the relationship between Sonrai and Heil, except for an archive copy. Sonrai further agreed not to use this material for development or acquisition of its products. Upon information and belief, Sonrai has breached this agreement by failing to either return or destroy material from Heil, and by using this material for its own products.

48. Sonrai agreed to not disclose and keep confidential Heil Evaluation Material. Sonrai breached this agreement by disclosing Heil confidential technical information to at least Geotab without Heil's consent.

49. Sonrai's breach of the agreement has damaged Heil in an amount to be proven at trial.

50. These acts caused, and on information and belief, are causing Heil irreparable harm and will continue to harm Heil unless enjoined by the Court.

## COUNT II
## Federal Unfair Competition

51. Heil restates the averments of the preceding paragraphs.

52. Upon information and belief, Sonrai has misused the technology it received from Heil regarding Connected Truck to market a product to compete with Connected Truck.

53. Sonrai's actions are likely to cause confusion or mistake, or to deceive as to the origin, sponsorship, or approval of Heil's and Sonrai's respective goods and services.

54. Sonrai's acts constitute unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

55. Sonrai's unfair competition has damaged Heil in an amount to be proven at trial.

56. Sonrai's actions are willful, deliberate, intentional, and in bad faith, making this an exceptional case pursuant to 15 U.S.C. § 1117.

57. These acts caused, and on information and belief, are causing Heil irreparable harm and will continue to harm Heil unless enjoined by the Court.

## COUNT III
## Deceptive Trade Practices

58. Heil restates the averments of the preceding paragraphs.

59. Sonrai passed off Geotab's products, both hardware and software, as its own "Vector" product.

60. Upon information and belief, Sonrai misused the technology it received from Heil regarding Connected Truck to develop a product that it passes off as including Sonrai's technology.

61. Sonrai's actions are likely to cause confusion or mistake, or to deceive as to the origin, sponsorship, or approval of Heil's and Sonrai's respective goods and services.

62. Sonrai's acts willfully violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

63. Heil was injured as a result of Sonrai's violation.

**COUNT IV**
**Unjust Enrichment**

64. Heil restates the averments of the preceding paragraphs.

65. In the alternative to Heil's Count I, in the event that no enforceable contract rights are found to exist, Heil alleges, upon information and belief, that Sonrai has unjustly retained and exploited the technology it received from Heil regarding Connected Truck.

66. Upon information and belief, Sonrai has benefited from its unjust use of Heil's technology.

67. Sonrai's actions have damaged Heil in an amount to be proven at trial.

68. These acts caused, and on information and belief, are causing Heil irreparable harm and will continue to harm Heil unless enjoined by the Court.

**COUNT V**
**Breach of Common Law Copyright**

69. Heil restates the averments of the preceding paragraphs.

70. Upon information and belief, Sonrai has infringed, and continues to infringe, Heil's common law copyright, by copying, distributing, and/or preparing derivative works using material created by Heil.

71. Sonrai's infringement was and is knowing and willful and continuing.

72. Sonrai's infringement has damaged Heil in an amount to be proven at trial.

73. These acts caused, and on information and belief, are causing Heil irreparable harm and will continue to harm Heil unless enjoined by the Court.

## RELIEF REQUESTED

Heil requests the following relief from this Court:

A. For Sonrai's breach of contract, judgment against Sonrai for compensatory damages, punitive damages and costs of suit;

B. For Sonrai's unfair competition, judgment against Sonrai for monetary damages and attorney fees and costs;

C. For Sonrai's deceptive trade practices, judgement against Sonrai for monetary damages and attorney fees and costs;

D. For Sonrai's unjust enrichment, judgment against Sonrai for monetary damages and attorney fees;

E. For Sonrai's willful infringement of common law copyrights, judgment against Sonrai for monetary damages;

F. Permanently enjoin Sonrai, including its partners, officers, agents, servants, suppliers, customers, employees, attorneys, and all those persons and entities in active concert or participation with them from further exploitation of the intellectual property it derived from Heil.

G. Order Sonrai to account to Heil all profits wrongfully derived by its unlawful conduct.

H. Order Sonrai to file and serve a report in writing, and under oath, setting forth the manner and form in which it has complied with the Court's order and injunction.

I. Order any such other or further relief as the Court may deem just and proper.

**JURY DEMAND**

Heil demands a trial by jury for all issues so triable.

Dated: October 20, 2017

LYNCH THOMPSON LLP

By: /s/ *James L. Thompson*

James L. Thompson (IL 6199621)
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Tel: (312) 346-1600
Fax: (312) 896-5883
jthompson@lynchthompson.com

**COUNSEL FOR THE HEIL CO.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 20, 2017 a true and accurate copy of the foregoing **DEFENDANT THE HEIL CO. ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND DEMAND FOR JURY TRIAL** was filed and served electronically through the Court's CM/ECF system which will send notice of electronic filing to counsel of record.

/s/ *James L. Thompson*
James L. Thompson