## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SONRAI SYSTEMS, LLC,

      Plaintiff,

   v.

ANTHONY M. ROMANO, GEOTAB, INC.
and THE HEIL CO. d/b/a
ENVIRONMENTAL SOLUTIONS GROUP,

      Defendants.

No. 16 CV 3371

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Sonrai alleges that Anthony Romano, Geotab Inc., and The Heil Co. schemed to usurp Sonrai's business. Geotab (R. 586) and Heil (R. 594) move for summary judgment. Romano (R. 592) joins in these motions. The motions for summary judgment are granted in part and denied in part.

### Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir.2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court considers the evidentiary record, views the evidence, and draws all reasonable inferences in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

1

## Background

Geotab is a company that offers data tools for waste collection companies. Specifically, Geotab offers an event validation product called Geotab GO (the "Go Device") which plugs into and collects data from onboard computers in refuse collection vehicles ("RCVs"). R. 615 ¶ 1. The Go Device then transmits the data to Geotab's servers where users access the data through their MyGeotab web portal. *Id.* Waste collection companies rely on event validation products such as the Go Device to monitor their fleets and verify that refuse pick-ups were completed. R. 616 ¶ 7.

Sonrai is another company that offers data tools for waste collection companies. R. 623 ¶ 1. In 2014, Sonrai began development of an event validation product called Vector. R. 614 at 11. In January 2014, Sonrai and Geotab entered a Confidential Information Agreement ("CIA"). R. 587-24. The CIA protected confidential information exchanged between the parties for the purpose of evaluating a "potential business transaction" but provided that it did not "create an agency or partnership" between the parties. *Id.* Based on information exchanged under the CIA, Sonrai presumably learned about the Go Device. *See* R. 614 at 11.

After entering the CIA, Geotab and Sonrai did not directly engage in business transactions. R. 587-1 ¶ 9. Instead, Sonrai began purchasing Go Devices from Geotab-authorized reseller Assured Telematics Inc. ("ATI"). *Id.* ¶ 6. Of note, Geotab only sells Go Devices through authorized resellers. *Id.* Sonrai contends that it ultimately modified and enhanced these Go Devices to create Vector, and that Vector contains features proprietary to Sonrai. R. 623 ¶¶ 4–6. Geotab contends that Vector is merely an unmodified Go Device. R. 615 ¶ 16.

2

In June 2014, after purchasing Go Devices from ATI, Sonrai signed up for MyGeotab Premium, a service that allowed Sonrai to have a custom page on the MyGeotab web portal. R. 623 ¶ 7. As Sonrai worked to modify the Go Devices to create Vector, the Vector devices continued to plug into RCV computers and transmit data to the MyGeotab web portal, specifically to Sonrai's custom page. *Id.* ¶ 5.

Heil is a company that manufactures RCVs. R. 616 ¶ 2. When manufacturing RCVs, Heil installs the Heil-manufactured RCV body onto a chassis (wheelbase) that has been separately manufactured by a third party. *Id.* ¶ 9. In July 2014, Sonrai and Heil entered a Letter Agreement. R. 596-14. The purpose of the Letter Agreement was to facilitate the exchange of confidential information and discussions about a potential business relationship in which Sonrai's Vector would be connected to Heil's RCVs. R. 614 at 12. In a standard RCV, data collection devices (such as the Go Device) collect chassis and location data but not signals from the RCV body. R. 616 ¶ 10. The innovation of Sonrai and Heil was that they would design a "Connected Truck" where Vector would process signals from Heil's RCV body, and then interpret those signals as data to measure movement of the RCV's arms, forks, or tailgate. *Id.* ¶¶ 10–15.

In August 2014, Heil provided Sonrai with a list of body signals ("PGN codes") that the Heil controller on the RCV body was able to capture. R. 616 ¶ 21. Sonrai then wrote custom rules for Vector to interpret the PGN codes. R. 614 at 12. Sonrai and Heil debuted a prototype of Vector and the Connected Truck at the Waste Expo in June 2015. *Id.*

During this time, from July 2014 through mid-2015, Sonrai and Heil shared information and operated under the Letter Agreement as Sonrai developed Vector and Heil developed the Connected Truck. In May 2015, Heil offered to acquire Sonrai, which Sonrai rejected. R. 616 ¶ 32. In August 2015, the parties discussed alternatives to formalize their business relationship, but could not reach an agreement. *Id.* ¶ 33. Heil pushed Sonrai for a response, explaining that Heil needed to know whether it would be working with Sonrai or independently, for continued development of the Connected Truck. *Id.* ¶ 35. In December 2015, Sonrai's CEO Christopher Flood informed Heil that Sonrai was going to remain independent. *Id.*

Around this time, Sonrai's Vice President Anthony Romano left Sonrai. R. 616 ¶ 37. Romano resigned after a disagreement with Flood about whether Romano had been promised an equity stake at Sonrai, and his final day of employment was January 15, 2016. *Id.* There is no dispute that in January 2016, around the time that Romano left Sonrai, he accessed Sonrai data and downloaded unknown Sonrai files to his laptop.[1] R. 626 ¶ 13. Then, within days of leaving Sonrai, Romano formed a consulting company called Optimum Analytics, LLC. R. 616 ¶ 45. On January 22, 2016, Heil entered a consulting agreement with Optimum, under which Optimum would consult for Heil regarding product development. *Id.* ¶ 46. Sonrai contends that Heil induced Romano to leave Sonrai and steal confidential information about Vector on his way out. R. 614 at 41–43.

---

[1] During discovery, Romano was sanctioned for deliberate destruction of evidence, including the destruction, concealment, and wiping of his computer and hard drives after being put on notice of this litigation. R. 626 ¶ 23.

In September 2016, Heil acquired a company called 3rd Eye. R. 616 ¶ 53. In 2017, Heil, acting through 3rd Eye, completed development of an event validation product called Enhance. *Id.* ¶ 55. Romano continued to work with Heil and 3rd Eye to develop Enhance. R. 614 at 17. Sonrai contends that Heil relied on Sonrai's confidential information to create Enhance and that Enhance is a knock-off of Vector. *Id.* Heil contends that Enhance is different than Vector and that Heil did not rely on Sonrai's confidential information to create Enhance. R. 616 ¶ 56.

Progressive is a waste collection company. Starting in October 2015, Sonrai sold Vector units to Progressive for installation in Progressive's RCV fleet in the Region of Peel near Toronto. R. 615 ¶ 14. On January 4, 2016, Progressive and Sonrai's rollout of Vector for the Region of Peel went live. *Id.* ¶ 21. According to Progressive employee Charles Palmer: "We were having system failures. We couldn't get [Vector] to work properly. . . . We weren't getting data as promised and we weren't getting any answers back from Sonrai . . . [and around] January 20th, we completely lost all of the data . . . required for data tracking for the contract." R. 587-9 at 9. Also, according to Palmer, Progressive believed that Vector was at least partially a Geotab product, so Progressive contacted Geotab for support. *Id.* Following communications with Geotab, Palmer emailed Sonrai on March 2, 2016 stating that: "Progressive Waste has taken control of our Geotab site and have currently shut down access to all other users that are not Progressive related" and that going forward, "Progressive will be supported by the recommended Geotab supplier [ATI] and will be moving all of their units over to their support program." R. 587-27. Sonrai contends that Geotab

caused Progressive to transfer business away from Sonrai and thus unlawfully interfered with Sonrai's relationship with Progressive. R. 614 at 20–25.

Waste Management is another waste collection company. In 2015, Waste Management owned a variety of Geotab products that it had acquired through different Geotab-authorized resellers, and which reported to different Geotab databases. R. 615 ¶ 30. In December 2015, Waste Management began a project to organize and consolidate its data and planned to work with Sonrai as its "data agent." *Id*. ¶ 31. To this end, Waste Management requested that Geotab provide Sonrai with access to all its Geotab data. *Id*. In January 2016, Geotab notified Waste Management that it had completed the request and Geotab provided Sonrai with access to the merged database. *Id*. ¶ 32. Sonrai contends that Geotab provided Romano with access to the Waste Management data page and thus unlawfully interfered with Sonrai's relationship with Waste Management. R. 614 at 25–26.

In March 2016, Sonrai filed this lawsuit against Romano, Geotab, and Heil. R. 1. Geotab moved for summary judgment. R. 586. Heil moved for summary judgment. R. 594. And Romano joins in these motions. R. 592.

## Analysis

### I. Geotab's Motion for Summary Judgment

In its Second Amended Complaint, Sonrai brought four counts against Geotab. R. 119. Counts II and III were dismissed, leaving Count I (tortious interference) and Count IV (breach of the CIA). R. 560. Geotab moves for summary judgment on both remaining counts. R. 586. For the reasons stated below, Geotab's motion is granted in full. Geotab is thus dismissed from the case.

### A. Tortious Interference by Geotab

Sonrai argues that Geotab tortiously interfered with contract and business expectancies as to Sonrai's relationships with Progressive and Waste Management. R. 614 at 19–20. To establish a claim for tortious interference with contract, a plaintiff must show: (1) a valid and enforceable contract; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) a breach caused by defendant's conduct; and (5) resultant damages. *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004). To establish a claim for tortious interference with business expectancies, a plaintiff must show: (1) plaintiff's reasonable expectation of entering a valid business relationship; (2) defendant's knowledge of plaintiff's expectancy; (3) purposeful interference by defendant that prevents plaintiff's legitimate expectancy from being fulfilled; and (4) resultant damages. *Id.*

### 1. Progressive

As discussed above, Progressive employee Charles Palmer testified that Sonrai did not provide sufficient support to Progressive during the Region of Peel launch, that Progressive was unable to access its data, and that as a result, Progressive contacted Geotab for support. R. 587-9 at 9. Palmer's testimony is corroborated by an affidavit from Geotab employee Colin Sutherland who states that on "February 4, 2016, Chuck Palmer of Progressive called me to inform me of issues that Progressive was having with the Geotab GO devices that Sonrai had sold to Progressive and had installed in Progressive's fleet of trucks in the Region of Peel." R. 587-1 ¶ 11. There is no dispute that Progressive's data was housed on the MyGeotab web portal. R. 623

¶ 5. And Geotab admits that following Progressive's request for support, Geotab created a new web portal for Progressive separate from Sonrai's page, and that it gave Progressive administrative access to that portal. R. 588 at 15. There is also no dispute that Progressive asked Geotab for guidance on where to receive proper support for the Region of Peel launch and that Geotab recommended that Progressive work with its authorized reseller ATI. *Id.* (citing R. 587-27).

Sonrai cites to three documents that purportedly show Geotab's intent to interfere. R. 615 ¶ 24 (citing R. 617-28, R. 617-29, and R. 617-30). But none of these documents suggest or support an inference that Geotab intended to interfere with Sonrai and Progressive's relationship. The first is an email chain exchanged between Geotab and Progressive on February 5, 2016, following the initial phone call where Palmer reached out to Sutherland. *See* R. 617-28 Indeed, this email corroborates Palmer and Sutherland's testimony that Progressive reached out to Geotab in early February. The second is an internal chat between Geotab employees Scott Sutarik and Jordan Gutter, where they discuss Sonrai but say nothing that supports a claim of interference by Geotab. *See* R. 617-29 Finally, the third is an email chain where Geotab connected Progressive with ATI. *See* R. 617-30 But critically, this email was sent on February 26, 2016, once again following Progressive's earlier request for support.

In sum, the undisputed facts and the documents identified by Sonrai establish that Geotab acted in response to Progressive's requests. The record does not support a reasonable inference of interference because, under Illinois law, "[a]ctions that form

the basis of a tortious interference claim *must be directed* at third-party business prospects . . . [and] the plaintiff must allege and prove facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies." *Kikson v. Underwriters Laboratories, Inc.*, 492 F.3d 794, 800 (7th Cir. 2007) (emphasis added). Geotab never took actions *directed* at Sonrai's business prospects. Rather, Progressive solicited help from Geotab because Sonrai was unresponsive, and Geotab actions were *in response* to Progressive's requests. Simply put, Geotab did not act with the purpose of injuring Sonrai. Ultimately, the fact that Progressive reached out to Geotab and that Geotab did not solicit Progressive is sufficient to defeat Sonrai's tortious interference claims. *See Medallion Prod., Inc. v. McAlister*, 2008 WL 5046055, at *14 (N.D. Ill. Nov. 20, 2008) ("[T]he evidence is that NPI approached and sought to do business with the ICC Defendants. This is insufficient to show interference by the ICC Defendants.")

Sonrai's tortious interference claims are also defeated because the undisputed evidence established that Sonrai's own failures, rather than actions taken by Geotab, caused Progressive to stop working with Sonrai. *See Celex Grp., Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1126 (N.D. Ill. 1995) (granting summary judgment where counterclaimant could not prove counterclaim defendant was the proximate cause of any injury). Palmer testified to this in his deposition. R. 587-9 at 14 ("Sonrai was terminated because they were unable to support the [Vector] device."). And Palmer's deposition testimony is corroborated by his March 2, 2016 email to Sonrai where he stated that it had "become apparent over the past 7 weeks that Sonrai has been

unable to support Progressive's current setup." R. 587-27. Sonrai claims that Palmer's credibility should be evaluated by the jury. R. 614 at 24. But Sonrai fails to identify any evidence that conflicts with Palmer's deposition testimony or email. After years of the discovery, the only evidence on the record is that Progressive stopped working with Sonrai because of Sonrai's own failures and not because of Geotab. Geotab did not tortiously interfere with Sonrai and Progressive's relationship.

For these reasons, Geotab's motion for summary judgment is granted with respect to Sonrai's tortious interference claims regarding Progressive.

## 2. Waste Management

Regarding Waste Management, Sonrai's argument is undeveloped, difficult to follow, and fails to establish exactly when and how its relationship with Waste Management was impacted. Sonrai makes two cursory assertions. First, Sonrai asserts that Geotab changed Sonrai's credentials so that Sonrai could no longer access the Waste Management database. R. 614 at 25. But Sonrai fails to cite a single piece of evidence to support this assertion. To the contrary, the evidence shows that Geotab granted Sonrai access to the database. For example, in a December 2015 email regarding the Waste Management database, a Geotab support engineer confirms that "Sonrai Systems will have access to all vehicles as they need to monitor and implement their add-in." *See* R. 617-36.

Second, Sonrai asserts that Geotab gave Romano access to Sonrai's information, which included the Waste Management database. R. 614 at 25. But Geotab gave Romano access to Sonrai's database on January 11, 2016, which was four days prior to Romano's final day at Sonrai. R. 617-38. And Sonrai fails to articulate

10

how giving Romano access on January 11 was improper. The only other pertinent evidence is an e-mail chain between Sonrai and ATI dated March 4, 2016, where Sonrai requests that ATI block Romano's access. R. 617-37. This email supports a reasonable inference that Romano retained access to the MyGeotab web portal following his resignation from Sonrai. But this does not support a reasonable inference that Geotab intentionally allowed Romano to retain access for the purpose of tortious interference. Indeed, following Romano's resignation, the onus is on Sonrai (not Geotab) to ensure that Romano no longer has access to Sonrai's documents and data. Because Sonrai fails to marshal evidence sufficient to support this claim, Geotab's motion for summary judgment is granted with respect to Sonrai's tortious interference claims regarding Waste Management.

### B. Breach of Contract by Geotab

Sonrai argues that Geotab breached the CIA by granting Progressive, Romano, and Heil administrative access to Sonrai's page on the MyGeotab web portal (which housed the data from the Region of Peel launch). R. 614 at 26–27. The argument has no merit. As discussed above, the CIA was signed in January 2014 and protected confidential information exchanged for the purpose of evaluating a potential business transaction. R. 587-24. But Sonrai never engaged in a business transaction directly with Geotab, and instead purchased Go Devices from ATI. R. 587-1 ¶ 6. ATI was not a party to the CIA and Sonrai's purchase of Go Devices from ATI was a separate and independent transaction unrelated to the CIA. R. 587-24. Sonrai then modified and sold these Go Devices to Progressive in October 2015 and set up a MyGeotab web

11

portal to collect the data.[2] R. 615 ¶ 14; R. 623 ¶¶ 4–7. The CIA is plainly irrelevant to the Go Devices purchased from ATI, to the MyGeotab web portal set up to collect data from these Go Devices, and to Sonrai's relationship with Progressive. The CIA protected information exchanged between Sonrai and Geotab around January 2014 for the purpose of entering a business transaction. Even assuming Geotab granted Progressive, Romano, and Heil administrative access to Sonrai's web page on the MyGeotab portal, thus allowing them access to the Region of Peel data, Sonrai's web page and the Region of Peel data is irrelevant to the CIA. Geotab thus did not breach the CIA. For this reason, Geotab's motion for summary judgment is granted with respect to breach of contract by Geotab.

## II.    Heil's Motion for Summary Judgment

In its Second Amended Complaint, Sonrai brought three counts against Heil. R. 119. Count VI alleges breach of the Letter Agreement. Count VII alleges that Heil tortiously induced Romano to breach his fiduciary duty to Sonrai. And Count VIII alleges unjust enrichment. Heil moves for summary judgment on all counts. R. 594. For the reasons stated below, Heil's motion is granted in part and denied in part.

### A. Breach of Contract by Heil

Sonrai alleges that Heil breached the Letter Agreement by using confidential information from Sonrai when developing Enhance. R. 614 at 34–41. To establish a

---

[2] When a user logs into the MyGeotab web portal, the user is presented with and must accept Geotab's End User License Agreement ("EULA"). R. 615 ¶ 3. The parties dispute whether Sonrai accepted the EULA. *Id.* ¶ 4. The Court need not address the EULA because Sonrai only alleges breach of the CIA, and regardless of whether Sonrai accepted the EULA, the CIA remains irrelevant as discussed above.

claim for breach of contract, Sonrai must demonstrate: (1) a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). The first element is not in dispute. As discussed above, Sonrai and Heil entered the Letter Agreement in July 2014 to facilitate the exchange of confidential information related to Sonrai's Vector and Heil's Connected Truck. The second element is also not in dispute. Heil does not contend that Sonrai failed to perform.

### 1. Breach (Element 3)

Sonrai argues that Heil breached the Letter Agreement because it stole and used Sonrai's confidential information on Vector to develop Enhance. R. 614 at 36. In relevant part, the Letter Agreement states that it "shall not construed to limit [Heil's] right to independently develop or acquire business ideas, products or technologies similar to or the same as that which is provided by [Sonrai]; provided that [Heil] *does not use* Evaluation Material of [Sonrai] in the development or acquisition of such ideas, products, or technologies." R. 596-14 at 5 (emphasis added).

As to whether Heil used Sonrai's information when developing Enhance, there are disputed issues of fact. Mark Regan was employed by 3rd Eye from November 2010 through August 2018. R. 596-78 ¶ 2. In his declaration, Regan states that 3rd Eye employee Kyle Kummer told him that Romano had "back door" access to Sonrai's data during the time that Romano was working with 3rd Eye to develop Enhance. *Id.* ¶ 12. Kummer told Regan that Kummer had "actually [seen] Romano access Sonrai's

software platform" during this time.[3] *Id.* Heil argues that in Kummer's deposition, Kummer stated that he had never seen Romano access Sonrai's data. R. 595 at 27. But Heil's argument goes to the credibility of Regan and Kummer and on summary judgment, "a court may not make credibility determinations. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citations omitted).

Tyler Mantel was employed by Heil from September 2015 through July 2017. R. 617-22 ¶ 4. During his employment, Mantel was a Product Manager, and he was responsible for the development of Enhance. *Id.* Around November 2016, after Heil acquired 3rd Eye, Mantel "turned over [his] Product Manager duties to [Romano]." *Id.* ¶ 6. In his declaration, Mantel states:

> During my employment with Heil, Heil came into possession of information and data through Romano . . . that may be [Sonrai] information and data. My belief that this information and data was from Sonrai is based upon observing Romano accessing a database that contained data with the label Sonrai . . . and Romano telling me that the data and information came from Sonrai. . . . [Romano] used his personal computer to login to the Sonrai branded website on the MyGeotab platform and retrieve old and new Sonrai data that Heil then used in testing algorithms that would serve as the backbone for some of Enhance's features. Romano did this frequently. I remember him using the data to test a route efficiency metric.

*Id.* ¶¶ 8, 12.

Heil argues that "Mantel cannot testify as to [this] subject because he never worked on the 3rd Eye development team effort and left Heil in 2017, while 3rd Eye

---

[3] Kummer is an employee of 3rd Eye, which was owned by Heil, and Kummer's statement was made concerning a matter within the scope of his employment. Sonrai may therefore introduce Kummer's statement (through Regan) under the party opponent exception to hearsay. *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003).

was still building the product." R. 595 at 27. In his declaration, however, Mantel refers to first-person observations as the basis for his knowledge. Heil is free to challenge Mantel's credibility by arguing that Mantel could not have observed what he claims, but again, on summary judgment, courts may not make credibility determinations.

Heil also moves to strike Mantel's declaration because the declaration was produced on May 15, 2022, approximately three years after the close of fact discovery. R. 591. But in Romano's Responses to Sonrai's First Set of Interrogatories, Romano identified at least thirteen relevant meetings attended by both Romano and Mantel. R. 607-8. Additionally, Mantel's name appeared 681 times in the document production and his Heil email address appeared 433 times. R. 651 at 3. Based on repeated references to Mantel in the documents, there is no question that Heil was aware or should have been aware that Mantel had information pertinent to this matter and was thus a potential witness. Heil thus had a fair opportunity to seek discovery from Mantel prior to the close of fact discovery. For this reason, Sonrai may rely on the Mantel declaration to support its position at summary judgment and Heil's motion to strike is denied as to the Mantel declaration.[4] *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 732 (7th Cir. 2004) (finding that the district court

---

[4] Heil also moves to strike Sonrai's late identification of nine new witnesses (in addition to Mantel) and supplemental document productions made by Sonrai following the close of discovery. R. 591. The Court did not rely on testimony from these nine additional witnesses or on the supplemental documents when ruling on summary judgment. Heil's motion to strike is denied without prejudice. To the extent Sonrai seeks to rely on these witnesses and documents in the future, Heil may reraise its objections at that time.

properly considered an affidavit at summary judgment where the opposing party was "on notice prior to the close of discovery that [the declarant] had information pertinent to this matter and was a potential witness" and thus "had a fair opportunity to seek discovery from [the affiant] prior to the deadline for filing summary-judgment motions").

In addition to the Regan and Mantel declarations, Sonrai's expert Timothy Giardina examined Vector and Enhance and concluded that Enhance's "features, benefits, data gathering capabilities and processes for management reports are substantially the same as the Vector product by Sonrai." R. 617-26. Heil emphasizes its own expert David Williams, who investigated the features in Vector and Enhance and concluded that the two products are distinct. R. 595 at 25–26 (citing R. 596-6). But on summary judgment, courts "may not weigh conflicting evidence" and resolution of dueling expert reports is a matter best left for the jury. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations omitted).

Drawing all reasonable inferences in favor of Sonrai, and considering Regan and Mantel's declarations combined with Giardina's expert report, there is a material dispute of fact as to whether Romano had access to and used Sonrai's data when working with Heil to develop Enhance. Sonrai has set forth sufficient evidence to deny Heil's motion for summary judgment.

### 2. Damages (Element 4)

Sonrai seeks lost profits for breach of contract. R. 614 at 43. "Because damages for lost profits are prospective, these damages will be inherently uncertain and

incapable of calculation with mathematical precision." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632–33 (7th Cir. 2007). Illinois law "does not require that lost profits be proven with absolute certainty. Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct." *Id.* at 633 (citations omitted). Additionally, when the lost profits arise out of a breached contract, the profits must have been "reasonably within the contemplation of the defaulting party at the time the contract was entered into." *Id.* at 632.

Heil argues that because Vector is a new product, the "new business rule" bars the recovery of lost profits related to Vector. R. 595 at 13. The "new business rule" sets forth a general principle that expected profits of new commercial businesses and new product lines are considered "too uncertain, specific and remote to permit recovery." *TAS Distrib. Co.*, 491 F.3d at 633. But the rule is not absolute and does not apply where a new product has been introduced into an "established market." *Milex Prod., Inc. v. Alra Laboratories, Inc.*, 603 N.E.2d 1226, 1237 (Ill. App. Ct. 1992). Sonrai has existed since 2007, R. 626 ¶ 1, and is not a new business. And though Vector may be a new product, it is Sonrai's third generation event validation product. *Id.* Vector was introduced into an established market—event validation products for waste collection companies. The new business rule does not apply.

Heil also argues that lost profits cannot be recovered because lost profits are consequential damages not reasonably contemplated by the parties when they entered into the Letter Agreement. R. 595 at 20–23. But the Letter Agreement

expressly provides that in the event of breach, the non-breaching party may seek money damages, injunctive relief, specific performance, or "all other remedies available to it at law or in equity." R. 596-14 at 6. The phrase "all other remedies" includes lost profits. And even if the Letter Agreement had been silent as to the availability of lost profits, courts take a "common sense" approach and consider "the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 2017 WL 11887460, at *6 (N.D. Ill. Sept. 19, 2017) (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000)). When Sonrai and Heil entered the Letter Agreement, they acknowledged that both parties "own[], [are] developing or [have] developed similar products and technology." R. 596-14 at 5. In other words, they were aware that they were developing competing products. As alleged, Heil stole Sonrai's confidential information to develop Enhance, a competing product. It is common sense that the sale of one competing product may decrease the sale and profits of the other product. Lost profits were thus reasonably contemplated by the parties when they entered into the Letter Agreement.

Finally, Heil takes issue with Sonrai's damages expert Suzanne Stuckwisch. R. 595 at 15–18. Stuckwisch's report is 72 pages long with over 300 footnotes. R. 617-44. In summary, she identified five waste haulers who were potential Sonrai customers and based on the fleet size of these customers, she calculated the potential revenue that Sonrai could have gained had the Defendants not usurped Sonrai's relationships with these waste haulers. *Id.*

18

First, Heil argues that Stuckwisch's revenue calculations lack reasonable certainty because they were based on speculation. R. 595 at 15. Specifically, Heil challenges Stuckwisch's assumption that these five waste haulers would have installed Vector on 95% of their fleets. *Id.* Heil emphasizes its own expert's opinion that no hauler would roll out a new piece of technology, like Vector, on 95% of its fleet. *Id.* at 16. But Stuckwisch explained the basis for this calculation in her report. R. 617-44 ¶¶ 157–59. And as stated above, the resolution of dueling expert reports is a matter best left for the jury.

Second, Heil argues that Stuckwisch failed to address causation. R. 595 at 17. Indeed, Sonrai admits that Stuckwisch assumed causation. R. 614 at 54. But "[f]or the purpose of calculating damages, an expert can assume liability." *Chartwell Studio, Inc. v. Team Impressions, Inc.*, 2023 WL 1992180, at *7 (N.D. Ill. Feb. 14, 2023). And Stuckwisch's conclusion traces damages back to specific conduct by each Defendant. *See, e.g.,* R. 617-44 ¶ 182.vi ("If the jury determines that Heil's breaches caused Casella to stop deploying Sonrai Vector products, then Sonrai's lost profits total $719,938."). Whether Sonrai can prove causation (e.g.: that Heil's breaches caused Casella to stop deploying Vector) is a fact issue for the jury.

Third, Heil argues that Stuckwisch failed to apportion damages between Romano, Geotab, and Heil. R. 595 at 17. Sonrai admits that it failed to apportion damages but argues that it was not required to do so because its injury was indivisible. R. 614 at 56–57. *See Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 640 (7th Cir. 2011) ("Where a plaintiff has suffered a single, indivisible injury . . . the jury's

task is to award a sum of money to compensate the plaintiff for that injury, not to enter a damages award against each defendant who is or will be liable on the judgment."). Sonrai's injuries are indivisible as to conduct by Heil and Romano because the alleged wrongful conduct occurred while Romano was working with Heil to develop Enhance. But Sonrai's injuries are divisible as to conduct by Geotab. For example, any alleged damages stemming from Progressive's use of Geotab products are unrelated to wrongful conduct by Heil or Romano. *See, e.g.,* R. 617-44 ¶ 118. As discussed above, Geotab prevailed on summary judgment and Sonrai is not entitled to collect damages from Geotab. This issue can be remedied as follows: by October 25, 2024, Stuckwisch shall amend her report to remove calculations and analysis related solely to Geotab. By November 22, 2024, Heil may take a deposition of Stuckwisch of no more than two hours to address any edits to the report. To the extent Heil raises additional issues with the report, Heil may seek to exclude certain calculations by motions in limine prior to trial.

Sonrai has sufficiently shown damages for the purpose of summary judgment. Because Sonrai has raised at least disputed material facts for each element of breach of contract by Heil, Heil's motion for summary judgment is denied on this issue.

### B. Tortious Inducement of Romano by Heil

In its motion for summary judgment, Heil argues it did not breach the Letter Agreement by soliciting to employ Romano. R. 595 at 29–30. But Sonrai does not contend that Heil's solicitation of Romano breached the Letter Agreement. Rather, in the First Amended Complaint, Sonrai alleges that Heil tortiously induced Romano to breach his fiduciary duty to Sonrai. R. 119 ¶ 95–99. Under Illinois law, tortious

inducement to breach fiduciary duty is a free-standing claim that exists independent of breach of contract. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Heil's motion for summary judgment is thus denied on this issue because it fails to address Sonrai's actual claim.

### C. Unjust Enrichment by Heil

Unjust enrichment is "unavailable where the claim rests on the breach of an express contract." *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006); *see Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005) (citations omitted) (Where a specific contract "governs the relationship of the parties, . . . unjust enrichment has no application."). As discussed above, the Letter Agreement is an enforceable contract that governs the parties' relationship. Heil's motion for summary judgment is granted with respect to unjust enrichment.

## III. Romano's Motion for Summary Judgment

In its Second Amended Complaint, Sonrai brought one count against Romano for breach of fiduciary duty. R. 119 ¶ 86–92. In his motion for summary judgment, Romano does not raise his own arguments but rather incorporates Geotab and Heil's arguments by reference. R. 592 ("For all of the reasons Sonrai cannot prove damages or causation against Geotab or Heil, it also cannot prove damages or causation against Romano."). For the same reasons that the Court denied Heil's arguments regarding damages and causation, Romano's motion is denied as well.

## Conclusion

Geotab's motion for summary judgment (R. 586) is granted in full and Geotab is dismissed from the case. Heil's motion to strike (R. 591) is denied without prejudice. Heil's motion for summary judgment (R. 594) is granted in part and denied in part. Romano's motion for summary judgment (R. 592) is denied.

By October 25, 2024, Stuckwisch shall amend her report to remove calculations and analysis related solely to Geotab. By November 22, 2024, Heil may take a deposition of Stuckwisch of no more than two hours to address any edits to the report.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: September 23, 2024