**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SONRAI SYSTEMS, LLC,

               Plaintiff,

         v.

ANTHONY M. ROMANO and HEIL CO.
D/B/A/ENVIRONMENTAL SOLUTIONS
GROUP,

               Defendants.

Civil Action No. 1:16-cv-03371

District Judge Thomas M. Durkin

**HEIL'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................... 1

I.    All claims fail as a matter of law because Sonrai's singular damages theory is legally defective—and its proof of causation and damages are legally insufficient. .................... 2

    A.    Illinois law does not allow lost-profits recovery in a case like this. ........................... 3

        1.    Sonrai's Vector is a new business. ........................................................ 5

        2.    Vector was not selling into an established market. ................................ 6

        3.    Sonrai's lost profits were not based on data of a comparable company. ............ 8

    B.    Sonrai's causation evidence was legally insufficient. ............................................. 10

    C.    Sonrai's damages evidence was legally insufficient. ................................................ 14

    D.    Vacating the compensatory awards requires vacating the punitive awards. ............. 15

II.    The tort claim against Heil fails as a matter of law, as does the punitive-damages award ................................................................................................................... 16

    A.    Sonrai's tort recovery against Heil is barred by the *Moorman* doctrine ................... 16

    B.    There is insufficient evidence to support the tort finding in any event. ................... 17

    C.    At a minimum, the punitive award against Heil must be vacated. ........................... 18

III.    The contract claim fails as a matter of law. ....................................................... 19

    A.    Sonrai's breach evidence was legally insufficient as to the "use" theory. ............... 19

    B.    Sonrai did not prove that Heil reasonably contemplated future lost sales at the time of contracting. ................................................................................................. 23

    C.    Sonrai failed to prove solicitation damages. ........................................................... 25

IV.    The Court should conditionally grant a new trial if it grants this motion. ........................ 25

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act II Jewelry LLC v. Wooten*,
　318 F. Supp. 3d 1073 (N.D. Ill. 2018) ..............................................................8, 9

*Alpha Sch. Bus Co. v. Wagner*,
　391 Ill. App. 3d 722 (1st Dist. 2009) ...................................................................17

*Ass'n for Disabled Americans, Inc. v. Claypool Holdings LLC*,
　2001 U.S. Dist. LEXIS 23729 (S.D. Ind.) ...........................................................22

*Beverly v. Abbott Lab'ys*,
　107 F.4th 737 (7th Cir. 2024) ...............................................................................1

*BIC Leisure Prods. v. Windsurfing Int'l*,
　1 F.3d 1214 (Fed. Cir. 1993)................................................................................15

*In re Brand Name Prescription Drugs Antitrust Litig.*,
　1999 U.S. Dist. LEXIS 550 (N.D. Ill.) .................................................................21

*Chi. Joe's Tea Room, LLC v. Village of Broadview*,
　94 F.4th 588 (7th Cir. 2024) ..................................................................................4

*Children's Broad. Corp. v. Walt Disney Co.*,
　245 F.3d 1008 (8th Cir. 2001) ..............................................................................15

*CIT Commc'ns Fin. Corp. v. Wes-Tech Automation Sols.*,
　2010 U.S. Dist. LEXIS 84742 (N.D. Ill.) .......................................................19, 20

*CSC Holdings, Inc. v. Redisi*,
　309 F.3d 988 (7th Cir. 2002) ................................................................................15

*Dranchak v. Akzo Am.*,
　1995 U.S. Dist. LEXIS 11241 (N.D. Ill.) .............................................................12

*Garrett v. Barnes*,
　961 F.2d 629 (7th Cir. 1992) ..............................................................................2, 9

*Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*,
　2012 IL App (2d) 110718 .....................................................................................10

*Glob. Cash Network, Inc. v. Worldpay, U.S., Inc.*,
　148 F. Supp. 3d 716 (N.D. Ill. 2015)................................................................16, 17

*Hayman v. Autohaus on Edens, Inc.*,
315 Ill. App. 3d 1075 (1st Dist. 2009) ...................................................................15

*Home Placement Serv., Inc. v. Providence J. Co.*,
819 F.2d 1199 (1st Cir. 1987) ...............................................................................8

*Hossack v. Floor Covering Assocs. of Joliet*,
492 F.3d 853 (7th Cir. 2007) ................................................................................1

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
2025 U.S. Dist. LEXIS 61723 (D. Del.) ................................................................9

*Ivey v. Transunion Rental Screening Sols., Inc.*,
2021 IL App (1st) 200894, *aff'd*, 2022 IL 127903 .......................................3, 6, 8

*Kinesoft Dev. Corp. v. Softbank Holdings*,
139 F. Supp. 2d 869 (N.D. Ill. 2001) ...............................................................5, 14

*Lehrman v. Gulf Oil Corp.*,
500 F.2d 659 (5th Cir. 1974) ................................................................................8

*LQD Bus. Fin. Inc. v. Azizuddin Rose & Akf, Inc.*,
2023 U.S. Dist. LEXIS 237125 (N.D. Ill.) ..........................................................17

*M.S. Distrib. Co. v. Web Records, Inc.*,
2003 U.S. Dist. LEXIS 8078 (N.D. Ill.) ................................................................5

*Maere v. Churchill*,
116 Ill. App. 3d 939 (3rd Dist. 1983) .............................................................11, 13

*Mandel v. Hernandez*,
404 Ill. App. 3d 701 (1st Dist. 2010) ..................................................................24

*Mayster v. Santacruz*,
2020 IL App (2d) 190840 ....................................................................................11

*Meadoworks, LLC v. Linear Mold & Eng'g, LLC*,
2020 U.S. Dist. LEXIS 127901 (N.D. Ill.) ..........................................................17

*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,
118 Ill. 2d 306 (1987) .........................................................................................10

*Mindgames, Inc. v. W. Publ'g Co.*,
218 F.3d 652 (7th Cir. 2000) ................................................................................9

*Mitchell v. Elrod*,
275 Ill. App. 3d 357 (1st Dist. 1995) ..................................................................16

iii

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
    91 Ill. 2d 69 (1982) ...............................................................................16, 17

*Nordstrom Consulting, Inc. v. M&S Techs., Inc.*,
    2008 U.S. Dist. LEXIS 17259 (N.D. Ill.) ....................................................22

*Onvi, Inc. v. Radius Project Dev.*,
    2022 U.S. Dist. LEXIS 164845 (N.D. Ill.) .....................................................5

*Petty v. Chrysler Corp.*,
    343 Ill. App. 3d 815 (1st Dist. 2003) ..........................................................16, 18

*Rasgaitis v. Waterstone Fin. Grp., Inc.*,
    2013 IL App (2d) 111112 .............................................................................16

*Real Est. Value Co. v. USAir, Inc.*,
    979 F. Supp. 731 (N.D. Ill. 1997) .............................................................5, 14

*Sencon Sys., Inc. v. W.R. Bonsal Co.*,
    1988 U.S. Dist. LEXIS 2833 (N.D. Ill.) ......................................................17

*Seshadri v. Kasraian*,
    130 F.3d 798 (7th Cir. 1997) ......................................................................12

*Sk Hand Tool Corp. v. Dresser Indus.*,
    284 Ill. App. 3d 417 (1st Dist. 1996) ..........................................................3

*Smart Mktg. Grp. v. Publ'ns*,
    624 F.3d 824 (7th Cir. 2010) ....................................................................3, 4

*Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*,
    51 F.3d 1319 (7th Cir. 1995) .......................................................................4

*Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Physicians Assurance Corp.*,
    922 F.3d 778 (7th Cir. 2019) .......................................................................5

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) .............................................................. *passim*

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
    2010 U.S. Dist. LEXIS 143993 (S.D.N.Y.)................................................19

*Tractebel Energy Mktg. v. AEP Power Mktg.*,
    487 F.3d 89 (2d Cir. 2007)..........................................................................24

*Transperfect Glob., Inc. v. Lionbridge Techs., Inc.*,
    2022 U.S. Dist. LEXIS 12710 (S.D.N.Y.), *aff'd*, 2024 U.S. App. LEXIS 1053
    (2d Cir.)..................................................................................................13, 22

*U.S. Data Corp. v. RealSource, Inc.*,
    910 F. Supp. 2d 1096 (N.D. Ill. 2012) ....................................................................17

*Unilever U.S., Inc. v. Johnson Controls, Inc.*,
    2017 U.S. Dist. LEXIS 21498 (N.D. Ill.) ...............................................................24

*Union Planters Bank, N.A. v. Thompson Coburn LLP*,
    402 Ill.App.3d 317 (2010) ......................................................................................11

*Vojdani v. Pharmsan Labs, Inc.*,
    741 F.3d 777 (7th Cir. 2013) ..................................................................................11

**Other Authorities**

Fed. R. Civ. P. 50 .......................................................................................... *passim*

Fed. R. Civ. P. 59 ......................................................................................1, 9, 25

Fed. R. Evid. 801(d)(2) ...................................................................................12

Judgment is required as a matter of law. Sonrai's damages theory was legally defective from the start, resulting in speculative "lost profits" awards that rest on nothing more than conjecture by plaintiffs' executives, parroted by a damages "expert" who looked at no financial records and conducted no market analysis in her projections. On top of that, the record showed that Sonrai simply gave up on its product, defeating any inference that ***Heil*** caused these imagined customer losses. Sonrai cannot sustain its verdict which rests on imaginary, self-inflicted damages.

The tort verdict against Heil fails for other reasons, too. Even if the Court could sustain the Romano verdict (it cannot), Illinois law bars Sonrai's tort claim against ***Heil*** as coextensive with its contract claim. Equally as fatally, Sonrai's evidence was insufficient to justify a finding that Heil ***even knew about*** Romano's supposed breach (a claimed data download), much less that Heil knowingly induced it or accepted "benefits" from it. And without a predicate tort, let alone clear and convincing evidence of malicious conduct, the punitive-damages verdict against Heil falls too.

The contract verdict also falls. Sonrai nowhere identified the Sonrai-furnished "Evaluation Material" that Heil supposedly received and used in its 3rd Eye positive-service verification (PSV) product, as required to sustain the liability finding on the confidentiality obligation. Nor did Sonrai prove any actual damages stemming from a breach of the (time-limited) non-solicitation obligation. Both flaws (among others) require judgment in Heil's favor.

Heil thus renews its Rule 50 motion and asks this Court to enter judgment as a matter of law disposing of all claims. In the alternative, the Court should grant a new trial or remittitur, for the reasons set out in Defendants' Rule 59 brief also being filed today.

## ARGUMENT

"The standard for granting judgment as a matter of law mirrors the standard for granting summary judgment." *Beverly v. Abbott Lab'ys*, 107 F.4th 737, 748 (7th Cir. 2024). "A mere scintilla of evidence supporting the jury's verdict will not suffice" to support the verdict. *Hossack*

*v. Floor Covering Assocs. of Joliet*, 492 F.3d 853, 859 (7th Cir. 2007) (affirming Rule 50 relief). Neither will mere speculation or conjecture. *Garrett v. Barnes*, 961 F.2d 629, 632, 634 (7th Cir. 1992).

**I.**     **All claims fail as a matter of law because Sonrai's singular damages theory is legally defective—and its proof of causation and damages are legally insufficient.**

To prevail in this lawsuit, Sonrai was required to prove proximately-caused damages—or for the tort claims, the acceptance of corresponding benefits—by a preponderance of the evidence and to a reasonable degree of certainty. *See* Dkt. 772 (Final Jury Instructions) at 21, 23, 25, 27. Sonrai presented the jury with a single damages theory: that its Vector product would have generated $72.5 million dollars in lost profits "but for" Defendants Heil and Romano taking confidential information from Sonrai in breach of their legal duties, using that information to create a "copycat" product called Enhance, and diverting would-be Vector sales to Heil. Trial Tr. 990:22–991:13; 1006:11–19; 1009:2–1010:2 (Stuckwisch's "but for" world). Sonrai's damages expert, Suzanne Stuckwisch, illustrated her damages calculations as follows:

## Summary of Opinions

Total Lost Profits through June 30, 2025:  **$72.5 Million**

| Customer | Lost Profits ($M) |
|---|---|
| Progressive/Waste Connections | $13.2 |
| Waste Management | $32.8 |
| Republic Services | $23.0 |
| Waste Corp. of America | $2.4 |
| Casella Waste Systems | $1.1 |
| **Total** | **$72.5** |

PTX-213 at Slide 1. The jury subsequently awarded damages on three "lost" customers: Progressive; Waste Management; and Republic Services. Dkt. 775 (verdict); Dkt. 779 (reflecting a $28,905,154 damages award). For three reasons, those damages awards cannot stand.

2

## A. Illinois law does not allow lost-profits recovery in a case like this.

A business's expected profits in a "new product line[]" are "considered too uncertain, specific and remote to permit recovery." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007). This is the so-called "new business" rule—although "[t]he term 'rule' is perhaps imprecise." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 30. While there "is no inviolate rule that a new business can *never* prove lost profits" (*id.* ¶ 31), a business line without a profit history "generally will be unable to provide competent proof by which [future] profits can be estimated with reasonable certainty." *Sk Hand Tool Corp. v. Dresser Indus.*, 284 Ill. App. 3d 417, 427 (1st Dist. 1996). The burden is high, and hiring an expert to project new-venture profits based on company-provided projections does not cut it. On the contrary, such a damages projection—uncorroborated by profit data from a substantially-similar vendor—is pure speculation. And Illinois courts, like courts in the Seventh Circuit, have never hesitated to "reverse damage awards that are based on speculation or conjecture." *TAS*, 491 F.3d at 633.

Many cases make this clear. Start with *Smart Mktg. Group v. Publications,* in which the Seventh Circuit vacated a damages award and ordered a new trial. 624 F.3d 824, 831 (7th Cir. 2010). That case involved two companies who hoped to deliver sales leads to auto dealers through a web-based program. The plaintiff had experience running promotional programs for auto dealers, but "[n]either side had ever engaged in an enterprise that wedded these two elements" (internet leads and dealer promotions) together. *Id.* at 830. When things went south and the plaintiff tried to recover lost-profits damages from its counterparty, it faced a major problem—how to prove, without resorting to guesswork or speculation, "how successful the parties' venture would have been." *Id.* On that critical question, the proof fell short—despite proffering an expert who analyzed pre-launch dealer contracts and "then projected the profits that [the plaintiff] would have earned over the remainder of the two-year term of the [parties'] agreement." *Id.* at 828. As the Seventh

Circuit observed, there simply was "no evidence that the deal would have become profitable" after the defendant's alleged breach; after all, "[m]any new business ventures fail[.]" *Id.* at 831. "[C]ontracts represent[ing] only pre-orders for future, hoped-for leads" did not establish likely profitability; those were mere projections, themselves "unreliable." *Id.* at 831–32 (emphasis added). And even if those leads *had* panned out, the plaintiff "would still need to show how successful it would have been in selling [them] to car dealers"—something that was contingent on a number of factors, and something for which the plaintiff had no "hard data from comparable firms to corroborate [its expert's] calculation." *Id.* at 831, 833. This means one thing: "the damages award rested on such shaky ground that a new trial on damages [was] necessary." *Id.* at 829.

A similar thing happened in *TAS*, where the plaintiff-technology provider tried to prove its lost profits by pointing to "evidence of the sales of [its products] by [the defendant's] chief competitor," who previously had a licensing arrangement with the plaintiff. 491 F.3d at 635. Not enough. The "new business" rule rendered the comparison too speculative to permit recovery, where the two competitors were not "sufficiently comparable companies to warrant imputing [one's] engine sales" to the other. *Id.* at 635–36 (affirming summary judgment). And just last year, the Seventh Circuit affirmed the exclusion of opinion testimony on a new-venture's lost profits as "too speculative" because the plaintiff offered no evidence of someone "operat[ing] the same established business at the identical location for the period of time which plaintiff seeks damages." *Chi. Joe's Tea Room, LLC v. Village of Broadview*, 94 F.4th 588, 601 (7th Cir. 2024) (citation omitted); *see also, e.g.*, *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 51 F.3d 1319, 1328 (7th Cir. 1995) (previous "success[] with other apartment buildings" did not substantiate proof of lost profits on the real-estate venture in dispute).

District courts have enforced the same high burden. In *Onvi, Inc. v. Radius Project Development*, for example, Judge Feinerman rejected a lost-profits analysis based on projected sales for a new electronic toothbrush, even where the expert bolstered those projections using plaintiff's online advertising data and then "audited the reasonableness of that estimate using sales data" from a competitor toothbrush. 2022 U.S. Dist. LEXIS 164845, at *6–8 (N.D. Ill.). That single-competitor dataset was too small to remove the air of speculation, and, regardless, the products were too dissimilar, so the competitor data could not "reasonably be used to predict sales volume" for the product at issue "with the degree of rigor required by the new business rule." *Id.* at *8. Other courts in this district have reached like results in new-venture cases, on the same basis. *E.g.*, *Kinesoft Dev. Corp. v. Softbank Holdings*, 139 F. Supp. 2d 869, 909 (N.D. Ill. 2001) (rejecting damages; "past successes with similar products or similar businesses is not sufficient"); *M.S. Distrib. Co. v. Web Records, Inc.*, 2003 U.S. Dist. LEXIS 8078, *30–31 (N.D. Ill.) (same; "Any compensatory damages that are based on lost sales from the new [ ] venture run headlong into the new business rule"); *Real Est. Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 745 (N.D. Ill. 1997) (same effect; a lost-profits expert cannot blindly rely on internal business projections and accept all spoon-fed assumptions).

All these cases lead to the same, simple conclusion: the bar is very high for a plaintiff to sustain a lost-profits damages theory in a case involving a new business venture.

### 1. Sonrai's Vector is a new business.

That brings us to this case—and first to the issue of whether Vector is a "new business" under the law. It is, as the trial record showed. Although the Court held otherwise before, now is the time to correct course on this issue with the benefit of a fully developed trial record. *Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Physicians Assurance Corp.*, 922 F.3d 778, 784 (7th Cir. 2019) (affirming Rule 50 relief after district court reconsidered summary judgment denial).

During summary judgment, Sonrai defended its lost-profits case, in part, by claiming that "any determination of whether Sonrai or Vector should be considered a 'new' business" is "a fact issue that cannot be determined at this stage of the litigation." Dkt. 614 at 36. This Court agreed, noting that "Sonrai has existed since 2007 and is not a new business." Dkt. 657 at 17.

That was error: "The new business rule has **nothing to do** with the date of a company's launch; it applies unless a company can present evidence of past, actual profits from which to assess estimates of alleged lost profits." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 52, *aff'd*, 2022 IL 127903 (emphasis added). Here, Sonrai presented **no** "evidence of past, actual profits" from Vector at trial. *Id.* Quite the opposite: Sonrai's CFO Dennis Keizer testified only to a low-volume revenue figure for a single year, offering **no** testimony as to whether those modest sales yielded any profits. Trial Tr. 373:22–374:6. The only Sonrai financial statement in the trial record confirmed that Sonrai was **losing** money through the first ten months of 2015. DTX-228. And although Sonrai's damages expert claimed to be employing a before-and-after revenue methodology, she did not rely on any financial statements in her damages calculus. Trial Tr. 1092:6–16. Indeed, she did not even base her Vector projections on any **other** Sonrai-related profit history (from RFID or otherwise)—despite Sonrai arguing at summary judgment that it had "a track record of sales and profits" from "Trash Tracker and 20/20 Mobile Solution" "from which lost profits can be traced." Dkt. 614 at 35–36.

The record points only in one, irrefutable direction: Vector is a "new product line[]" under Illinois law, and it thus falls under the new-business rule. *See TAS*, 491 F.3d at 633.

### 2. Vector was not selling into an established market.

As a new business (with no "evidence of past, actual profits[,]" *Ivey*, 2021 IL App (1st) 200894, ¶ 52), Vector's "lost profits" were recoverable only if Sonrai established that it was (1) selling Vector into an "established market," and (2) basing its lost-profits calculations on the

performance of a substantially-similar product in that established market. *TAS*, 491 F.3d at 634 (reflecting same). Sonrai's damages proof satisfied neither prong.

Start with the "established market" requirement. At summary judgment, Sonrai took a kitchen-sink approach, arguing variously that "Vector is Sonrai's third-generation event validation and monitoring product" and that Stuckwisch's calculations were "based on the established event validation systems market within the waste industry." Dkt. 614 at 35, 39. The approach worked; Sonrai made enough noise to get its damages theory to trial. *See* Dkt. 657 at 17 (adopting some of these arguments).

But at trial, Sonrai chose a different lane. Far from leaning into any "established market" theory, Sonrai ***walked away*** from any notion that "event validation" was the relevant market—and its RFID product the relevant proxy. Instead, Sonrai emphasized that Vector was ***in a league of its own***—far superior to its own predecessor products. Keizer testified that, in fact, Vector was functionally different from all other event-validation products (including its own) as it "solved the RFID problem and – and the done button issues" and was "three years ahead of everybody" in terms of "leveraging the internet of things that were coming into the business." Trial Tr. 285:16–25. By Sonrai's own words, Vector was thus a first-of-its-kind product, within both Sonrai ***and*** the broader marketplace:

> Q.  Okay. And was there anything else like this in the marketplace at the time?
> A.  There was nothing.
> Q.  This would have been first to the U.S. market?
> A.  When I joined, I said 42 years of experience in the collection business. This was number one, and I was glad to be there.
>
> ***
>
> Q.  And do you agree this was the only fully integrated collection, body, chassis data model in the entire U.S. waste industry?
> A.  I do.

Trial Tr. 312:10–313:1 (Keizer). Sonrai's favorite documents reflected this too (*e.g.*, PTX-24), and Stuckwisch confirmed the same. *See* Trial Tr. 1028:15–16 (Stuckwisch: Vector was "first in market . . . the first one out there"). This record speaks for itself: Vector was a "new business" with no "established market." This precludes lost-profits recovery as a matter of law. *See, e.g.*, *Ivey*, 2022 IL 127903, ¶¶ 34, 36 (affirming JMOL; refusing to find an "established market" when the plaintiff testified that existing lease products were "limited[,]" so he created a "superior" product to satisfy "gaps in the market for a quality lease product").

### 3. Sonrai's lost profits were not based on data of a comparable company.

A final thing confirms the legal unavailability of lost-profits damages here. As the First Circuit has explained, a new business "cannot rely on past earnings patterns or projections" to compute lost profits for a simple reason: they do not have an "earnings record sufficient to allow" the estimation. *Home Placement Serv., Inc. v. Providence J. Co.*, 819 F.2d 1199, 1205 and n.7 (1st Cir. 1987) (citing *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974)). "Instead, [a new business] must attempt to measure its damages with reference to the performance of one or more closely comparable firms in the same industry"—the so-called "yardstick" approach. *Id.* at 1205–06. Other courts have recognized the same. *See, e.g.*, *Act II Jewelry LLC v. Wooten*, 318 F. Supp. 3d 1073, 1085–86 (N.D. Ill. 2018) (collecting cases and rejecting expert-supported damages theory when the new-business plaintiff failed to follow the yardstick approach). This makes sense; after all, the new business itself has no profit history from which to make forward-looking sales projections, and damages must be proven to a reasonable certainty ***somehow***.

But Sonrai did not center its damages model around the performance of a "comparable company selling comparable products" in the marketplace. *TAS*, 491 F.3d at 635. Quite the opposite: it ***expressly disclaimed*** any reliance on actual competitor PSV sales data (from Heil) in computing its damages—presumably because those metrics would have anchored the jury in a

lower damages range. Trial Tr. 1026:24–1027:8 (Stuckwish describing her analysis: "nowhere in there is a comparison to Heil's actual [PSV] revenue or actual world"). It separated itself from Heil's PSV numbers, just like it abandoned any theory its "lost profits can be traced" from its own "track record of sales and profits" in the RFID space. *Contra* Dkt. 614 (Sonrai MSJ Opp.) at 35–36. Rather than choose a "but for" lane that presented real-world numbers, Sonrai chose a lane that allowed it to parade fantastical, unprecedented numbers, chasing a big verdict. That choice meant the jury's verdict rested on speculation—which is exactly what entitles Defendants to judgment as a matter of law. *Garrett*, 961 F.2d at 634 ("speculation cannot be the basis of a jury verdict").

In the end, rather than prove its damages in a non-speculative way, Sonrai "assume[d] a success not guaranteed to any new business." *Act II Jewelry*, 318 F. Supp. 3d at 1086. It paid an expert $1.2 million to run a simple revenue-and-cost analysis parroting ***Sonrai's own*** sales projections and assumptions for a first-of-its-kind product, when the company had yet to make a ***single*** Vector sale to two of the three customers for whom the jury awarded damages. *See* Defs.' Rule 59 Brief (explaining same). That is the definition of conjecture in a world where "[d]amages must be proved, and not just dreamed[.]" *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000). Just a few months ago, a Delaware district court applying Illinois law enforced this very principle, vacating a jury award after finding that the plaintiff-company could not escape the "new business" rule—or the inherently speculative nature of its damages case—by relying on internal business projections, a corroborating expert, and "years of industry experience" in a familiar market. *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2025 U.S. Dist. LEXIS 61723, at *17 (D. Del.). The result is the same here. Sonrai's dream damages must be vacated, with judgment entered for Defendants.

**B.      Sonrai's causation evidence was legally insufficient.**

Even if Illinois law permitted Sonrai to recover lost Vector profits as a general matter, Sonrai failed to prove that Heil's "alleged breach [was] the cause of those damages, with reasonable certainty." Dkt. 772 at 27; *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 316 (1987) (same effect).

Sonrai's first causation problem stems from its own inaction. The record unequivocally showed that Sonrai **gave up** on Vector in early 2016—just when its alleged "lost" sales would have started, and just when it had the market to itself:

> Q.      And we can agree, can't we, that in the real world, Sonrai essentially stopped trying to sell Vector in 2016, can we not?
> A.      They had paused selling Vector in 2016, but that was after already the bad acts were happening.
> Q.      They held off sales of Vector, correct, ma'am?
> A.      I think that was the language that Mr. Keizer used in his deposition, that is correct, after the bad acts had already started.
> Q.      Ms. Stuckwisch, Sonrai had the market to itself for nearly two years at the time it was rolling out this Vector technology, correct?
> A.      Yes. And it would have continued to have the market to itself.
> Q.      3rd Eye did not begin selling products with event validation technology until November of 2017, correct, ma'am?
> A.      Correct.

Trial Tr. 1122:25–1123:15; *see also* PTX 219 at 2  (in the "but for" world, Sonrai would have started rollouts for each of the "lost" customers before November 2017). Sonrai's chief witnesses, Keizer and Flood, both admitted this. *See* Trial Tr. at 377:21–23 (Keizer: "Sales have dropped off [since May of '16], absolutely"); *id.* at 623:24–624:11 (Flood: no new developments to Vector customers since 2016).

This is dispositive. In both contract and tort, "Illinois has long recognized the applicability, in questions of damages, of the doctrine of avoidable consequences, which prevents a party from recovering damages for consequences which that party could reasonably have avoided." *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61 (tort

case). Here, even assuming *arguendo* that Romano copied something proprietary before he left, Sonrai did not prove (or even suggest) that Romano took the ***only copy of Vector***—which explains why it never moved for an injunction for its (alleged) return after suing him in March 2016, or in the nine years since.[1] Sonrai had the market to itself for years, but it did nothing (other than sue for damages). "[T]he law does not require [a defendant] to pay for [a plaintiff's] voluntary decision to close the business." *Mayster v. Santacruz*, 2020 IL App (2d) 190840, ¶ 47 (contract case); *Maere v. Churchill*, 116 Ill. App. 3d 939, 945, 949 (3rd Dist. 1983) (affirming summary judgment where the claimed damages "were the result of [plaintiffs'] own inaction" rather than "attributable to the defendants"). The Seventh Circuit recognized a similar principle in affirming Rule 50 relief in a dispute between two former business partners: a party cannot prove (much less recover) "lost sales" damages if it is "no longer selling the [product]." *Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777, 784 (7th Cir. 2013). Whether you call this a damages-mitigation principle or a proximate-cause principle or something else (*see Mayster*, 2020 IL App (2d) 190840, ¶ 42 (discussing same)), the result is the same: Sonrai's unmitigated "losses" are not recoverable as a matter of law.

To try to avoid this result, Sonrai had Keizer testify at trial that "Heil [was] offering the Enhance product" right away, leaving Sonrai to "compete with [its] own product with [its] own salesperson immediately after January 8th, 2016[.]" Trial Tr. 416:11–22, 418:15–18 (Keizer). That testimony—and certain related testimony by Chris Flood—was false, as the impeachment clips (themselves substantive evidence under FRE 801(d)(2)) showed time and again:

---

[1] To be clear, though, Sonrai's liability theory is ever-changing and inherently contradictory. In the *Waste Connections* litigation, for example, it told Judge McNally that it could not identify its Vector "trade secrets" because they "existed only on the hard drive that was stolen by Mr. Romano and then later wiped and that was the only location they were and now they're gone." Ex. A, 7/02/25 Hearing Tr. 4:1–3. Judge McNally was then "***surprise[d]***" to hear Sonrai witnesses testify in *this* case that its Vector sales fell off ***not*** "because we don't know what we're doing because someone stole our code" but "because we had this fierce competition from a product through Heil[.]" *See id.* 6:18–23. She thus ordered a show-cause hearing, "very troubled" by the lack of Sonrai's "candor to the Court[.]" *Id.* 10:12–15.

| Witness | Trial Testimony | Deposition Testimony |
|---|---|---|
| Dennis Keizer | Q. What do you attribute the fact that the company only has six or seven Vector customers, as opposed to the 120 that it once had? **A. I attribute that to Tony going to Heil and confusing the marketplace with a competitive product**. Tr. 387:7–15 | Q. And to what do you attribute the fact that the company only has six or seven Vector customers as opposed to the 120 that it once had? **A. The fact that we have really held off any sales efforts on the Vector solution**. Tr. 34:10–15 |
| Chris Flood | Q. Vector is not part of Sonrai's ongoing business activities? **A. I believe it is.** Tr. 623:16–17 | Q. Is the Sonrai Vector System still a part of Sonrai's ongoing business activities? **A. Currently, no.** Tr. 24:7–9 |
| Chris Flood | Q. The last customer you signed up for Vector was in early 2016; is that correct? **A. No, it is not.** Tr. 625:6–8 | Q. What's the – what's the last customer who signed up for a Vector System, the most recent? **A. It would have been probably Lake Shore, maybe.** Q. And do you remember approximately when Lake Shore signed up to have some Vector Systems installed? **A. I want to say 2016, maybe. Early 2016.** Tr. 25:11–19 |

Even in the Rule 50 context, the duty to refrain from weighing credibility "extends only to ***plausible*** issues of credibility." *Dranchak v. Akzo Am.*, 1995 U.S. Dist. LEXIS 11241, at *33 (N.D. Ill.) (emphasis added). If a "story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it[,]" that "testimony can and should be rejected[.]" *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (affirming summary judgment). That is the case here. The Court need not credit Keizer's cursory, impeached "immediate competition" testimony given the overwhelming evidence from Sonrai's ***own case*** contradicting it—including testimony from Keizer, Flood, their paid expert witness, and former Heil employee Tyler Mantel. *See supra* at 12; *see also* Trial Tr. 1122:25–1123:15 (Stuckwisch: "Sonrai had the market to itself

for nearly two years"); *id.* at 453:3–454:10 (Mantel: confirming that "Heil had no SaaS customers paying monthly fees for an Enhance product" by the end of 2016).

But even accepting this "immediate competition" testimony as true, that ***still*** does not sustain the verdict. It still does not show that Sonrai made "a reasonable effort to avoid" these claimed damages. *Maere*, 116 Ill. App. 3d at 947. At no point in the trial did Keizer, Flood, or Stuckwisch explain Sonrai's post-2016 Vector sales efforts, much less present concrete sales, costs, and profit numbers. So this cursory testimony does not provide the jury any basis to believe, "with reasonable certainty," that Heil's conduct was "the cause" of those lost sales. *TAS*, 491 F.3d at 633. Indeed, if Sonrai and Heil were truly competing for these five customer opportunities at the same time, using the same product and leading to lost profits by Sonrai, where was the evidence that ***Heil secured these customer accounts*** at the imagined times? There was none. *See, e.g.*, *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, 2024 U.S. App. LEXIS 1053, at *8 (2d Cir.) (affirming judgment in trade secret and contract case, when the plaintiff "failed to connect its asserted damages to any instance in which [defendant's] pursuit of [customer] business translated into losses for [plaintiff] or gains for [defendant]"). At most, Keizer's impeached testimony may have supported a case for temporary "confusion" damages. *See* Trial Tr. 415:6–22 (Keizer vaguely gesturing to "confusion"). But Sonrai never disclosed any such damages measure during discovery, much less provided the jury with any reasonable basis to make such a nuanced computation at trial. Any way you cut it, Sonrai's damages theory is legally incoherent, and its causation evidence legally insufficient.

Sonrai faces another causation problem, too. As the jury heard, in early 2016, Sonrai proved itself incapable of delivering even a ***small*** rollout of Vector to a ***single*** region for a ***single*** customer. *See, e.g.*, DTX-241 (Jan. 1, 2016 Progressive email explaining its "concerns" about the

13

Peel Region startup); DTX-119 (Mar. 1, 2016 Progressive termination letter); Trial Tr. 1586:12–1587:21 (Palmer testimony). And the only other at-issue customer who ever bought Vector—Casella—returned those devices because they simply did not like the product. *See* Trial Tr. 759:6–18; DTX-44. In other words, Vector's only real-world customers were already "becoming frustrated by [Sonrai's] failure to deliver what it had promised"—itself dooming Sonrai's ability to meet the "reasonable certainty" causation standard. Add to that the fact that Sonrai presented no specific evidence that it had ever been successful in implementing a large-scale technology rollout like this, and it becomes clear that the verdict rests on ***layer after layer*** of speculation. Merely saying that a plaintiff offers "an attractive commodity" is not enough to eliminate that speculation. *See Real Est. Value Co.*, 979 F. Supp. at 743 (similar "causation deficiencies" doomed lost-profits claim). These failures of proof entitle Defendants to judgment as a matter of law.

### C.    Sonrai's damages evidence was legally insufficient.

Causation was not the only thing that Sonrai failed to prove to a reasonable degree of certainty. It also failed to prove the ***amount*** of its damages for each customer in question. *See* Dkt. 772 at 27 ("Sonrai also has the burden to prove the amount of its damages to a reasonable degree of certainty"); *Kinesoft*, 139 F. Supp. 2d at 910 (new business or not, a plaintiff seeking lost profits must prove them to a reasonable degree of certainty).

At trial, Sonrai presented ***no evidence*** that the third parties at issue—Progressive, Waste Management, and Republic—characteristically enter into technology contracts of the imagined duration and contract terms: no customer testimony, no customer documents, and no industry-expert testimony. Nor did it present evidence to find that these three opportunities were truly zero-sum opportunities that only Sonrai or Heil—but not both, and not anyone else—could secure and sustain throughout the nine-year asserted damages period. In contrast to Sonrai's non-existent evidence, Heil's ***actual, real-world*** evidence told a different story. *See, e.g.*, Trial Tr. 1238:20–

14

1239:8 (Heil's industry expert John Culbertson: "any company in the industry looking at a new technology would go look at other prospective competitors . . . and the notion of there being very long-term contracts for a technology just doesn't fly"); *id.* at 1238:9–14 (Culbertson: "Q. Are there other players in the positive service verification space other than 3rd Eye? A. Yeah, absolutely… positive service verification can be done multiple ways"); *id.* at 1397:15–1398:11 (Kyle Kummer naming 3rd Eye's "main competitors in the service verification piece of the digital solutions market"); *id.* at 1633:19–23 (Eric Monsen confirming that Waste Management sent its PSV-related RFI to "multiple competitors").

As other courts have held, lost-profits awards cannot be sustained when the imagined "but for" world fails to account for the reality that "[d]uring the period in question, [multiple] competitors vied for sales" in the relevant market, selling "different types of [the underlying product] at different prices to different customers." *See BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218–19 (Fed. Cir. 1993) (reversing lost-profits award); *cf. Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (affirming new-trial order where the damages expert "failed to consider the effect of competition" and his "testimony gave the jury an unrealistic idea of the appropriate measure of damages"). That is exactly the case here. Uncertainty in future-damages estimation "does not give an injured party carte blanche to provide wild guesses at its damages." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995 (7th Cir. 2002). Sonrai's wild guesswork on damages amounts requires entering judgment for Defendants.

### D.     Vacating the compensatory awards requires vacating the punitive awards.

Entering judgment on damages also requires vacating the punitive damages awards. On this, Illinois law is clear: punitive damages "are in addition to compensatory damages and cannot be allowed unless actual damage is shown." *Hayman v. Autohaus on Edens, Inc.*, 315 Ill. App. 3d 1075 (1st Dist. 2009); *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 825 (1st Dist. 2003) (same

effect); *Mitchell v. Elrod*, 275 Ill. App. 3d 357, 362 (1st Dist. 1995) ("punitive damages may not be recovered in the absence of compensatory damages") (collecting cases).

## II.      The tort claim against Heil fails as a matter of law, as does the punitive-damages award.

Sonrai's tort claim against Heil fails for two other reasons, too.

### A.      Sonrai's tort recovery against Heil is barred by the *Moorman* doctrine.

To start, as Heil previewed during trial, Illinois law does not allow Sonrai to recover in tort for its pure economic losses. That verdict must be vacated, along with the corresponding punitive damages award. *See* Trial Tr. 1872:10–1873:23 (raising this issue); *id.* at 1875:10–15 (The Court: "If it turns out you're correct that somehow it's a unitary theory… the punitive damage issue, if that's correct, can simply be stricken – stripped from the award."). Two things are not in dispute. One, Sonrai sought purely economic losses. And two, the complained-of conduct by Heil was the same in contract and tort—the key allegation being that it used "confidential information from Sonrai" to create a "copycat" product. Trial Tr. 990:22–991:13 (Stuckwisch); *see also id.* at 982:1–4 (Sonrai counsel: "They emboldened him to breach his fiduciary duty, and they violated the agreement by soliciting him and using Vector material"); *id.* at 185:13–186:4 (same effect). The combination of those two undisputed points compels a single conclusion—the tort verdict cannot stand.

That is because, subject to certain exceptions not applicable here (*see Rasgaitis v. Waterstone Fin. Grp., Inc.*, 2013 IL App (2d) 111112, ¶ 56), "a contracting party who suffers purely economic losses **must seek his remedy in contract and not in tort**." *Glob. Cash Network, Inc. v. Worldpay, U.S., Inc.*, 148 F. Supp. 3d 716, 723 (N.D. Ill. 2015) (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69 (1982) (emphasis added)). And "where a claim for civil theft is exactly coextensive with the nonperformance of an agreement between the parties," only the

contract claim is allowed. *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1107 (N.D. Ill. 2012) (citation omitted). In *Global Cash Network*, for example, the *Moorman* doctrine required the dismissal of a claim for aiding-and-abetting a breach of fiduciary duty because, as the court noted, the defendant's obligations "were essentially contractual[.]" *Id.* at 727. The same is true here; Sonrai's tort claim is impermissible because "a contractual provision exists governing the confidentiality of proprietary information[.]" *Sencon Sys., Inc. v. W.R. Bonsal Co.*, 1988 U.S. Dist. LEXIS 2833, at *11 (N.D. Ill.). The *Moorman* doctrine precludes tort—and punitive-damages liability—as a matter of law. *See, e.g.*, *Meadoworks, LLC v. Linear Mold & Eng'g, LLC*, 2020 U.S. Dist. LEXIS 127901, at *10–12 (N.D. Ill.) (dismissal of *Moorman*-barred tort claim mooted punitive damages).

### B. There is insufficient evidence to support the tort finding in any event.

Even if the *Moorman* doctrine did not shield Heil from tort liability (it does), the evidence is legally insufficient to support a liability finding against Heil.

Take the first required element of this claim—that "Mr. Romano breached his duty of loyalty, as set out in the previous instruction." Dkt. 772 at 23. Sonrai did not prove that element, for all the reasons discussed in Romano's Rule 50(b) motion, being filed separately today and incorporated by reference herein. *See, e.g.*, *Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 738 (1st Dist. 2009) ("A predicate to any liability based on a theory of an inducement of a breach of a fiduciary duty, however, is the existence of a fiduciary duty in the first instance.").

But even if the Court does not disturb the liability finding against Romano on the basis that he downloaded data and had an adverse instruction against him, ***Heil*** is a different story altogether. No evidence shows that Heil "colluded" with Romano in committing any download-and-use breach—or that it "knowingly participated in or induced" the same, enabling it to later "accept benefits resulting from that breach" through copycat sales. *LQD Bus. Fin. Inc. v. Azizuddin Rose*

& *Akf, Inc.*, 2023 U.S. Dist. LEXIS 237125, at *31 (N.D. Ill.). This is not even a close call: Sonrai pointed to no contemporaneous emails showing that Heil ***even knew*** that Romano was on-site at Progressive in early January 2016, much less that Heil ordered him to download proprietary Sonrai data to give Heil a competitive edge post-employment. Nor did Sonrai solicit any witness testimony to that effect at trial: nothing from Romano, Carroll, or anyone else. And Sonrai cannot avoid this result by pointing to the spoliation instruction against Romano. That inference did not apply to Heil (*see* Dkt. 772 at 19), and Sonrai ***had*** the relevant emails from Heil; it simply did not find any evidence of Heil mentioning, much less exhorting Romano to take, Sonrai data. On this critical issue, the record is silent. This entitles Heil to judgment as a matter of law.

## C.     At a minimum, the punitive award against Heil must be vacated.

If Sonrai's tort case against Heil was weak, its punitive damages case was even weaker. This Court already recognized that Sonrai's evidence of malice "as to Heil" was "thin, very thin." Trial Tr. 1668:21–1669:4. That evidence was not merely "thin;" it was ***nonexistent***.

Punitive damages "are not favored in the law" and "should not be awarded if the defendant's misconduct is not above and beyond the conduct needed for the basis of the underlying cause of action." *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 828–29 (1st Dist. 2003). Here, Sonrai failed to prove that Heil is even liable on the "underlying cause of action." It certainly did not prove, by clear and convincing evidence, that Heil acted "with a conscious and deliberate disregard for Sonrai's rights." Dkt. 772 at 25. That ends the matter.

Of course, the lack of evidence did not stop Sonrai's counsel from blurring the issue during closing argument, suggesting that it was the language and tone of the December 2015 emails that demonstrated malice. Sonrai's counsel focused specifically on PTX-55, an email from Romano to Heil's Frank Kennedy ***and*** someone outside Heil altogether (Don Ross, of Kessler Consulting): "Talked with JC last night, he had been debriefed by Pat. He shares everyone else's option of 'fuck

him.'" *See* PTX-55 at 4; Trial Tr. 1751:13–1752:11 (closing argument). Blurring the issue may have been an effective short-term strategy, but it is legal nonsense. No reasonable person could look at that email and think, "Heil is urging Romano to download particularized, proprietary data while on-site at Progressive to be malicious toward Sonrai." This was a sideshow. While one might hope for more decorum in communications, the appearance of profane language in emails between Romano, Kennedy, and a third party in no way constitutes "evidence of conscious wrongdoing or outrageous acts" tied to the underlying theory of liability and damages. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 2010 U.S. Dist. LEXIS 143993, at *44 (S.D.N.Y.) (granting Rule 50(b) relief and vacating punitive damages award when the plaintiff "adduced no evidence suggesting anything more than, at worst, personal animus on the part of [the complained-about employee], and poor management decisions" by the employer); *CIT Commc'ns Fin. Corp. v. Wes-Tech Automation Sols.*, 2010 U.S. Dist. LEXIS 84742, at *30 (N.D. Ill.) (similar). The Court must correct this error and vacate the punitive damages award against Heil.

## III.    The contract claim fails as a matter of law.

Finally, Sonrai's contract claim fares no better than its tort claim.

### A.    Sonrai's breach evidence was legally insufficient as to the "use" theory.

Take the "misuse of confidential information" theory first. "Evaluation Material" is a defined term in the contract: it includes a list of things "furnished to the Receiving Party or any of its Representatives pursuant hereto." PTX-2 at 2. And the contract does not protect ***all*** exchanged information; falling outside that bucket is any information that (1) is publicly available; (2) is already in the Receiving Party's possession; or (3) becomes available to the Receiving Party from a different source on a non-confidential basis. *See id*. Once the parties stopped exchanging information in late 2015 (once Sonrai conveyed that it wished to remain independent, *see* DTX-226, PTX-52), the surviving obligation was to refrain from "us[ing] Evaluation Material of the

Disclosing Party in the development or acquisition" of "business ideas, products or technologies similar to or the same as that which is provided by the Disclosing Party." PTX-2 at 4. But of course, the contract allowed each party to develop a product that is "***similar to or the same as***" the counterparty's, so long as it did not use the counterparty's Evaluation Material in doing so. *See id.*

So what proprietary Evaluation Material did Sonrai furnish to Heil under the contract? The answer is unclear, even construing the record in the light most favorable to Sonrai. This entitles Heil to judgment as a matter of law on this contract theory.

At most, Keizer and Flood testified that "Vector" was some sort of "system" to "knit" body and chassis signals together. Trial Tr. 296:22–297:8; 534:15–535:8. But that is no more than a general description of the "Connected Truck" concept that Heil had been working on since 2012, incorporating Heil's full suite of proprietary body codes, without Sonrai. *See* DTX03; DTX06; Trial Tr. 886:2–887:5; 919:13–920:6 (Carroll). That generic "system" description plainly falls squarely within the contractual carveout for already-known information and independently-sourced information. *See* PTX-2 at 2–3 (Sonrai "acknowledge[s] that [Heil] owns, is developing, or has developed similar products and technology prior to the execution of this letter agreement, including without limitation, ***connected truck and all on board marketing software solutions***") (emphasis added). No reasonable jury could conclude otherwise.

Sonrai's evidence gets no better when discussing the specifics, either. When pushed to describe the ***technical*** components of its "Vector" system, Sonrai witnesses Keizer and Flood were equally as vague—and they never once testified to the critical "furnishing" piece:

- **Custom Rules**. Trial Tr. 299:7–19; 309:1–4; 535:21–538:5; 540:15–23; 552:2–8. There is no record evidence that Sonrai provided Heil with these custom rules, or with access to end users' websites where such custom rules were used.

- "**An enterprise service bus.**" It's a group of different software components pulled together that are integrated." Trial Tr. 307:2–14 (Keizer). There is no evidence that

Sonrai provided Heil with access to its enterprise service bus or to the computer code or other technology that created that component. And if this is referencing the J1939 Bus, that technology is publicly available (and is thus not Evaluation Material); it was not created by Sonrai. *See* Trial Tr. 1296:18–25 (Smith).

- "**A reliable, robust and scalable architecture**," a description that is so general as to be meaningless. Trial Tr. 311:1–19 (Keizer). Neither Keizer nor any witness or document evidences Sonrai furnishing the technology underlying this architecture to Heil under the 2014 contract.

- "**Certain applications we built into the—our website on the platform**." Trial Tr. 552:5–8 (Flood). Other than a zone importer, discussed below, Sonrai never detailed these "certain applications" or offered any evidence that it provided Heil with access to these applications or to the code creating them.

- **A zone importer that used data and technology from ESRI and ARCGIS**. Trial Tr. 307:2–308:6; 552:5–553:2. There is no evidence that Sonrai ever described this tool or gave Heil access to it or to the ARCGIS/ESRI information. And ESRI and ARCGIS themselves are separate products created by other companies that are publicly available—*i.e.*, the opposite of Evaluation Material.

These failures of proof are persistent—and dispositive. Even assuming these component pieces were proprietary to Sonrai (several were public, so—no), the only witness to testify on this "furnishing" issue during Sonrai's case-in-chief ***consistently and expressly denied*** supplying these supposed pieces to Heil during the parties' joint-development work. *See* Trial Tr. 721:4–722:10; 724: 4–12 (Romano). Heil's John Smith, who personally furnished to Sonrai ***Heil's*** key Evaluation Material—its proprietary body codes—also denied receiving any Evaluation Material from Sonrai. *Id.* at Trial Tr. 1313:5–8. Sonrai cannot escape a judgment as a matter of law by ignoring this testimony or questioning its credibility. Inference alone will "neither supplant nor neutralize the clear, compelling, and unequivocal evidence" on this issue. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 U.S. Dist. LEXIS 550, at *26 (N.D. Ill.) (granting Rule 50 relief). Having failed to identify a single piece of Vector-related Evaluation Material that it provided to Heil under the contract, Sonrai's verdict cannot stand.

That verdict cannot stand for a second, independent reason: Sonrai failed to prove that Heil *used* such Evaluation Material (whatever that was) in 3rd Eye's ultimate PSV product. *See, e.g.*, *Transperfect Glob., Inc. v. Lionbridge Techs., Inc.*, 2022 U.S. Dist. LEXIS 12710, at *17 (S.D.N.Y.), *aff'd*, 2024 U.S. App. LEXIS 1053 (2d Cir.) (granting summary judgment in contract and trade-secret misappropriation case in the absence of similar evidence). This is critical. None of Sonrai's witnesses testified that the 3rd Eye product released in late 2017 actually used the contractually-defined Evaluation Material. *See* Trial Tr. 401:11–403:16; 409:2–413:22 (Keizer admitting he had no evidence of the 3rd Eye PSV product using Sonrai Vector technology); *id.* at 428:20–23; 432:12–15 (Mantel testifying that he left in July 2017, before the 3rd Eye product was launched, and admitting that he was not involved in the 3rd Eye technology or development efforts); *id.* at 500:22–25; 501:6–13 (Regan testifying that he knew nothing about the technical development of the 3rd Eye product). And of course, Sonrai offered *no technical expert* at trial, despite this being a technical dispute beyond the ken of ordinary jurors. *See, e.g.*, *Nordstrom Consulting, Inc. v. M&S Techs., Inc.*, 2008 U.S. Dist. LEXIS 17259 (N.D. Ill.) (granting summary judgment in copyright infringement action in the absence of expert testimony); *Ass'n for Disabled Americans, Inc. v. Claypool Holdings LLC*, 2001 U.S. Dist. LEXIS 23729 (S.D. Ind.) (similar). This failure of proof by Sonrai is stark.

Contrast Sonrai's non-existent proof with Heil's own. Witness after witness confirmed that the 3rd Eye PSV product was developed by engineers who had no knowledge of, much less use for, Vector, Sonrai, or anything that Sonrai provided under Heil's 2014 contract. Trial Tr. 1313:5–8 (Smith); 1536:4–7 (Ham). Here is just a sample of testimony from Richard Buteau—the technical engineering lead at 3rd Eye:

> Q.     Okay. Mr. Buteau, prior to having your deposition taken in 2021, had you ever heard of Sonrai's Vector product?

A.      No.

Q.      How big a team did you ultimately end up building to work on this technical [PSV] solution?

A.      I think we had 40 people I think, roughly 25 full-time employees. I had to build an office in Austin, Texas, to do that. And we had 15 subcontractors in India.

Q.      Did Heil contribute any technology to that [Gateway V4 device] effort?

A.      No.

Q.      Right. What other technology from Heil's Enhance effort [other than encrypted body codes] did you use in the 3rd Eye solution?

A.      None.

Q.      And did you use any of that [Heil/Dover] code?

A.      No. We deleted all of it because there was nothing useful.

Q.      Did you incorporate any technology from the Geotab device into the positive service verification solution you ended up building?

A.      No, we did not. It's incompatible with what we were doing.

Q.      Did Heil as part of the acquisition supply you with any custom rules that you built into your 3rd Eye solution?

A.      No. Most of our decisions were based on the edge computer -- straight edge that we have. That's not compatible with what the Geotab [device] is doing[.]

1442:13–15; 1452:10–14; 1456:10–11; 1456:20–22; 1457:7–8; 1458:11–14; 1460:23–1461:2.

This evidence is overwhelming, and it points only in one direction: 3rd Eye never used any Sonrai-furnished Evaluation Material in its PSV product. Sonrai's failure of proof entitles Heil to judgment as a matter of law on the contract "use" theory.

**B.      Sonrai did not prove that Heil reasonably contemplated future lost sales at the time of contracting.**

Judgment is also required on the contract claim because Sonrai failed to prove that future lost sales "were reasonably within the contemplation of [Heil] at the time the contract was entered into." *See TAS*, 491 F.3d at 632–33.

At summary judgment, the Court found that Heil "reasonably contemplated" Sonrai's lost sales because "[i]t is common sense that the sale of one competing product may decrease the sale

23

and profits of the other product." Dkt. 657 at 17–18. That may be "common sense," but that does not mean Sonrai **proved** that in **2014**, when the parties entered into the agreement, Sonrai raised the possibility of profits arising from the **five specific** collateral transactions at issue, so much so that—under the law—Heil assumed liability for Sonrai giving up on Vector sales after Heil's (alleged) breach. The law does not stretch as far as Sonrai would like. *See, e.g.*, *Mandel v. Hernandez*, 404 Ill. App. 3d 701, 707 (1st Dist. 2010) (a contractual party "cannot be held responsible for lost profits that were contingent on collateral transactions of which he had no **specific knowledge** at the time of contract") (emphasis added).

Nor is it the case that third-party deals, at large, were themselves "the basis of the [parties'] agreement" so as to fall within Heil's contemplation. *See Unilever U.S., Inc. v. Johnson Controls, Inc.*, 2017 U.S. Dist. LEXIS 21498, at *12 (N.D. Ill.). In June 2014, neither party had a viable PSV product combining chassis and body data. There were no customers. To that end, the contract on its face does not contemplate profits from third-party transactions contingent on each party's performance. Rather, it is a non-disclosure agreement, under which each party agreed to exchange information to facilitate a "possible transaction **involving [a] possible sale [or] licensing** . . . **of Sonrai** and/or intellectual property and related know-how[.]" PTX-2 at 2 (emphasis added). There are no payment terms; no exclusivity provisions—certainly nothing about being in the enviable position of outfitting "approximately one-third of the entire [waste hauling] market" with PSV technology. Trial Tr. 1045:10–14. In no sense was Sonrai's "ability to operate [its] business, and thereby generate profits on collateral transactions," "contingent on [Heil's] performance of the primary contract." *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2d Cir. 2007). Quite the opposite: each side recognized that the other had the ability, and the intention, to compete independently to execute on the "Connected Truck" vision if Sonrai did not want to be acquired.

24

PTX-2 at 4. Sonrai, however, gave up on its plans. *See supra* at 10–13. Illinois contract law does not permit the recovery of these consequential damages.

### C. Sonrai failed to prove solicitation damages.

At a minimum, Sonrai never suggested—much less proved—that Romano made "copycat" sales on Heil's behalf at any point through ***June 24, 2016***, when Heil's non-solicitation obligation expired. *See* PTX-2 at 4–5. Indeed, Sonrai's expert readily admitted that Heil did not make any competing PSV sales until ***late 2017***. Trial Tr. 1027:12–20 ("Sonrai was in the market several years before Heil"); 1028:5–14 (same); 1107:9–16 (same); 1123:13–15 (same). At any rate, Stuckwish told the jury that Sonrai "would've made all of the but-for sales even if Tony Romano had left the company[.]" Trial Tr. 1120:18–23. So much for harm from a solicitation breach. This lack of damages proof requires judgment as matter of law in Heil's favor on the solicitation theory.

## IV. The Court should conditionally grant a new trial if it grants this motion.

Should the Court grant this motion (and it should), it must also "conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." *See* Fed. R. Civ. P. 50(c)(1). Here, a new trial should be conditionally granted for all the reasons set out in Defendants' Rule 59 motion, also filed today.

## CONCLUSION

The Court should enter judgment as a matter of law in favor of Heil (and Romano) on all counts.

Date: July 25, 2025                                    Respectfully submitted,

                                                       The Heil Co.

James Thompson (Atty No. 6199621)
Mindy S. Schwab (Atty No. 6236299)
Stephen Mrowiec (Atty No. 6330175)                    By: */s/ Kelly Mannion Ellis*

LYNCH THOMPSON LLP                                    *One of its attorneys*
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
312-346-1600/312-667-9231 (fax)
jthompson@lynchthompson.com


William C. O'Neill (Atty No. 6280735)
Kelly Mannion Ellis (Atty No. 5216429)
Anthony Matthew Durkin (Atty No. 6325610)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
312-558-5600
WONeil@winston.com
KMannion@winston.com
MDurkin@winston.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record on July 25, 2025 via the Court's electronic filing system.

*/s/Kelly Mannion Ellis*

*Counsel for Defendant The Heil Co.*