**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SONRAI SYSTEMS, LLC,

              Plaintiff,

    v.

ANTHONY M. ROMANO AND THE HEIL CO.
d/b/a ENVIRONMENTAL SOLUTIONS
GROUP,

              Defendants.

No. 16 CV 3371

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Sonrai Systems, LLC brought three primary claims in this case. First, Sonrai alleged breach of contract against The Heil Co. Second, Sonrai alleged that Heil tortiously induced Sonrai's former employee, Anthony Romano to breach his fiduciary duties to Sonrai. And third, Sonrai brought a claim against Romano for breach of fiduciary duty. A two-week jury trial was held in June 2025. The jury ultimately found in favor of Sonrai on all counts, awarding it $28.9 million in compensatory damages, joint and several against both Defendants, and $30 million in punitive damages against Heil, as well as $1 in punitive damages against Romano. Defendants move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), R. 799, 801, and for a new trial under Federal Rule of Civil Procedure 59(a), or alternatively, for remittitur of the damages award, R. 800. Sonrai also moves to include prejudgment interest and for ongoing compensation. R. 798. For the following reasons, the motions for judgment as a matter of law and for new trial are denied.

1

The motion for remittitur is granted in part and denied in part. And the motion to include prejudgment interest and for ongoing compensation is denied.

## Background

### I.      Preliminary Background

Sonrai is a company that designs and sells data tools for waste collection companies. Heil is a company that manufactures garbage trucks, known in the industry as refuse collection vehicles ("RCVs"). When manufacturing RCVs, Heil installs the Heil-manufactured RCV body onto a chassis (wheelbase) that has been manufactured by a third party. In July 2014, Sonrai and Heil executed a Letter Agreement. The purpose of the Letter Agreement was to facilitate the exchange of confidential information and discussions about Heil's potential acquisition of Sonrai or a business relationship in which one of Sonrai's data products, known as "Vector," would be connected to Heil's RCVs. In a standard RCV, data collection devices collect chassis and location data but not signals from the RCV body. The innovation of Sonrai and Heil was that they would design a "Connected Truck" where Vector would process signals from Heil's RCV body, and then interpret those signals as data to measure movement of the RCV's arms, forks, or tailgate, presumably so that the operator of the truck could collect information regarding the truck and its collection of waste. This is known collectively as "positive service verification" and "event validation."

From July 2014 through mid-2015, Sonrai and Heil shared information and operated under the Letter Agreement as Sonrai developed Vector and Heil developed the Connected Truck. For example, Heil provided Sonrai with a list of body signals

2

("PGN codes") that the Heil controller on the RCV body was able to capture. Sonrai then wrote custom rules for Vector to interpret the PGN codes.

In May 2015, Heil offered to acquire Sonrai, which Sonrai rejected. In August 2015, the parties discussed alternatives to formalize their business relationship, but could not reach an agreement. Heil pushed Sonrai for a response, explaining that Heil needed to know whether it would be working with Sonrai or independently for continued development of the Connected Truck. In December 2015, Sonrai's CEO Chris Flood ("Flood") informed Heil that Sonrai would remain independent.

Also in December 2015, Sonrai's Vice President of Sales Anthony Romano began to request equity in Sonrai, which had been promised to him by Flood. A disagreement between Romano, Flood, and Sonrai's Chief Operating Officer Dennis Keizer ("Keizer") ensued over the equity stake, with Flood ultimately denying Romano any equity. Executives of Heil learned of the disagreement and began reaching out to Romano. Romano then began accessing Sonrai's data and downloading unknown Sonrai files onto his laptop and an external hard drive. Thereafter, Romano submitted his resignation on January 11, 2016 and had an exit interview on January 15, 2016, but did not return his laptop and continued to help Sonrai on a project in Polk County, Florida until February 4, 2016. Within days of his exit interview, Romano formed a consulting company called Optimum Analytics, LLC. On January 22, 2016, Heil entered a consulting agreement with Optimum, under which Optimum would consult for Heil regarding product development. On

February 11, 2016, after receiving a demand letter from Sonrai, Romano returned his laptop, but not before wiping it and his hard drives.

In September 2016, Heil acquired a company called 3rd Eye. In 2017, Heil, acting through 3rd Eye, completed development of an event validation product called Enhance. Romano worked with Heil and 3rd Eye to develop Enhance.

Sonrai filed this lawsuit in March 2016. The operative second amended complaint was filed in August 2017. Pertinently, Sonrai alleged that Romano breached his fiduciary duties to Sonrai when he stole confidential information about Vector and that Heil induced Romano to do so. Additionally, Sonrai alleged that Heil breached the Letter Agreement by soliciting Romano and using Sonrai's confidential information to create Enhance. Sonrai also alleged unjust enrichment against Heil.

Further, Sonrai sued Geotab, Inc., another company that offers its own event validation product for waste collection companies called Geotab Go (the "Go Device") which plugs into and collects data from onboard computers in RCVs. The Go Device then transmits the data to Geotab's servers where users access the data through their MyGeotab web portal. In January 2014, Sonrai and Geotab entered a confidential information agreement ("CIA") that protected confidential information exchanged between the parties. After entering the CIA, Geotab and Sonrai did not directly engage in business transactions. Instead, Sonrai purchased Go Devices and contends it ultimately modified and enhanced these Go Devices with Sonrai's proprietary features to create Vector. In its complaint, Sonrai alleged, *inter alia*, that Geotab breached the CIA and tortiously interfered with Sonrai's business relationship with

4

two large waste collection companies, Progressive/Waste Connections ("Progressive") and Waste Management.

## II.    Summary Judgment

After discovery, Geotab, Heil, and Romano moved for summary judgment. The Court granted Geotab's motion in full and dismissed it from the case. R. 657 at 6–12. Regarding Heil, the Court granted summary judgment on the unjust enrichment claim, but denied it as to the breach of contract and tortious inducement claims. *Id.* at 12–21. The Court explained that Heil failed to address Sonrai's actual claim on tortious inducement. Next, the Court found there were disputed facts as to whether Romano had access to and used Sonrai's data when working with Heil to develop Enhance, in breach of the Letter Agreement. The Court further found that Sonrai had sufficiently shown damages. In so finding, it rejected Heil's argument that Sonrai could not seek lost profits under Illinois's "new business rule" and that lost profits were not reasonably contemplated by the parties when they entered into the Letter Agreement. The Court denied Romano's motion for summary judgment for the same reasons.

The Court also largely rejected Heil's challenges to Sonrai's damages expert, Suzanne Stuckwisch ("Stuckwisch"). Stuckwisch's damages, however, were not apportioned between Romano, Heil, and Geotab. The Court disagreed with Sonrai's argument that its injuries were indivisible between Geotab and Heil/Romano. Given Geotab's dismissal, the Court ordered Stuckwisch to amend her report to remove calculations and analysis related solely to Geotab.

5

### III.  *Daubert* Challenge

In this case, Stuckwisch has disclosed a number of expert reports. *See* 761 at 1–3 (explaining progression of reports). In her 2022 report, Stuckwisch calculated $59.4 million in lost profits Sonrai would have received from five waste hauler customers but for the purported wrongful conduct of Romano, Heil, and Geotab, namely: Progressive; Waste Management; Republic; Waste Corp. of America; and Casella. On October 25, 2024, after Geotab was dismissed, Stuckwisch disclosed a second amended report, which deleted most mentions of Geotab and the damages alleged against it but opined that Heil and/or Romano caused lost profits of $59.4 million, the exact same amount set forth in her 2022 report.

Defendants filed a *Daubert* motion to exclude Stuckwisch's testimony at trial. Stuckwisch then disclosed a third amended report on May 2, 2025, which the Court allowed, and which indicated that her methodology was unchanged, but increased the lost profits amount to $83.4 million based on updated evidence. In a supplemental report, Stuckwisch reduced that amount by the incremental costs, for a total lost profits of $72.5 million. On June 2, 2025, Stuckwisch testified at a *Daubert* hearing.

Ultimately, the Court denied the *Daubert* motion, finding the following: (1) Stuckwisch followed the "before-and-after" methodology to calculate lost profits; (2) her assumption that all five of the haulers would have launched fleetwide rollouts of Vector was appropriate and supported by evidence she reviewed; (3) Stuckwisch reasonably explained her customer-by-customer calculation was not an all-or-nothing

6

approach that failed to rule out or factor for alternative contributory causes; and (4) Stuckwisch's late inclusion of additional incremental costs was not prejudicial.

## IV.    The Trial

A two-week jury trial proceeded on three claims: (1) breach of a fiduciary duty against Romano; (2) tortious inducement of fiduciary duty breach against Heil; and (3) breach of contract against Heil. Stuckwisch testified that, as a result of Defendants' wrongful conduct, Sonrai's lost profits were $72.5 million. She testified further that Sonrai's lost profits by customer were: $13.2 million for Progressive; $32.8 million for Waste Management; $23 million for Republic; $2.4 million for Waste Corp. of America; and $1.1 million for Casella. At the end of Sonrai's case-in-chief, Defendants moved for judgment as a matter of law pursuant to Rule 50(a). R. 763. The Court did not rule on that motion and allowed the matter to be submitted to the jury.

The jury returned a verdict in Sonrai's favor, finding that Romano had breached his fiduciary duty, that Heil had tortiously induced Romano to breach his fiduciary duty, and that Romano and Heil had acted with malice in doing so. The jury further found that Heil had breached the Letter Agreement by improperly soliciting Romano and misusing Sonrai's confidential information in the development of Enhance. The jury awarded the following compensatory damages for lost profits for the following companies: $5,195,441 from Progressive; $12,877,408 from Waste Management; $10,832,305 from Republic; $0 from Waste Corp. of America; and $0 from Casella. R. 775.

7

After rendering its verdict on liability, the jury was then presented with the question of punitive damages. After further deliberations, the jury awarded Sonrai $1 against Romano and $30 million against Heil. R. 777.

Defendants filed renewed motions for judgment as a matter of law pursuant to Rule 50(b) and a motion for a new trial under Rule 59(a), or alternatively, for remittitur of the damages award. Sonrai moves to include prejudgment interest.

## Discussion

### I.    Motion for Judgment as a Matter of Law

A motion under Rule 50(b) is a post-verdict renewal of a Rule 50(a) motion for a directed verdict, and asks the court to enter a judgment as a matter of law against a party that prevailed at trial. *See* Fed. R. Civ. P. 50(a), (b). A court should only grant a Rule 50(b) motion if "a reasonable jury would not have a legally sufficient evidentiary basis to find" for the prevailing party. *See id.* "In other words, a trial court should overturn a verdict only where the evidence supports but one conclusion—the conclusion not drawn by the jury." *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009). In reviewing such a motion, courts construe the evidence "strictly in favor of the party that prevailed at trial," including by "drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2012) (citations omitted). Defendants argue that judgment as a matter of law should be entered because Sonrai's liability proof is legally insufficient and its damages are legally defective. The Court takes these in turn.

### A.      Romano – Liability

The Court first addresses Defendants' arguments against the jury's liability findings as to Romano. Sonrai alleges that Romano breached his fiduciary duties to Sonrai. Under Illinois law, to succeed on a claim for breach of fiduciary duty, it must be proven: "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 69. The Court found as a matter of law that Romano, despite his title as a vice president, was an employee. *See* R. 748 at 11–34; R. 782. Employees owe a duty of loyalty to their employer, which means employees must treat their employers "with the utmost candor, care, loyalty and good faith." *See Lawlor*, 2012 IL 112530, ¶ 69; *LaSalle Bank Lake View v. Seguban*, 937 F. Supp. 1309, 1324 (N.D. Ill. 1996) (applying Illinois law). Once an employee leaves his employment, his duty of loyalty ends. *See Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 160 (1993).

Romano argues that he is entitled to judgment as a matter of law for two reasons: (1) there is insufficient evidence that he took and used Sonrai's proprietary information; and (2) he did not compete with Sonrai while employed by Sonrai. The Court addresses these in turn.

### 1.      Proprietary Information

It is well-established that an employee in Illinois breaches his fiduciary duty by downloading or copying employer data in order to compete with the employer after their employment has ended. *See Griffin Asset Mgmt., LLC v. Clark*, 2023 WL

6276551, at *5 (N.D. Ill. Sept. 26, 2023); *PrimeSource Bldg. Prods., Inc. v. Felten*, 2017 WL 11500971, at *8 (N.D. Ill. July 6, 2017); *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 837–38 (C.D. Ill. 2014); *Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 1075–76 (1991).

The jury heard evidence that on December 13 and 14, 2015, Romano connected an external hard drive to his computer that took data off the laptop to be stored on the external hard drive. Tr. 640. Further, on January 8 and 9, 2016, Romano's laptop connected to Sonrai's system and began a 24-hour download. *Id.* at 641–43. These events all occurred while Romano was undisputably still employed by Sonrai. After Romano submitted his resignation on January 11, 2016, Flood set up an exit interview for January 15, 2016 and asked Romano to return "all physical and intellectual Sonrai property." *Id.* at 687. However, Romano did not bring his company laptop to the meeting. *Id.* Between January 15, 2016 and February 4, 2016, Romano continued to work on a project in Polk County for Sonrai and claimed he needed the laptop to work on that project. *See id.* at 567, 688. On February 6, 2016, Sonrai sent a demand letter to Romano to return his laptop and any corporate property by February 11, 2016, or else Sonrai would seek legal action. *Id.* at 687–88. On February 10, 2016, Romano connected the same external hard drive and downloaded 30 gigabytes of data and removed 236 gigabytes of data from his company laptop. *Id.* at 643–44. On February 11, 2016, Romano installed a program called CleanMyMac, an anti-forensic tool which makes it difficult to perform a forensic investigation. *Id.* at 645–46. The laptop was returned on February 11, 2016.

10

While this case was in discovery, then-Magistrate Judge Cummings issued a report and recommendation, finding that Romano had spoliated evidence and recommended as a sanction that this Court give an adverse inference instruction to the jury against Romano. *See generally* R. 470. The Court adopted the report and recommendation, R. 474, and the parties agreed that a mandatory adverse inference be given, R. 748 at 46. The jury was instructed that they "must assume that such [spoiled] evidence would have been unfavorable to Romano." R. 772 at 20. Therefore, there was sufficient evidence for the jury to infer that Romano took Sonrai's proprietary information, such as its custom rules, while Romano was an employee of Sonrai, whether his employment ended on January 15, 2016, as Romano contends, or February 4, 2016, as Sonrai contends.

Moreover, the jury heard testimony that while Romano was employed by Heil, he had access to and used Sonrai's confidential data and information in helping to build Enhance. Tr. 440–41, 496–97.[1] Indeed, one ex-Heil employee called Vector the "foundation" for the Enhance product.[2] *Id.* 441–42. This is sufficient evidence for the jury to find that Romano used Sonrai's proprietary data while at Heil.

---

[1] Romano argues that 3rd Eye's former employee Mark Regan's testimony was hearsay. R. 801 at 8. But no hearsay objection was made at trial, so the testimony came in for its truth.

[2] The parties dispute whether Enhance is a standalone product or an information-gathering project intended to help create the Connected Truck—Sonrai presented evidence that Enhance was a product and Heil presented evidence that it was a project. In the end, the jury heard the parties' arguments and weighed the evidence. Although the jury was not asked to make a special finding on this question, it rejected Heil's take on the evidence.

11

Romano argues that Sonrai failed to prove that the data he downloaded was in fact proprietary to Sonrai and that Sonrai may not rely solely on the adverse inference to support the jury's verdict. *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1135 (7th Cir. 2020) (explaining that an "adverse inference based on the destruction of evidence—standing alone"—is not enough to support a jury's verdict). But an adverse inference, supported by relevant direct or circumstantial evidence, "may be a sufficient evidentiary basis for a jury's verdict." *Id.* at 1136. Here, Sonrai did not only rely on the adverse inference; it presented evidence from former Heil and 3rd Eye employees that they personally saw or heard about Romano accessing Sonrai's software and that Vector was foundational to Enhance. The jury heard testimony from Flood describing his development of Vector and the custom rules he built that had not existed in the industry before and were only available through Vector. Tr. 535–41. The jury also heard that Romano had access to these codes while at Sonrai. *Id.* at 540. The adverse instruction allowed the jury to infer why Sonrai could not identify the exact files Romano downloaded, but Sonrai did not stop there.

Romano also argues that there was insufficient evidence to prove a breach of his fiduciary duty occurred because he was simply using the information and knowledge he acquired while working at Sonrai. "It is clear that an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer." *Schulenburg v. Signatrol, Inc.*, 33 Ill.2d 379, 387 (1965); *see also Prudential Ins. Co. of Am. v. Sempetrean*, 171 Ill. App. 3d 810, 817 (1988) ("One who works for another cannot be compelled to erase

from his mind all the general skills, knowledge, acquaintances and over-all experience which he acquired during the course of his employment."). But it is also "equally clear that the same employee may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors." *Schulenburg*, 33 Ill.2d at 387. The jury heard sufficient evidence from which it could infer that Romano took with him to Heil not only general information and knowledge he acquired while at Sonrai, but also Sonrai's confidential data. And Romano presented no evidence that he committed any Sonrai data to memory or that it was readily obtainable. *See, e.g.*, *Revcor, Inc. v. Fame, Inc.*, 85 Ill. App. 2d 350, 357 (1967) (explaining that an employee may use his "memory" and any "publicly listed or otherwise readily obtainable" information); *Kalnitz v. Ion Exch. Prods., Inc.*, 2 Ill. App. 3d 158, 162 (1971) (finding that the customer price list was not confidential and it was not a breach to remember some of defendant's prices from plaintiff's years of experience with defendant).

Romano additionally argues that when he was wrongfully accessing Sonrai's data, he owed no fiduciary duty to Sonrai as a matter of law because he was no longer employed by Sonrai. True, an employee's fiduciary duty generally ends when his employment ends, but that does not excuse breaches that were carried out while still employed. It would be illogical for Romano to be able to be absolved for a breach of fiduciary duty committed while he was employed simply by resigning.

13

### 2. Competing with Sonrai

Next, Romano argues that he did not compete with Sonrai while he was employed there. "[E]mployees may plan, form, and outfit a competing corporation while still working for the employer, but may not commence competition." *See Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 736 (2009); *Guaranteed Rate, Inc. v. Thomas*, 2020 WL 6446947, at \*3 (N.D. Ill. Nov. 3, 2020). In December 2015, Romano began communicating with Heil, telling senior level employees that he would pay them back "in spades" and then began downloading massive amounts of data from Sonrai's system. Tr. 669; PTX50. Romano submitted his resignation on January 11, 2016 and had his exit interview on January 15, 2016, but continued to use his Sonrai laptop to assist Sonrai on a project in Polk County through February 4, 2016 in order to repay a salary advance. Tr. 332–33, 567. Romano formed Optimum Analytics, LLC, a consulting firm, and entered into an agreement with Heil on January 18, 2016 to help with the "[d]evelopment of technology to monitor and report data" for RCVs. *Id.* at 882; PTX 69. Thus, sufficient evidence was presented from which the jury could find that Romano breached his fiduciary duty by competing with Sonrai while employed by Sonrai, regardless of whether his employment ended January 15, 2016 or February 4, 2016, and the jury was instructed as to the parties' contentions about when his employment ended. R. 772 at 22.

Romano argues that, at most, he was an independent contractor between January 15 and February 4. But whether an individual is an employee or an independent contractor is a question of fact for the jury, *see Shoemaker v. Elmhurst-*

14

*Chicago Stone Co.*, 273 Ill. App. 3d 916, 920 (1994), and Romano requested no such jury instruction. For all these reasons, there was legally sufficient evidence to find Romano liable for breach of fiduciary duty.[3]

### B.     Heil – Liability

The jury found Heil liable for tortious inducement of breach of fiduciary duty and breach of contract. Heil argues that the evidence was insufficient to support the verdict on both counts.

### 1.     Tortious Inducement of Breach of Fiduciary Duty

First, Heil argues that Sonrai's tort recovery for lost profits, and by extension the punitive damages, are barred under *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69 (1982). In *Moorman*, the Illinois Supreme Court announced the economic loss doctrine, which bars recovery in tort for purely economic loss between contracting parties. *See Meadoworks, LLC v. Linear Mold & Eng'g, LLC*, 2020 WL 4194211, at *3 (N.D. Ill. July 21, 2020). However, Heil has forfeited this argument by not raising it at summary judgment or in its Rule 50(a) motion. A legal question that was raised at summary judgment is preserved for appeal, even if it is not raised in a Rule 50 motion. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023) (explaining that a Rule 50 motion is not required to preserve a purely legal issue when that issue was raised earlier in the case). And a Rule 50(b) motion is a renewal of the Rule 50(a)

---

[3] Sonrai also argues there was sufficient evidence for the jury to find that Romano breached his fiduciary duty by diverting Progressive away from Sonrai and instead to Heil. But the evidence showed that Romano landed Progressive at the earliest on February 11, 2016, PTX74, which was indisputably after his employment with Sonrai ended.

motion and "can be granted only on grounds advanced in the [Rule 50(a)] motion." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) (finding argument first raised in Rule 50(b) motion was not preserved). Allowing Heil to raise this argument at this stage would be contrary to Rule 50 and basic ideas of fairness and notice. *See Sunny Handicraft (H.K.) Ltd. v. Envision This! LLC*, 66 F.4th 1094, 1098 (7th Cir. 2023) ("The function of Rule 50(b) is to provide a means to reconsider issues raised earlier" not to "wait until the trial is over and cry 'Gotcha!'"); *Laborers' Pension Fund v. A & C Env't, Inc.*, 301 F.3d 768, 777 (7th Cir. 2002) ("[T]he purpose of the rule is to allow the responding party an opportunity to cure any defect in its case before it is submitted to the jury.").[4]

Heil also argues that there was insufficient evidence that it knowingly colluded with Romano. To succeed on a claim for tortious inducement of a breach of fiduciary duty in Illinois, Sonrai must show that Heil "(1) colluded with [Romano] in committing a breach; (2) knowingly participated in or induced the breach of duty; and (3) knowingly accepted the benefits from that breach." *Borsellino v. Goldman Sachs*

---

[4] Heil cites to a discussion between Heil's counsel and the Court where Heil's counsel argues that the economic loss doctrine does not permit punitive damages to be submitted to the jury. Tr. 1872–73. This discussion, however, was made after the jury had returned a verdict on the underlying claim and awarded compensatory damages. Because it was not raised before then, it cannot serve as a basis for invalidating the verdict on the underlying claims for those reasons just given. To the extent Heil argues that the economic loss doctrine should invalidate the punitive-damages award, Heil is again too late. The jury found Heil had tortiously induced Romano to breach his fiduciary duty, and had done so with malice. Punitive damages—which are not economic in nature—may then flow from an intentional tort. *See Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019) ("[P]unitive damages are retributive in nature and seek to deter wrongful acts in the first place.").

16

*Grp., Inc.*, 477 F.3d 502, 508–09 (7th Cir. 2007) (citation omitted). Liability requires a showing that defendant engaged in some "active misbehavior." *Id.* at 509; *see also Groves Inc. v. R.C. Bremer Mktg. Assoc. Inc.*, 2024 WL 4503240, at *7 (N.D. Ill. Oct. 16, 2024) (explaining that plaintiff must show that defendant induced the breach while the individual was still employed by plaintiff).

Heil argues that there is insufficient evidence to find that Heil colluded with Romano, or knowingly participated in or induced him, to steal Sonrai's confidential and proprietary data. Although there is no direct evidence of Heil telling Romano to download Sonrai's proprietary information, Heil knew that Romano was an employee of Sonrai and that Sonrai did not want to be acquired by Heil. PTX51. Heil also knew that during a meeting on December 7, 2015 with Romano, Flood, and Keizer, Romano asked for 20 percent equity in Sonrai. Tr. 706–08. The meeting turned into a screaming match and Romano left the meeting "questioning decisions that [he] had made for the last 10 years." *Id.* Immediately, top level employees of Heil began urgently reaching out to Romano—despite being concerned about Sonrai thinking Romano was "doing something" with Heil—to reassure Romano that he would land on his feet. PTX49; PTX50. Romano created a new, non-Sonrai email, got a new cellphone number, and told Heil that it would "get[ ] paid back in spades." PTX50. Thereafter, Romano began downloading Sonrai's data,[5] submitted his resignation,

---

[5] The jury was instructed that the spoliation finding could not be imputed to Heil, and that the jury was "to independently evaluate the evidence to determine what, if anything, Romano took from Sonrai and conveyed to Heil." R. 772 at 20. Thus, the jury could have still found that Romano took proprietary information from Sonrai and gave it to Heil.

and formed a consulting LLC that contracted with Heil to develop technology to capture data for RCVs. Once at Heil, Romano was listed as a core member of the Enhance team, named project manager for Enhance, and was allegedly accessing confidential Sonrai information. Tr. 431–32, 441–42, 496–97; PTX96; PTX179. From this evidence, the jury could have inferred that Heil saw this as an opportunity to hire Romano, an experienced salesperson in the waste collection industry, and that Romano intended to bring his knowledge of and connections to the industry to Heil, all the while unaware that Romano was stealing proprietary information. Or the jury could have reasonably inferred that Heil sought out Romano as a means to acquire Sonrai's technology and that Romano would pay back Heil with Sonrai's technology. The jury found the latter.

Heil responds that there are no emails or direct evidence that Heil ordered Romano to download proprietary Sonrai data to give itself a competitive advantage, and that Sonrai elicited no witness testimony to that effect. But the lack of this type of direct evidence is neither dispositive nor surprising given the secretive nature of the inducement. Also, the admitted emails did not encompass the totality of the conversations. Indeed, Sonrai's trial exhibits indicate that Heil employees spoke with Romano via telephone. *See, e.g.*, PTX49.

Heil further argues that, even assuming Heil induced Romano to take the information, Romano's fiduciary duty to Sonrai ended by the time he was accessing Sonrai's data. To say Heil is absolved of liability for inducing Romano to breach his fiduciary duty while at Sonrai because Heil did not reap the benefits of that breach

18

until his employment ended is illogical and legally unsupportable. *See Borsellino*, 477 F.3d at 508–09 (explaining that defendant must have "accepted the benefits from that breach"). Therefore, there was legally sufficient evidence, albeit not overwhelming, to support the jury's liability finding against Heil for tortious inducement of breach of fiduciary duty.

### 2. Breach of Contract

Sonrai advanced two theories for breach of the Letter Agreement: (1) misusing Sonrai's Evaluation Material; and (2) soliciting Romano in violation of the anti-solicitation clause. The jury found Heil liable under both theories. To succeed on an Illinois breach-of-contract claim, "a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28. Heil argues that judgment as a matter of law should be entered on both or either of Sonrai's breach of contract theories. The Court addresses each of Heil's arguments in turn.

### a. Misusing Evaluation Material

The Letter Agreement acknowledges that Sonrai and Heil would be exchanging "Evaluation Material." PTX2 at 2. Evaluation Material is defined to include, among other things, "software (source code or object code)." *Id.* The Letter Agreement provides, in relevant part, that it "shall not be construed to limit [Heil's] right to independently develop or acquire business ideas, products or technologies similar to or the same as that which is provided by [Sonrai]; provided that [Heil] does

19

not use Evaluation Material of [Sonrai] in the development or acquisition of such ideas, products, or technologies." *Id.* at 4. In other words, Heil could develop a product "similar to or the same as" Vector, so long as it did not use Sonrai's Evaluation Material in doing so.

Heil first argues that judgment should be entered on Sonrai's "misuse" theory because Sonrai has not identified the Evaluation Material Sonrai furnished to Heil under the Letter Agreement. The jury heard from Flood that he developed "custom rules" and "certain applications . . . like the zone importer" that were considered proprietary and confidential intellectual property of Sonrai. Tr. 537–40, 552. Flood testified that Sonrai shared confidential information under the Letter Agreement. *Id.* at 551. Keizer also explained features of the Vector product and system. For example, it knew where the truck was, which customer it was picking up for, whether the truck was operating a lift, what type of garbage can was being lifted, and then combined and broadcasted these events in real time to a web portal. *Id.* at 297, 299–301, 305, 307–09; *see also* PTX17 ("The intellectual property on [V]ector is the data handling and service provisions."). Evidence showed that Heil had an understanding of the data the custom rules were able to collect and report on. *See, e.g.,* PTX20 at 5, 16; PTX24 at 10–12. Indeed, Heil's Vice President of Sales and Marketing, Eric Monsen, testified that Romano, while at Sonrai, taught Heil how to interpret the data it was collecting, data it had never had before. Tr. 1644–45. Therefore, there was legally sufficient evidence for the jury to find that "software (source code or object code)" was shared by Sonrai with Heil under the Letter Agreement.

20

Heil further argues that Sonrai failed to present evidence that Heil *used* such Evaluation Material in the Enhance products. Heil points to its own witnesses who testified that the Enhance product was developed by engineers with no knowledge of or use for anything Sonrai provided under the Letter Agreement. But this is not surprising because Romano was the conduit for Vector to form the foundation for the Enhance product. The jury also heard from Sonrai's witnesses that the Vector technology was foundational to the development of Enhance and that these employees were aware of Romano accessing and using Sonrai's information at Heil while Heil was developing Enhance. Although none of Sonrai's witnesses could definitively confirm whether the launched Enhance product contained Evaluation Material, circumstantial evidence is just as probative and the jury could reasonably infer Heil used or integrated Evaluation Material in Enhance. *See United States v. Colon*, 919 F.3d 510, 516 (7th Cir. 2019) (explaining that juries may use common sense when making reasonable inferences from circumstantial evidence); *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (stating that direct and circumstantial evidence are of the same probative value); *DW Data, Inc. v. C. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1053 (N.D. Ill. 2013) ("While there is no direct evidence that the software was installed, circumstantial evidence is every bit as probative as direct evidence and in some cases may be more certain[.]"). Heil effectively asks the Court to reweigh the evidence and make different credibility determinations on a Rule 50 motion, which the Court will not do.

21

Additionally, Heil faults Sonrai for not offering any technical expert. Although this case has technical underpinnings, it is not itself a technical case, such as a patent case, or the copyright and trade secrets cases cited by Heil. *See* R. 799 at 28; R. 809-1 at 17. Instead, Sonrai needed to prove by a preponderance of the evidence that Heil developed a product "similar to or the same as" Vector using Sonrai's Evaluation Material. There was evidence to suggest that Heil received Sonrai's Evaluation Material under the Letter Agreement and through Romano and that Heil produced the Enhance product with access to Sonrai's Evaluation Material. This is legally sufficient evidence to find that Heil breached the Letter Agreement, obviating the need for a technical expert.

At trial, Heil's former employee Tyler Mantel ("Mantel") and 3rd Eye's former employee Mark Regan ("Regan") testified that they knew about Romano accessing Sonrai's confidential information while at Heil. Heil attempts to minimize this testimony by stressing that Mantel left the Enhance team well before Heil launched its Enhance product and that Mantel and Regan were not involved in the technical development of the product. But that argument does not minimize both Mantel's *and* Regan's testimony that they had personal knowledge of Romano using Sonrai's information in the development of Enhance. *See* Tr. 447, 496–97. Therefore, the jury had sufficient evidence to find that Sonrai provided Evaluation Material to Heil, that Romano was accessing Sonrai's information at Heil during the development of Enhance, and that Heil was using such information to develop Enhance.

22

### b. Solicitation

Next, Heil argues that judgment should be entered on Sonrai's solicitation theory because Sonrai has not proven that Romano sold any copycat product on behalf of Heil at any point before June 24, 2016, when the non-solicitation provision expired. That provision states that, "[i]n consideration of the Evaluation Material being furnished to" Heil, Heil agreed that, from June 24, 2014 to June 24, 2016, it would not "directly or indirectly solicit to employ any of the officers or employees of" Sonrai. PTX2 at 3. Notably, the provision concerns only solicitation of Sonrai's employees and says nothing about sales. The provision is violated if Heil solicited Romano before June 24, 2016. The timing of Romano's sales on behalf of Heil is irrelevant. The jury heard evidence that Heil was communicating with Romano in December 2015 and that Romano was hired by Heil before June 24, 2016. The jury had legally sufficient evidence to find that Heil had breached the non-solicitation provision of the Letter Agreement.

With breach of the solicitation provision established, Sonrai then had to prove lost profits resulting from that breach with reasonable certainty. After Heil solicited Romano and Romano gave Sonrai's proprietary information to Heil, Sonrai contends that it could no longer compete. Stuckwisch then analyzed the "but-for" world where there was no improper solicitation and calculated lost profits. Therefore, the jury was given a basis to compute lost profits with reasonable certainty due to this breach.

Heil points to one portion of Stuckwisch's testimony where she agreed with Heil's counsel that she "assume[d] Sonrai would've made all of the but-for sales even

23

if Tony Romano had left the company[.]" Tr. 1120. This cherry-picked statement is misleading because her damages are based on Romano not simply leaving Sonrai, but being improperly solicited by Heil—Sonrai's competitor—and taking proprietary information with him.

### c.     Contemplated Damages

Finally, Heil argues that judgment as a matter of law should be entered on the breach of contract claim because lost sales were not reasonably contemplated when the parties entered the Letter Agreement. "[L]ost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 623 (7th Cir. 2007) (cleaned up) (applying Illinois law). "[W]hen the profits sought are those arising out of the breached contract, the profits are considered one of the elements of the contract, and are presumed to have been within the contemplation of the defaulting party at the time he entered the contract; they are recoverable if provided with reasonable certainty." *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 263 (1992).

The Letter Agreement expressly provides that in the event of breach, the non-breaching party may seek money damages, injunctive relief, specific performance, or "all other remedies available to it at law or in equity." PTX2 at 4. On summary judgment, the Court held:

> The phrase "all other remedies" includes lost profits. . . . When Sonrai
> and Heil entered the Letter Agreement, they acknowledged that both

24

parties "own[ ], [are] developing or [have] developed similar products and technology." . . . In other words, they were aware that they were developing competing products. As alleged, Heil stole Sonrai's confidential information to develop Enhance, a competing product. It is common sense that the sale of one competing product may decrease the sale and profits of the other product. Lost profits were thus reasonably contemplated by the parties when they entered into the Letter Agreement.

R. 657 at 18. Thus, the Court decided, as a matter of law, that the profits Sonrai is seeking arise out of the breach of the Letter Agreement. That legal ruling remains undisturbed. *See Dupree*, 598 U.S. at 735 ("Trials wholly supplant pretrial factual findings, but they leave pretrial legal rulings undisturbed. The point of a trial, after all, is not to hash out the law.").

Even so, Heil argues that the parties could not have reasonably foreseen in 2014 that Sonrai would have captured the allegedly lost customers. Heil further argues that the Letter Agreement was a non-disclosure agreement to facilitate a possible sale or licensing of Sonrai and did not contemplate profits from third-party transactions. But these arguments do not change the conclusion that lost profits were reasonably contemplated by the parties. Sonrai presented the five allegedly lost customers as a way to provide a "reasonable basis for the computation of" lost profits. *TAS*, 491 F.3d at 633.

For all these reasons, there was legally sufficient evidence for the jury to find that Heil had breached the Letter Agreement by both soliciting Romano and misusing Sonrai's confidential information in the development of Enhance.

### C.  Damages

The jury awarded Sonrai $28.9 million in lost profits. Defendants contend that

Sonrai is not entitled to lost profits under Illinois's "new business rule." Defendants further contend that Sonrai has not proven either the amount of damages nor their causation with the required reasonable certainty.

### 1.	Proving Amount of Damages

First, Defendants argue that Illinois's "new business rule" prohibits Sonrai from recovering lost profits because Vector was a new product without an established track record of profits. The "new business rule" is shorthand for how Illinois courts have applied "the general principle that a plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty." *Ivey*, 2022 IL 127903, ¶ 30. In other words, Illinois courts have held that a plaintiff cannot recover lost profits unless the plaintiff can demonstrate that the business was "established before [the breach of contract or tortious act] so that the evidence of lost profits is not speculative." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 40, *aff'd,* 2022 IL 127903. However, if a new business can provide evidence "to support an inference of definite profits grounded upon a reasonably sure basis of facts," it may recover such profits. *Ivey*, 2022 IL 127903, ¶ 31. This analysis "is a fact-intensive inquiry." *Id.*

As an initial matter, whether Vector is a "new business" is a question of law that the Court already decided in Sonrai's favor at summary judgment. On summary judgment, the Court found that the new business rule did not apply because: (1) "Sonrai has existed since 2007;" (2) event validation for waste collection companies is an established market; and (3) Vector was Sonrai's third generation event validation

26

product. R. 657 at 17. In other words, the Court found that there was sufficient evidence for a jury to find lost profits regarding Vector. Heil did not move for reconsideration, so the questions of fact supporting the Court's finding that Vector was not a "new business" was not a question presented to the jury. And because that question was not presented to the jury, the jury could not have decided it, and it cannot be the basis for a motion under Rule 50. Whether there was sufficient evidence of lost profits was before the jury, and the Court considers Heil's arguments in that light below. But the Court has already ruled that the "new business rule" did not apply such that it precluded the question of lost profits from being submitted to the jury. The application of the "new business rule" is not a proper subject for a motion under Rule 50.

Regardless, Defendants' argument lack merit. Sonrai's damages expert, Stuckwisch, based her damages calculations on inputs from which the jury could reasonably draw definite profits. Keizer testified that Vector had about $500,000 in revenue in 2015. Tr. 418. Stuckwisch testified that she reviewed invoices, quotes, orders, deposition transcripts, and had discussions with Flood and Keizer in order to determine Vector's revenues and costs, along with the revenues and costs of data fees. Tr. 1050–53; *see also id.* at 1092 ("I know their costs specific to the Vector product[.]"). She subtracted those costs from revenues to come up with Vector's per-unit profits and then applied that across the five customers at issue. PTX219. Stuckwisch also testified that she did industry research on fleet sizes and explained how she calculated the number of trucks from each potential customer that would be

27

retrofitted with Vector. Tr. 994, 1043, 1048–50. Furthermore, Stuckwisch considered Keizer's and Flood's deep connections to the waste collection industry and the Flood family's long history in the industry and its financial wherewithal to finance Sonrai. Thus, Stuckwisch opined that Sonrai had the customer opportunities and capital to scale the company if it landed contracts. *Id.* at 1003, 1118–19. From this, Stuckwisch provided the jury with lost profits calculated for each allegedly lost customer.

Nevertheless, Defendants argue Sonrai has not proven lost profits because Stuckwisch did not perform a "yardstick" analysis, which helps establish lost profits for new businesses by using historical data from established, comparable businesses in the same industry with similar products in similar locations. *See Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 94 F.4th 588, 601–02 (7th Cir. 2024); *TAS*, 491 F.3d at 636; *Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1207–08 (7th Cir. 1987); *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1085–87 (N.D. Ill. July 11, 2018). Indeed, Defendants argue this is the *only* way Sonrai can prove damages in this case. *See* R. 809-1 at 4–5, 7. But such an analysis is helpful when the allegedly injured business has absolutely nothing from which to extrapolate lost future profit. *See Parvati*, 709 F.3d at 685. Here, Keizer testified to Vector sales in 2015 and Stuckwisch was able to estimate costs through review of documents given to her. And, although Stuckwisch stated that it was improper for her to include Heil's sales into her lost profits analysis, Tr. 1029–31, she opined that Heil's sales were relevant to demonstrate the demand for Enhance, and by proxy Sonrai's technology.

28

She did not, however, use Heil's sales as a means of calculating Sonrai's lost profits, but she ultimately did not need to.

Defendants also argue that lost profits are speculative because it depended on the success of Sonrai's and Heil's joint venture. *See Smart Mktg. Grp. v. Publications Int'l Ltd.*, 624 F.3d 824, 829–32 (7th Cir. 2010). The jury could reasonably infer that, but for the bad acts, the joint venture between Heil and Sonrai could have been successful.

Further, Defendants argue that Sonrai damages were "dreamed" up by Stuckwisch and point out that she was paid $1.2 million to give a spoon-fed opinion. But the amount she was paid is, at this point, irrelevant. And her damages have a grounding in the record, which distinguishes this case from that cited by Defendants. *See Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2025 WL 959654, at *6 (D. Del. Mar. 31. 2025) (finding the damages proffered solely by plaintiff's founder could "only be characterized as speculative").

Defendants contend, moreover, that Sonrai presented no evidence that the customers the jury awarded lost profits would ever enter into contracts of the imagined duration and terms, nor that these customer opportunities were those that only Sonrai or Heil could capture. True, Defendants presented their own evidence that long-term contracts for technology were rare in this industry and that there were other companies competing in the positive service verification space. *See* R. 799 at 20–21. But the jury also heard evidence that: Progressive, Waste Management, and Republic were customers of Sonrai before Romano left; Sonrai had "national contracts

29

for their RFID systems . . . with Republic Waste, with Waste Management;" Progressive was considering a fleet-wide rollout of Vector; what Vector offered was first of its kind and but-for Defendants conduct would have been the only competitor at that time; and contracts for such technology may be five years with possible extensions. *See* Tr. 288–89, 312, 317–18, 498, 569, 1028. Stuckwisch was heavily cross-examined on these points, yet the jury still credited her. Thus, the jury was given sufficient evidence to weigh, and the Court will not disturb their ultimate finding. *See Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 613 (7th Cir. 2013) (affirming denial of Rule 50 motion where there was ample evidence to find for defendant and the court must "not reweigh the evidence").

In sum, the jury was provided with a reasonable basis for the computation of lost profits with a fair degree of reasonable certainty. *See Milex Prods., Inc. v. Alra Labs., Inc.*, 237 Ill. App. 3d 177, 193 (1992).

### 2. Causation

Next, Defendants argue that Sonrai's causation evidence was insufficient. To recover under tort or breach of contract, a plaintiff must prove with "reasonable certainty" that the tort or breach caused the claimed damages. *See TAS*, 491 F.3d at 633; *Kritzen v. Flender Corp.*, 226 Ill. App. 3d 541, 557 (1992). The jury was so instructed and found for Sonrai. *See* R. 772 at 22, 26, 28.

Defendants argue that causation is lacking because Sonrai failed to mitigate or avoid the consequences of its losses when it gave up on Vector in early 2016. Illinois recognizes the doctrine of avoidable consequences, also called mitigation, which

dictates that damages that could have been avoided by a reasonable effort on the part of the person injured should not be recovered. *See Mayster v. Santacruz*, 2020 IL App (2d) 190840, ¶ 31 (breach of contract); *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61 (tort). This doctrine requires the injured party to exercise reasonable diligence and ordinary care to minimize its damages. *Mayster*, 2020 IL App (2d) 190840, ¶ 34. "The failure to mitigate damages is an affirmative defense that must be pleaded and proved by the defendant" and "[t]he party asserting failure to mitigate damages bears the burden of proof as to the extent of nonmitigation." *Id.* at ¶¶ 31, 41.

The jury heard evidence that before Romano left Sonrai he downloaded mass amounts of data onto his laptop and an external hard drive and then wiped his laptop and hard drives. The jury was instructed on this spoliation and told that they must assume such evidence would have been unfavorable to Romano. R. 772 at 20. The jury could have reasonably inferred that the laptop and/or hard drives contained Sonrai's propriety information. Indeed, the jury heard evidence that Romano was accessing Sonrai data while at Heil. *See* R. 784 at 202–03; R. 785 at 17–18.

The jury was also presented with evidence that after Romano left in early 2016, Heil immediately began developing Enhance with Romano at the helm. *See* R. 784 at 178, 207; R. 785 at 150. By February 9, 2016, Romano was creating reports on Enhance to be used as "[t]alking points for Republic GM meeting," and Romano was being asked to compare Enhance to a product Waste Management was running a trial on. R. 786 at 49–53; PTX171. Keizer explained that Sonrai kept "running into the

31

Heil Enhanced product" and that Heil's introduction of Enhance caused confusion in the market because "it had the same functionality as our Vector." R. 784 at 177. This—along with having to compete against Heil and Romano, who was Sonrai's former head of sales—led to Vector sales dropping after 2016. R. 784 at 180. The jury could have inferred from this evidence that Sonrai was effectively pushed out by its own technology, could no longer compete, and that there was simply nothing more Sonrai could have reasonably done to mitigate its damages.[6] Although Heil impeached both Keizer and Flood at trial pertaining to the reason for the decrease in Vector sales in 2016, the jury made a credibility determination that the Court will not disturb on a Rule 50 motion. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019) (explaining that, in a Rule 50 motion, the court must refrain from weighing for itself the credibility of evidence or testimony).

Defendants also argue that there was insufficient evidence to support causation because Sonrai was unable to meet the needs of Progressive during the Region of Peel rollout.[7] Meaning, Sonrai lost customers not because of Heil, but

---

[6] Defendants rely on *Vojdani v. Pharmsan Laboratories, Inc.*, 741 F.3d 777 (7th Cir. 2013), but that case is distinguishable. There, the Seventh Circuit found that lost profits could not be awarded under a "diverted trade" theory where there was no evidence defendant's breach cost plaintiff a single sale and plaintiff made no attempt to compete with defendant. *Id.* at 786. Here, no diverted trade theory has been advanced and there is evidence to suggest that Sonrai lost sales due to Defendants' wrongful conduct.

[7] Defendants also point to the fact that Casella returned the Vector units it purchased. However, the jury awarded zero damages for Casella. The jury made an independent determination that Sonrai had not met its burden of proof on damages as to Casella, either on causation or the amount, but the Court will not speculate as to which. Either way, this is evidence that the jury properly followed the instructions and carefully and separately considered the evidence as to each customer.

32

because of its own inadequate product. But there was sufficient evidence for the jury to infer that the Vector units were adequate and functional. When the Region of Peel, Canada rollout began, a number of trucks were not responding correctly. R. 784 at 84–85. In response, Flood went to some of the trucks that were not reporting and found that the Vector units' connectivity to the satellite was being blocked by the trucks' camera system. *Id.* at 86–87. Once Flood moved those units, they began to respond properly. *Id.* at 86–88. When Keizer and Flood left the Region of Peel "everything was moving well" and they would not have left if the Vector systems were not working. *Id.* at 89.

Additionally, Defendants argue that, if Sonrai and Heil were indeed competing for the same customer opportunities, there is no evidence that Heil secured these customers until 2018. Thus, Sonrai had the market to itself for two years. However, trial evidence showed that Heil's business goals were to use the Vector technology to create the Connected Truck. *See* PTX24; PTX37. When the relationship between Heil and Sonrai ended, Sonrai's theory, and the one accepted by the jury, is that Romano stole their information, Heil introduced Enhance, created confusion in the market, and Sonrai could no longer compete. Heil then purchased 3rd Eye to continue their creation of the Connected Truck using Sonrai's information. *See* PTX92; PTX133. Heil's Connected Truck technology was not commercialized until 2018, which explains why Heil did not acquire these customers until then.

All considered, the jury was presented with legally sufficient evidence to find that Defendants caused Sonrai's alleged damages. Indeed, Defendants make similar

33

arguments here that they made to the jury, and the jury was properly instructed on causation and mitigation, but it ultimately rejected the Defendants' theory. For all these reasons, the Court finds that the jury had legally sufficient evidence to find Defendants caused Sonrai damages and was given a reasonable basis to calculate lost profits.[8]

## II.     Motion for New Trial and Remittitur

In the alternative to judgment notwithstanding the verdict, the moving party may request a new trial under Rule 59(a). Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59(a). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014); *see also Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) ("A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.") (citation and internal quotation marks omitted). "When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citation and internal quotation marks omitted).

---

[8] Because there was a sufficient basis to find actual damages, Defendants' argument that punitive damages cannot be recovered in the absence of compensatory damages, R. 799 at 21–21, is rejected.

Rule 59(e) additionally provides that a court may alter or amend a judgment where there is evidence in the record that clearly establishes a manifest error of law or fact or to present newly discovered evidence. *See* Fed. R. Civ. P. 59(e); *Stragapede v. City of Evanston*, 865 F.3d 861, 868 (7th Cir. 2017). When a federal jury awards compensatory damages on a state-law claim, state law governs remittitur. *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1019 (7th Cir. 2020). In Illinois, "remittitur is appropriate only when a jury's award (1) falls outside the range of fair and reasonable compensation, (2) appears to be the result of passion or prejudice, or (3) is so large that is shocks the judicial conscience." *Ewing v. 1645 W. Farragut LLC*, 90 F.4th 876, 891 (7th Cir. 2024) (cleaned up).

## A.     Admission of Stuckwisch's Calculations

Defendants argue that it was manifest error for the Court to admit Stuckwisch's calculations into evidence, such that a new trial is warranted. At the conclusion of Stuckwisch's testimony, Sonrai moved to admit PTX219 and PTX 220 as summary exhibits under Federal Rule of Evidence 1006. This rule provides that "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, records, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a). "A summary, chart, or calculation that functions only as an illustrative aid is governed by Rule 107." Fed. R. Evid. 1006(c).

This case involves complicated and voluminous data. Stuckwisch testified that PTX219 and PTX220 were summarizations of thousands of documents that helped

her determine the inputs and datapoints used in her methodology.[9] She then described these exhibits as her summaries of lost profits by customer. Tr. 1037–40. Stuckwisch testified as an expert, gave her opinion on how lost profits were calculated, testified as to her ultimate conclusions, and was cross-examined extensively. PTX219 and PTX220 are summations of her calculations, introduced to aid the jury in understanding the evidence at trial. *See Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 771–72 (8th Cir. 2020) (finding that the district court did not abuse its discretion by admitting damages models under Rule 1006); S*tate Off. Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845–46 (10th Cir. 1985) (holding that it was not an abuse of discretion to admit projections of lost profits where the expert testified as to his opinions); *cf. Petrone v. Werner Enter., Inc.*, 42 F.4th 962, 969 (8th Cir. 2022) (explaining that Rule 1006 was an inappropriate vehicle to admit voluminous and complicated evidence in the absence of admissible expert testimony). Therefore, it was not error for the Court to admit these exhibits and Defendants' cited cases do not convince the Court otherwise. *See United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013) (explaining that a Rule 1006 summary must not "make arguments about the inferences the jury should draw," but in a case that involved no expert testimony);

---

[9] Defendants take issue with Stuckwisch's characterization of reviewing "thousands" of documents when only the unfulfilled invoice from Republic was discussed at trial. But the rule simply states that the underlying documents must be admissible and that "[t]he proponent must make the underlying originals or duplicates available for examination or copying," Fed. R. Evid. 1006(a)–(b); it does not state that the proponent must go through the laborious process of admitting each document reviewed. Regardless, Defendants do not object that the documents reviewed by Stuckwisch that are the basis for these summaries are themselves inadmissible.

36

*Last Atlantic Cap. LLC v. AGS Specialist Partners*, 262 F. Supp. 3d 641, 679 (N.D. Ill. 2017) (refusing to admit a summary under Rule 1006 where plaintiff's partner manipulated the data by applying certain parameters and assumptions); *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 932–33 (C.D. Ill. 2014) (implying that an expert's summary may be allowed under Rule 1006 so long as the opinions and analysis meet the requirements of expert opinion evidence); *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 819, 835–36 (C.D. Ill. 2014) (excluding the bank's spreadsheet because it was not a summation of documents and instead "pure argument").

### B.     Lost-Profits Theory

Defendants further argue that a new trial is required because Illinois's "new business rule" does not permit the recovery of lost profits in his case. For the same reasons given above, *supra* Part I.C.1., the Court disagrees.

### C.     Expert Testimony and Damages Awards

Next, Defendants argue that a new trial or remittitur should be granted because it was manifest error for the Court to admit Stuckwisch's testimony and the jury's award was against the manifest weight of the evidence. For the following reasons, the Court finds that it was not erroneous to admit Stuckwisch's testimony, but that her testimony and the evidence did not support the lost profits as to Waste Management and Republic.

First, Defendants argue that Stuckwisch did not use a replicable, accepted methodology. *See* Fed. R. Evid. 702(c)–(d) (requiring that testimony be "the product

37

of reliable principles and methods" and reflect "a reliable application of the principles and methods to the facts of the case"). Although Stuckwisch claimed to perform a "before-and-after" profit analysis, Defendants contend that she did not properly perform the analysis according to the Association of International Certified Professional Accountants ("AICPA"). The AICPA's "before-and-after" methodology requires the expert to construct a counterfactual world of the party's but-for revenue (the "before") and compare it to the party's actual performance after the allegedly infringing event or action (the "after"). R. 696-9 at 37. The AICPA further says that "[b]ut-for revenues under this method typically rely on the plaintiff's historical accounting records." *Id.* Stuckwisch admitted at trial, Tr. 1092, and during the *Daubert* hearing, R. 745 at 60–61, that she did not receive or review any of Sonrai's financial records.

Defendants are correct that financial records are the most reliable and relevant way to determine lost profits, and the Court finds it peculiar that no such financial records were produced to Stuckwisch. But the Court finds it all the more peculiar that in the nearly six years this case was in discovery with the assigned-magistrate judge, such records were never produced, especially since Sonrai has existed since 2007 and Vector since 2014. Indeed, Defendants do not direct the Court to any instance where Defendants requested Sonrai's financial records, Sonrai refused to produce them, the magistrate judge compelled their production, or Sonrai filed a sworn declaration that those records do not exist. Although Sonrai carries the burden of proof, the absence of Sonrai's financial records is simply unexplained.

In any event, the AICPA indicates that the before-and-after methodology "typically" relies on historical accounting records, but it does not foreclose other means of calculating but-for revenues. Stuckwisch's expert reports indicate that she based her lost profits analysis on pretrial depositions and invoices. *See* 696-1, ¶¶ 42,[10] 142; *see also* R. 745 at 23, 61–64. Stuckwisch's testimony at trial was consistent with her report. Although her conclusions are based on seemingly cobbled together record evidence, her methodology, as the Court found in ruling on the *Daubert* motion, R. 761 at 6, is not so inconsistent with the AICPA as to warrant exclusion. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765-66 (7th Cir. 2013) (District courts must ensure "that the expert is using a valid methodology (scientific or otherwise), that there is sufficient data to justify the use of the methodology in the particular case, and that the expert applied the methodology appropriately."). Defendants could have further explored with Stuckwish her failure to consider historical financial records. Instead, they attempted to discredit Stuckwisch through their own expert, Ambreen Salters. Tr. 1182–85. The jury decided to credit Stuckwisch over Salters, which it was entitled to do and does not result in its verdict being against the manifest weight of the

---

[10] Notably, this paragraph indicates that Vector's revenue was $500,000 in 2015 and cites to Dennis Keizer's January 15, 2019 deposition. Meaning, Defendants had years to figure out how that number was calculated. Yet, that figure, to this day, remains largely undisputed and Keizer testified to this figured, unrebutted, at trial. This number is also not an internal projection of anticipated performance, which distinguishes Stuckwisch's methodology from those cases cited by Defendants. *See Endless River Techs., LLC v. TransUnion, LLC*, 2025 WL 233659, at *8 (6th Cir. Jan. 17, 2025) (finding expert's testimony unreliable where he based his calculations on plaintiff's profit projections to the exclusion of its actual real-world earnings); *Victory Records, Inc. v. Virgin Records Am., Inc.*, 2011 WL 382743, at *2 (N.D. Ill. Feb. 3, 2011) (excluding expert that based his opinion on plaintiff's internal projections).

39

evidence. Defendants had their opportunity at trial to convince the jury of the flaws of Stuckwisch's inputs and conclusions, and in some sense succeeded since the jury significantly reduced the award from that proposed by Stuckwisch. But this is not a basis for a new trial.

Defendants further argue that Stuckwisch made no effort to consider, explain, or discount the damages that resulted from non-Defendant activities. Defendants made a similar argument in their *Daubert* motion, with which the Court disagreed. R. 761 at 7–9. Although courts have excluded expert testimony that fails to account or correct for other "salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining," *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2004 WL 1613563, at *8 (N.D. Ill. July 19, 2004), Stuckwisch reasonably explained how Defendants' actions caused Sonrai's lost profits and why other factors did not affect her calculation. *See* Tr. 1075–78, 1121–29; R. 761 at 8–9 (explaining there is evidence that Defendants caused Sonrai to lose customers and Sonrai could only lose the revenue stream once); *see also* R. 657 at 19 ("Stuckwisch's conclusion traces damages back to specific conduct by each Defendant."). Stuckwisch need not account for "every alternative cause," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013), so long as she has explained why an alternative cause was not the sole cause, *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *25 (N.D. Ill. Mar. 31, 2017). Further disagreements with an expert's handling of

40

alternative explanations go to weight, not admissibility. *Id.* Whether Defendants proximately caused Sonrai's damages was ultimately a jury question.

Defendants also argue that Stuckwisch has no waste collection industry experience, spoke to no customers or industry experts, and corroborated her assumptions with no one but Sonrai. *See Turubchuk v. S. Ill. Asphalt Co.*, 958 F.3d 541, 554–55 (7th Cir. 2020) (concluding that it was an abuse of discretion to exclude an expert who explained the reasons for his settlement valuation which was "rooted" in his decades of experience). But Stuckwisch did conduct industry research. *See* Tr. 994; R. 761 at 7. And she does not need waste-collection experience or expertise to opine on lost profits so long as her opinion relies on a principled methodology applied to the facts of the case. *See* Fed. R. Evid. 702(c)–(d). Defendant's remaining concerns were grounds for cross-examination.

Finally, Defendants argue that Stuckwisch's assumptions that Vector would be rolled out fleetwide for the lost customers were not supported by the evidence. *See TAS*, 491 F.3d at 635 ("Illinois courts have not hesitated to reverse damage awards based on false assumptions or data as speculative."); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995 (7th Cir. 2002) (reversing district court's damages award where damages expert's opinion was not grounded in record evidence and "based on nothing more than guesswork"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (holding that the expert's "economic damages model relied on several empirical assumptions that were not supported by the record"); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("The question is not whether the opinion is based

41

on assumptions, but whether there is some factual support for them. If there is not, they are by hypothesis unreliable[.]"). Stuckwisch stated in her report, R. 696-1, ¶ 73, and at the *Daubert* hearing, R. 745 at 23, 53, that there was evidence that Sonrai was going to be installing Vector for the five haulers. Recall that the jury awarded lost profits for Progressive, Waste Management, and Republic.

At trial, there was sufficient evidence for Stuckwisch to assume that Progressive would install Vector fleetwide. *See* PTX6 (Progressive RFI to the industry for "single in-vehicle technology . . . compatible with our vehicle fleet"); PTX20 ("Sonrai has just landed its first major contract" with Progressive "to retrofit all 4,900 RCVs . . . with Vector"); PTX24; PTX58. Indeed, Progressive had purchased a number of Vector units and began testing the potential for a fleetwide rollout in the Region of Peel. *See* Tr. 316, 569. Stuckwisch's fleetwide opinion for Progressive was not based on say-so, as Defendants contend. Moreover, Defendants point to their own evidence that fleetwide rollouts had never been seen in the industry, R. 800 at 20–21, but there was also evidence to suggest that Progressive was considering it. Therefore, the Court will not grant a new trial on the damages awarded for Progressive. Nor will the Court remit it. The jury's award of $5.19 million is not outside the range of fair and reasonable, especially considering Stuckwisch opined that lost profits for Progressive was $13.2 million. *See Rainey v. Taylor*, 941 F.3d 243, 253 (7th Cir. 2019).

However, the Court finds that Stuckwisch's assumptions as to fleetwide rollouts for Waste Management and Republic were based on conjecture, and thus the damages opinions as to these customers were far too speculative. For Waste

42

Management, Sonrai argues that Stuckwisch relied on evidence showing that the "entire industry" wanted a Connected Truck. PTX24. But nowhere in that exhibit does it mention Waste Management contracting with Sonrai or wanting Vector. And basing a fleetwide assumption on a "want" is pure conjecture. Waste Management also sent an email to Geotab requesting that all chassis data go through Sonrai, which Stuckwisch opined was "a broader arrangement with Waste Management." Tr. 1061. But to conclude that a "broader arrangement" equates to a commitment to purchase Vector for an entire fleet, when Waste Management had never purchased a Vector product, is a factual assumption too far. Further, Stuckwisch saw a December 2014 email that Heil would be meeting with Waste Management's CEO to discuss "on-board fleet/route optimization capability 'stories,'" which Sonrai describes as a pitch of the Connected Truck fleet wide. PTX51; Tr. 1062–63. Yet this email says nothing about Waste Management's commitments to Sonrai, interests in Vector, or interest in fleetwide technology. And although the jury heard that Heil eventually secured a Waste Management contract for Enhance in 2019, Tr. 1635, Stuckwisch disavowed relying on Enhance's sales data to compute Sonrai's damages and stated that Vector and the Enhance product eventually installed were not comparable. *Id.* at 1026–27, 1029.

As for Republic, Stuckwisch relied on an unsigned quote for 48 Vector units, PTX163, and she admitted that she had no evidence that Republic ever paid for or installed those units. Tr. 1103–04. Indeed, Keizer admitted that Republic never purchased those Vector devices. *Id.* at 371. Stuckwisch also testified that she relied

43

on an email wherein Heil and 3rd Eye employees discussed Republic's desire to have 3rd Eye Cam in its entire feel by the end of 2017. PTX224.[11] But this document does not discuss Vector nor Enhance and Stuckwisch later conceded that this email says nothing about Republic considering a fleetwide rollout. Tr. 1080–81. Sonrai further cites to Defendants' demonstrative video of 3rd Eye's technology, but that presentation was given after Stuckwisch testified and does not support Stuckwisch's lost-profits damages. The Court is also unpersuaded by Sonrai's argument that it had longstanding relationships with Waste Management and Republic such that they would "likely [ ] become purchasers." R. 808 at 9. That is not enough to support a fleetwide assumption.

Therefore, Stuckwisch's opinion that Waste Management and Republic would have had fleetwide rollouts of Vector is based on conjecture or speculation, and thus her opinion cannot support the damages awarded as to Waste Management and Republic; it would also be a manifest error of law and fact to allow them to stand. *See Smart Mktg.*, 624 F.3d at 833 (reversing district court's denial of a Rule 59 motion where the "damage award fell so far outside anything the evidence might have supported"); *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1367–68 (7th Cir. 1996) (finding that the jury's award was excessive, had not basis in the evidence, and "lies in the extreme degree of speculation"). Instead of granting a new

---

[11] Stuckwisch testified to the contents of PTX224, but it was never admitted into evidence. During closing arguments, Sonrai's counsel published the exhibit to the jury and argued that "the whole industry was taking hold." Tr. 1747–48. Despite the Court giving a curative instruction, *id.* at 1761–62, Defendants argue this warrants a new trial. But because the damages for Republic will be remitted, this argument is moot.

trial on these customers, the Court finds it more appropriate to remit these damages entirely. *See Baier v. Rohr-Mont Motors, Inc.*, 174 F. Supp. 3d 1000, 1007 (N.D. Ill. 2016) (explaining that the court must "ensure that the award is supported by competent evidence" and that "[i]f the Court finds that damages are excessive, the proper remedy is remittitur rather than a new trial") (citations omitted). Thus, the remaining compensatory damages amount is $5,195,441.

### D.    Punitive Damages

Heil additionally argues that the $30 million punitive damages against it should be vacated or reduced.[12] "While States possess discretion over the imposition of punitive damages, . . . [t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). In reviewing punitive damages, the Court must consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. Heil contends that only the first two guideposts are relevant.

> In evaluating Heil's reprehensibility, the Court must consider whether:
>
> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct has financial vulnerability; the conduct involved repeated actions or was an isolated incident; and

---

[12] Romano does not contest his punitive damages of $1.

the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* at 419. If none of these factors weigh in favor of the plaintiff, the award is "suspect," and even if one factor weighs in the plaintiff's favor, that may not be enough to sustain the punitive award. *Id.* Finally, since a plaintiff is presumed to be made whole by the compensatory award, punitive damages should be awarded only if the defendant's conduct is "so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

Here, there was no physical harm or indifference to or reckless disregard of the health or safety of others. The Court is not entirely sure about the financial vulnerability of Sonrai because its financial documents were never admitted, but there was testimony that it had the financial backing of the Flood Brothers, Chris Flood's family business. *See Epic Sys.*, 980 F.3d at 1141. For example, Chris Flood testified that Flood Brothers had supplied "over a million" dollars to Sonrai and that if Sonrai needed "working capital," Flood Brothers would have given it. Tr. 586–87. Indeed, Stuckwisch calculated working capital to be zero because it "would be provided by the Flood Brothers." *Id.* at 1119. These factors weigh against finding Heil's conduct reprehensible.

Applying the fourth and fifth factors, there was legally sufficient evidence that Heil's conduct did involve a repeated course of wrongful acts and that the harm was the result of intentional malice. After knowing that the relationship between Romano and Sonrai had soured, Heil began reaching out to Romano, telling him to get a new phone and email address, and expressing concern that Sonrai may be worried about

46

Romano doing something with Heil. Romano told the Heil executives that he would pay them back in spades. Heil—while the Letter Agreement's non-solicitation provision was still in effect—then signed a consulting contract with Romano's company and named Romano as a part of the core team for Enhance. True, there is no direct evidence of Heil directing Romano to steal Sonrai's proprietary information and use it while he was at Heil, but there is enough evidence for the jury to reasonably infer that nefarious activities were afoot and that Heil was at the center of it. These factors weigh in favor of finding Heil's conduct reprehensible. On balance, the Court finds that Heil's conduct warrant punishment, but not in the amount of a $30 million punitive-damages award. *Epic Sys.*, 980 F.3d at 1142.

Turning to the second guidepost, the Court analyzes the ratio of punitive damages to the "harm, or potential harm" inflected on the plaintiff. *Campbell*, 538 U.S. at 424. "In most cases, the compensatory-damages award approximates the plaintiff's harm. In those cases, identifying the ratio is straightforward: [the Court] compare[s] compensatory and punitive-damages awards." *Epic Sys.*, 980 F.3d at 1142; *see also Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) ("Because compensatory and punitive damages are correlated, they must be considered jointly."). The jury originally awarded $28.9 million in compensatory and $30 million in punitive, meaning the jury awarded, roughly, a 1:1 ratio. The Court will maintain this ratio. Since only the damages award as to Progressive remains, the punitive damages awarded against Heil is reduced to $5,195,441.

### III.    Motion for Prejudgment Interest

Sonrai moves to include prejudgment interest and for ongoing compensatory damages. When exercising diversity jurisdiction over state-law claims, such as here, the Court looks to state law to determine whether prejudgment interest is appropriate. *See FDIC v. Chi. Title Ins. Co.*, 12 F.4th 676, 686 n.8 (7th Cir. 2021). Under Illinois law, prejudgment interest is proper when authorized by statute or agreement of the parties, or when warranted by equitable considerations. *See id.*; *Tri-G*, 222 Ill.2d at 255.

Sonrai does not argue that any statute authorizes prejudgment interest. Sonrai does contend that the Letter Agreement specifically provides for contractual prejudgment interest because it states that the aggrieved party "shall be entitled to seek equitable relief" and "all other remedies available to it at law or in equity." R. 798-1 at 6. But Sonrai is only entitled to prejudgment interest for contractual damages "if the damages are subject to easy computation," *Smart Mktg.*, 624 F.3d at 834, or liquidated, *Oldenburg v. Hagemann*, 207 Ill. App. 3d 315, 327 (1991). The Letter Agreement mentions nothing explicit about prejudgment interest and the damages sought by Sonrai are clearly not liquidated. Nor were they easily computed—indeed, an entire trial was needed to determine lost profits. Thus, Sonrai cannot seek prejudgment interest under the Letter Agreement.

Sonrai further contends that prejudgment interest is appropriate based on the jury's verdicts for breach of fiduciary duty and tortious inducement of breach of fiduciary duty and its finding of malice. "Illinois law treats a claim for breach of

48

fiduciary duty as an equitable claim, and Illinois law allows for an equitable award of prejudgment interest in such cases." *Chi. Title*, 12 F.4th at 687. The rationale for awarding prejudgment interest in such cases is to "make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." *In re Estate of Wernick*, 127 Ill.2d 61, 87 (1989). While "[t]here is no express requirement that the unfaithful fiduciary have wrongfully withheld money from the plaintiff," the Seventh Circuit has observed that "it is a nearly universal feature in the Illinois fiduciary cases" that there must be a "withholding of funds." *Chi. Title*, 12 F.4th at 687–88 (denying prejudgment interest in a case where the fiduciary enabled others to defraud the victim).

Here, although Sonrai was awarded damages, it was not based on any withholding of funds or other property. Although Romano breached his fiduciary duty and Heil induced him to do so, which caused Sonrai to lose profits, the law simply does not allow prejudgment interest in this circumstance. Sonrai's authority does not convince the Court otherwise. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (awarding prejudgment interest under federal common law); *Wernick*, 127 Ill.2d at 87 (reversing denial of prejudgment interest where the defendant deprived the plaintiff's use of funds for a time); *Murphy v. Richert*, 2021 WL 2156448, at *32 (N.D. Ill. May 27, 2021) (awarding prejudgment interest under the Illinois Interest Act where defendant breached her fiduciary duty by failing to distribute an intestate share). And this is not a trade secrets case, making inapposite *Chemetall GmbH v. ZR Energy, Inc.*, 2001 WL 1104604, at *16

49

(N.D. Ill. Sept. 18, 2001) (pre-*Chicago Title* trade secrets case awarding prejudgment interest, reasoning that "the trade secret misappropriation here is tantamount to fraud, which plainly falls within the equitable authority to recompense").

Finally, Sonrai seeks a running royalty for the continued misuse of Sonrai's proprietary information. But this is neither a trade secrets nor patent infringement case. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 2021 WL 6690279, at *3 (N.D. Ill. Dec. 14, 2021) (awarding ongoing royalty in a trade secret case); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 2018 WL 11650974, at *2 (N.D. Ill. July 31, 2018) (granting an ongoing royalty in a patent infringement case). And royalty damages were never mentioned in the complaints, in Stuckwisch's expert reports, at trial, or anywhere—except now, after trial and a jury verdict. Sonrai cannot use a motion for prejudgment interest as a vehicle to get damages for something it never sought. Therefore, Sonrai's motion for prejudgment interest and ongoing compensation is denied.

## Conclusion

For the foregoing reasons, Defendants' motions for judgment as a matter of law and for a new trial are denied. Defendants' motion for remittitur is granted in part and denied in part. Defendants' compensatory damages are reduced to $5,195,441 in lost profits for Progressive and Heil's punitive damages are reduced to $5,195,441. Further, Sonrai's motion for prejudgment interest and ongoing compensation is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: May 22, 2026

51